**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| ASHLEY PIERRELOUIS, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:18-cv-04473 |
| Plaintiff, | Hon. Jorge L. Alonso |
| v. | |
| GOGO INC., MICHAEL J. SMALL, NORMAN SMAGLEY, BARRY ROWAN, and JOHN WADE, | |
| Defendants. | |

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
**TO DISMISS THE AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    STATEMENT OF FACTS ........................................................................... 3

    A.    Background Regarding 2Ku Global Satellite System ............................. 3

    B.    Gogo's Future Was Tied To The Success Of The 2Ku System ........................... 3

    C.    Defendants Admit That 2Ku Is Defective ............................................. 4

    D.    The Full Extent Of The Issues With The 2Ku System Are Only Disclosed Following Removal Of The Company's Longtime CEO ...................................... 6

III.   ARGUMENT ............................................................................................. 7

    A.    Defendants' Materially False Or Misleading Statements ....................................... 7

        1.    Defendants' Statements And Omissions Concerning The 2Ku Systems Were Materially False And Misleading ..................................... 8

            (a)    Defendants' November And December 2017 Statements Were False ........................................................................... 9

            (b)    Defendants' February 2018 Statements Were False .................... 12

            (c)    Defendants' Pre-November 2017 Statements Were False When Made ............................................................................ 14

    B.    Defendants' Misrepresentations Are Not Protected By The Safe Harbor ........... 15

        1.    Many Of The Core Misrepresentations Are Not Forward-Looking Statements, But Statements Of Present Conditions ................................. 16

        2.    The Safe Harbor Does Not Protect Material Omissions .......................... 16

        3.    The Safe Harbor Does Not Protect Any Of Defendants' Misstatements From Liability ............................................................. 18

    C.    Defendants Acted With Scienter ......................................................... 20

1.      Defendants' Knowledge Of Facts And Access To Information Contradicting Their Public Statements Support A Strong Inference Of Scienter ........................................................................................... 22

2.      Additional Factors Further Strengthen The Inference Of Scienter .......... 26

3.      Gogo Acted With Corporate Scienter ....................................... 29

IV.     DEFENDANTS ARE LIABLE AS CONTROL PERSONS ........................................... 30

V.      CONCLUSION ........................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ............................................................... 8

*Arnlund v. Deloitte & Touche LLP*,
  199 F. Supp. 2d 461 (E.D. Va. 2002) .................................................... 27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................ 7

*Asher v. Baxter Int'l Inc.*,
  377 F.3d 727 (7th Cir. 2004) ................................................................ 18

*Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................. 19, 21

*Blatt v. Corn Prods. Int'l, Inc.*,
  2006 WL 1697013 (N.D. Ill. June 14, 2006) ........................................ 18

*Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) .................................... 14, 15

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ................................... 14, 17

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ........................................... 10

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) .......................................... 27

*Good v. Zenith Elecs. Corp.*,
  751 F.Supp. 1320 (N.D. Ill. 1990) ....................................................... 20

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) .................................................... 16

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................. 28

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ............................................................... 8, 29

*In re Carter-Wallace, Inc. Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000) .................................................................. 21

*In re Complete Mgmt. Inc. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) ................................................ 17

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012) ................................................ 28

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) .............................................................. 20

*In re MF Global Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................ 19

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................. 27

*In re Next Level Sys., Inc.*,
   1999 WL 387446 (N.D. Ill. Mar.31, 1999) ........................................ 20

*In re Oxford Health Plans Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................ 17

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ..................................... 16

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) ................................................. 26

*In re Spiegel, Inc. Sec. Litig.*,
   382 F. Supp. 2d 989 (N.D. Ill. 2004) ................................................. 17

*In re St. Jude Med., Inc. Sec. Litig.*,
   836 F. Supp. 2d 878 (D. Minn. 2011) ................................................ 28

*In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*,
   604 F. Supp. 2d 1188 (N.D. Ill. 2009) ............................................... 20

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996) .................................................................. 19

*Jensen v. Thompson*,
   2018 WL 1440329 (D.S.D. Mar. 22, 2018) ........................................ 10

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d 1014 (N.D. Ill. 2010) ......................................................... 9

*Kas v. Caterpillar, Inc.*,
  815 F.Supp. 1158 (N.D. Ill. 1992) ............................................................. 20

*Kohut v. KBR, Inc.*,
  2015 WL 11995250 (S.D. Tex. Sept. 3, 2015) ........................................ 30

*Lindelow v. Hill*,
  2001 WL 830956 (N.D. Ill. July 20, 2001) .............................................. 19

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .......................................................... *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) .......................................................... 7, 8, 28

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
  2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012) ......................................... 28

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................. 11

*Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*,
  388 F. Supp. 2d 871 (N.D. Ill. 2004) ........................................................ 18

*Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*,
  2017 WL 6039926 (N.D. Ill. Dec. 6, 2017) ................................... 8, 11, 12

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) .................................................................... 7

*Rehm v. Eagle Fin. Corp.*,
  954 F. Supp. 1246 (N.D. Ill. 1997) .................................................... 23, 25

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .................................................................... 19

*Ross v. Career Educ. Corp.*,
  2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ............................................ 27

*Rubinstein v. Gonzalez*,
  241 F. Supp. 3d 841 (N.D. Ill. 2017) ....................................................... 21

*Sequel Capital, LLC v. Rothman*,
  2003 WL 22757758 (N.D. Ill. Nov. 20, 2003) .................................................. 10, 14

*Shah v. Zimmer Biomet Holdings, Inc.*,
  348 F. Supp. 3d 821 (N.D. Ind. 2018) .................................................. 20

*Simpson v. Nickel*,
  450 F.3d 303 (7th Cir. 2006) .................................................. 7

*Siracusano v. Mattrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) .................................................. 19

*Stransky v. Cummins Engine Co.*,
  51 F.3d 1329 (7th Cir. 1995) .................................................. 13, 20

*Takara Tr. v. Molex Inc.*,
  429 F. Supp. 2d 960 (N.D. Ill. 2006) .................................................. 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................. 12, 21, 22, 28

## STATUTES

15 U.S.C. §78u-4(b)(1) .................................................. 7, 8

15 U.S.C. §78u-5(c) .................................................. 18

15 U.S.C. §78u-5(c)(1)(A) .................................................. 18

## RULES

Fed. R. Civ. P. 12(b)(6) .................................................. 7

Lead Plaintiffs Maria Zingas and Daniel Rogers ("Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss filed by defendants Gogo Inc. ("Gogo" or the "Company"), Michael J. Small, Normal Smagley, Barry Rowan and John Wade. (collectively, the "Individual Defendants," and together with Gogo, "Defendants").

## I.     PRELIMINARY STATEMENT

Gogo provides in-flight internet connectivity services using the Company's antenna and satellite-based system, 2Ku.  During the Class Period,[1] Defendants repeatedly misrepresented the status and true costs of 2Ku, which was Company's largest and most important project, to investors.  Defendants touted the installation progress of 2Ku systems, but failed to disclose that 2Ku had a fundamental design flaw – the use of de-icing fluid on the planes in cold weather rendered 2Ku inoperable.  Given the nature of the repair process, planes would often go several weeks before being fixed, and when the system was down, customers were unable to access Gogo's internet services, negatively impacting the Company's revenue and income.

Defendants claim that this case is simply one of "fraud-by-hindsight," and argue that the information about 2Ku's design defect was timely disclosed.[2]  But the well-pled allegations of the Amended Class Action Complaint ("Amended Complaint" or "AC") tell a different story. ECF No. 55.   For example, Defendants repeatedly claimed that the system was ***already***

---

[1] Plaintiffs bring this action as a class action on behalf of the purchasers of Gogo's securities between February 27, 2017 and May 7, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934.

[2] *See* ECF No. 64, Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("MTD") at 8, 24-25.  Unless otherwise noted, all emphasis in this brief has been added and internal quotation marks and citations have been omitted.

Defendants refer to a number of documents attached to a declaration of counsel. ECF No. 65. Plaintiffs have no objection to Defendants' references to these documents, except to the extent that Defendants rely on them for the truth of the matters asserted therein.  *See, e.g.*, *In re Shopko Sec. Litig.*, 2002 WL32003318, at *2 (E.D. Wis. Nov. 5, 2002) (on a motion to dismiss securities fraud claims, courts may consider SEC filings "only to determine what disclosures the defendants made," not "for the truth of the … disclosures contained therein").

delivering 15-plus megabits per second speed to connect the passengers to the Internet; and had 98% coverage of global flight hours and 98% service availability, all vital metrics for the system In reality, however, service availability was admittedly only in the mid 80s.

Additionally, the problems with 2Ku systems were so severe that Delta Air Lines was forced to intervene in multiple aspects of Gogo's operations, because it lacked faith in Gogo's ability to remedy 2Ku's issues. This fact, along with others relating to the scale and ramifications of 2Ku's defect, were not disclosed to investors during the Class Period. Instead, the true scope of the defect and its impact on the Company, requiring Gogo to, *inter alia*, "ramp up" spending during winter 2017-2018 to fix reliability issues, was not adequately disclosed until *after* the Company's long-term President and CEO, Defendant Small, was removed from his position and the Board of Directors and a new CEO was appointed.

Under the facts alleged, Defendants' arguments about a purported lack of falsity and the application of the PSLRA safe harbor are unavailing. The central misstatements at issue in this case are not forward-looking statements, but statements of ***present*** conditions regarding the status of 2Ku that were verifiably false when made. Moreover, the safe harbor does not protect ***omissions***, including Defendants' failure to disclose the significant issues that Gogo was experiencing with 2Ku's design flaw and the associated costs.

The Amended Complaint's allegations also raise a strong inference of scienter. Among other things, the Company's admissions following the Class Period raise both: (i) a strong inference that the Defendants knew their statements were false and misleading when made, and; (ii) an overwhelming inference that Defendants were at the very least reckless as to the truth or falsity of their statements. The inference of scienter is made even more compelling by the centrality of 2Ku to the Company's operations, the performance metrics of which Gogo's

executives tracked in real time, as well as the timing of Gogo's CEO's removal.

## II.    STATEMENT OF FACTS

### A.    Background Regarding 2Ku Global Satellite System

Gogo provides in-flight internet connectivity services.  ¶ 28.  Gogo integrates its hardware and software on airplanes with satellite and ground-based networks to provide internet and entertainment services for commercial and business aircraft.  *Id.*  Gogo's 2Ku system is an antenna and satellite-based system for airline internet service.

Gogo announced the 2Ku system in 2014.  At that time, Gogo expected to deploy 2Ku for commercial use in late 2015. ¶ 32.  Amongst other airlines, Delta Air Lines ("Delta"), which accounted for more than 25% of Gogo's revenues in 2015-17, selected Gogo to provide 2Ku on more than 250 aircraft, with installations to begin by 2016.  ¶ 35.

As of December 31, 2016, 2Ku was installed on 94 aircraft and the system had been installed (or selected for installation) on over a dozen airlines. ¶ 32.  By February 2017, Gogo had installed 2Ku on 130 aircraft and had secured additional 2Ku contracts or agreements with Air Canada, British Airways, Iberia, and Air France-KLM. Gogo also told the investors that it was expecting to install an additional 450 to 550 2Ku systems during 2017.  ¶ 39.

### B.    Gogo's Future Was Tied To The Success Of The 2Ku System

Gogo's future success required the successful implementation of 2Ku systems.  The Company's 2Ku purported to provide faster speeds and more revenue.  As Defendant Small explained on November 9, 2016, 2Ku systems could lead to an increase in Gogo's average revenue per aircraft: "So the whole story is more bandwidth, more revenue, and that's a fundamental issue. And we are starting the process in North America of conversions to 2Ku, about 800 of the backlog is 2Ku conversions in North America. ***As we start doing those, not***

*only that those planes start seeing higher average revenue per aircraft, when we switch from ATG to 2Ku, we see about a 30% increase.*"[3]  Similarly, before the Class Period, Defendant Small touted 2Ku's operational capacity, claiming it was better engineered, improving reliability.

> Yes, so 2Ku is a proprietary solution for Gogo. Its number one benefit is it's nearly twice as spectrally efficient. So, it is rare in business that you can have half the cost structure of your competition. But, we buy a given amount of satellite capacity, and we get twice as many bits out of it. That's benefit one.
>
> *Second, it has fewer moving parts and, frankly, we think better engineered. So, we get that 99% reliability. We often watch the competition struggle to get to 90% availability*. And even on our now two-year-old, three-year-old Ku technology, we're struggling to get to 98%. *So, this is inherently more reliable and available technology.*  ¶ 38.

## C.   Defendants Admit That 2Ku Is Defective

At the end of the Class Period, the Company's CEO, Oakleigh Thorne, admitted that, during the Class Period, 2Ku systems were defective.  As he explained, "[l]ast summer, 2Ku was our most successful product launch ever with greater than 98% service availability. And then came winter and availability plunged down to the mid 80s. The major cause with de-icing fluid getting into the antenna raceways in which the antenna discs spin."  ¶ 62.[4]  He further explained that the issues, which existed throughout the Class Period, were also due to "some manufacturing issues and software issues."  *Id.*

Defendants were certainly aware of this issue as 2Ku systems had been installed on a number of planes during the 2016-2017 winter.  It is illogical to argue that this design defect was not uncovered in *any* of the 130 aircraft that had 2Ku systems installed prior to the Class Period. The Company conceded this fact in November of 2017 when it admitted that "seasoned" aircraft

---

[3] Unless otherwise indicated, all emphasis is added and all citations and quotations are omitted.

[4] The de-icing fluid would permeate the compartment in which 2Ku was installed when sprayed on planes by airport personnel. The compartment, also referred to as the "radome" or "radar dome," had ventilation valves that allowed de-icing fluid to come into contact with the 2Ku system, which contained disc-like antennas stacked on top of one another that would rotate in different directions. When de-icing fluid entered 2Ku's radome, the fluid would make the antennas "sticky" and unable to function properly.  ¶ 55.

with 2Ku systems had less service margin and greater ARPA[5] than planes with recent system installation.  ¶¶ 110-11.

As the weather cooled, necessitating the need for de-icing fluid, the issues with the installed 2Ku only intensified.   Delta specifically notified Gogo that 2Ku systems were not working as early as November or December 2017.  ¶ 56.  The Company was admittedly aware of this fact.  Indeed, in a January 22, 2018 article, Blane Boynton, vice president of product management at Gogo admitted that "Much like a DirecTV dish has problems in heavy rain, deicing fluid is like a concentrated thunderstorm."[6]

By February 2018, Delta had issued a memorandum to cabin crews highlighting 2Ku's reliability issues and detailing a Delta action plan which called for the carrier becoming more involved in 2Ku maintenance (the "McDermott memo").[7]   In fact, the McDermott memo explained that Delta's "TechOps[8] has stepped in to assist Gogo in troubleshooting and diagnostics of 2Ku, stating that TechOps 'is involving itself in multiple aspects of Gogo's operations. Some of these are on a temporary basis and some will be permanent.'"  *Id.*  The memorandum further explained that "TechOps has begun working directly with component manufacturers in order to design improvements into the 2Ku hardware, while Gogo is increasing its stock level in order to better facilitate antenna replacements."  *Id.*  The fact that Delta had already determined that its TechOps needed to help facilitate design improvements of 2Ku demonstrates that Delta had concluded that Gogo was not sufficiently capable of fixing the issues without Delta's support.  Delta had been in discussions with Gogo for months about the issue.

---

[5] ARPA represented Gogo's average revenue per aircraft. ¶ 50.

[6] Jonathan M. Gitlin, *An end to in-flight Wi-Fi misery is at hand with Gogo's 2Ku*, ars Technica (Jan. 22, 2018, https://arstechnica.com/cars/2018/01/an-end-to-in-flight-wi-fi-misery-is-at-hand-with-gogos-2ku/

[7] Jason Rabinowitz, *Delta deepens involvement in 2Ku MRO in face of reliability issues*, Runway Girl Network (Feb. 27, 2018, https://runwaygirlnetwork.com/2018/02/27/delta-deepens-involvement-in-2ku-mro-in-face-of-wi-fi-reliability-issues/

[8] Delta TechOps is the maintenance, repair and overhaul (MRO) division of Delta Air Lines.

Certainly, Delta, one of the largest airlines in the world, did not whimsically decide to take over the design of one of its contractors' products.

###### D.   The Full Extent Of The Issues With The 2Ku System Are Only Disclosed Following Removal Of The Company's Longtime CEO

Even though the Company was aware of the substantial issues with 2Ku – problems so great that Delta itself stepped in to fix the issue – Defendants failed to fully disclose the problems to the public.  Instead, on February 22, 2018, Defendants choose to tout record revenue for the Company and stated that "Cash CAPEX increased to $220.5 million, up 66% from $133.1 million in 2016, primarily due to increased success-based airborne equipment purchases for 2Ku installations."  ¶ 121.  When discussing 2Ku issues, Defendant Wade represented that:  "We've identified the root cause of all of these issues, and have fixes for all of them that have either been deployed or in the process of being deployed. By midyear 2018, we expect the entire 2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving."  ¶ 122.   Additionally, Defendant Wade explicitly claimed that the problem had already been fixed:

> And on the reliability issues. It was actually really caused by the de-icing fluid, which was able to penetrate under some of the [radar,] which caused the antennas to temporarily get sticky, if you will. The fix to that was very easy to do, and we've deployed that on a number of aircraft and we're not seeing any further issues around that at this time.  ¶ 124.

On March 4, 2018, Michael Small stepped down from his positions as President and CEO of Gogo and resigned his position as a member of the Company's Board of Directors, effective immediately.  Oakleigh Thorne, the Company's largest investor, was appointed President and Chief Executive Officer, also effective immediately.  ¶ 22.

Thereafter, on May 4, 2018, Thorne, finally revealed the true extent of 2Ku's issues, as discussed above.  ¶ 62.  Additionally, in contrast to the Company's statements just months before

claiming that "the fix… was very easy to do[,]" Gogo executives finally admitted that the de-icing issues had a substantial, previously undisclosed, financial impact on the Company, and that Gogo was withdrawing its previously supplied financial guidance. ¶¶ 63-64. On this news, the Company's shares fell $1.73 per share or over 18% over the next two trading days to close at $7.86 per share on May 7, 2018, damaging investors. ¶ 65. That same day, after market close, Moody's downgraded Gogo's credit rating due to the 2Ku issue. ¶ 66. Gogo shares fell $2.80 per share or over 35.6% to close at $5.06 per share on May 8, 2018, further damaging investors.

## III. ARGUMENT

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court "tak[es] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008). "[The] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "[t]he plausibility standard is not akin to a 'probability requirement.'" *Id.*

### A. Defendants' Materially False Or Misleading Statements

In pleading falsity under the PSLRA, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). Although the PSLRA imposes a heightened standard of pleading, "[n]ot even the [PSLRA] requires proof as opposed to plausible allegations." *Simpson v. Nickel*, 450 F.3d 303, 306 (7th Cir. 2006). Ultimately, in evaluating whether a plaintiff has adequately pled falsity, the Court must determine "'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006), *as modified on denial of reh'g* (July 10, 2006), *vacated*

*and remanded*, 551 U.S. 308 (2007) ("*Tellabs I*")).  Under Rule 9(b), plaintiff need not "plead facts showing that the representation is indeed false." *Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, 2017 WL 6039926, at *9 (N.D. Ill. Dec. 6, 2017).

### 1. Defendants' Statements And Omissions Concerning The 2Ku Systems Were Materially False And Misleading

During the Class Period, Defendants fed investors materially misleading information about 2Ku systems and the Company's expected revenue.  Among other things, Defendants touted 2Ku systems and claimed that "2Ku is delivering the best performance in the industry, characterized by 3 numbers: 15, 98, 98.  This means 15-plus megabits per second speed to connect the passengers; 98% coverage of global flight hours and 98% service availability. This is the performance we are delivering today to 2Ku aircraft around the world." ¶¶ 44-45, 48.  Defendants touted 2Ku's performance despite the fact that during this period airlines held back on marketing the product, Gogo was forced to ramp up spending to fix reliability of 2Ku, and the Company had not achieved 98/98/15. ¶ 62.

The AC's allegations are supported by Plaintiffs' diligent pre-complaint inquiry, which "raise[s] a reasonable expectation that discovery will reveal" additional evidence of falsity and put Defendants on notice of Plaintiffs' claims.  *Devry*, 2017 WL 6039926, at * 9.[9]  Indeed, Defendants are sufficiently on notice of Plaintiffs' claims, as the AC's allegations set forth in clear and specific terms the information available to Gogo and why, given its possession of this

---

[9] *See also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1102 (10th Cir. 2003) ("The level of factual specificity required to meet [the PSLRA pleading] standard may put defendants on notice of precisely what they are alleged to have done wrong and permit them to defend against the charge."); *id.* at 1105 ("Although based on information and belief, [the complaint] alleges sufficient 'facts on which that belief is formed' to satisfy the pleading requirement of § 78u–4(b)(1) [because it] adequately puts the defendants on notice of the substance of the plaintiffs' claims, and the range, sources, and level of detail of the facts alleged demonstrate that this complaint is not frivolous or conclusory and deserves to proceed to the next stage of litigation."); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002) ("[T]he rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence [, and] Defendants' argument that even more detail be required, before there is any discovery, ... amounts to requiring plaintiffs to plead evidence.")).

information, Defendants' statements about 2Ku were misleading. In short, Plaintiffs have not asserted "fraud by hindsight," and the motion to dismiss must be denied. *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1020–21 (N.D. Ill. 2010).

>    **(a)  Defendants' November And December 2017 Statements Were False**

Problems related to Gogo's 2Ku increased in November 2017. ¶ 58. At this time, winter 2017-2018, Gogo had approximately 550 aircraft equipped with 2Ku systems. ¶ 32. Delta notified Gogo that 2Ku systems were not working, especially among Delta's northern routes. ¶¶ 56, 58. Given the nature of the repair process, planes would often go weeks before being fixed. ¶ 60. When a 2Ku system was down, airline customers were unable to access Gogo's services. In turn, this would impact Gogo's revenue, net income, and EBITDA. ¶ 61.

Nevertheless, Defendants did not disclose the de-icing issue to investors, and continued to tout 2Ku's performance, misleading investors and claiming, in November and December 2017, that Gogo was experiencing "increased take rates and improved ARPA on our satellite systems," claimed that EBITDA would be significantly higher in 2018 than in 2017, and described 2Ku's current operational performance as "15, 98, 98." *See, e.g.,* ¶¶ 98, 102, 104, 106, 110, 112. Indeed, on November 17, 2017, Small claimed, "[w]e describe the performance as 15, 98, 98. That's 15 megabits per second to the device, 98% of global flight hours, and 98% availability. This provides a ground-like experience everywhere aircraft fly." ¶ 106.

The Company's CEO, Oakleigh Thorne, later admitted that, during this period, the de-icing fluid's impact on 2Ku was two-fold:

> First, airlines held back on marketing the product, which hurt revenue. And two, we ramped up spending to fix reliability as soon as we could, which hurt costs. We'll see even higher spending in Q2 as our remediation plans ramp up further in that quarter. The costs are primarily around maintenance expense and CapEx for new antenna inventory. . . . My predecessor, Michael Small, talked about 98/98/15. That's 98% system availability, 98% flight route coverage and 15

> megabits per second speeds, and that's still our goal. We're achieving the 98% coverage, and we're achieving average 15 megabits per second speeds globally. But we slipped on the 98% system availability with our de-icing problems. ¶ 62.

As a result of the de-icing issue, Gogo was experiencing compromised take rates and ARPA, in turn impacting EBITDA (¶¶ 61, 63), and system availability of only about 80%, not 98% (¶ 62). Defendants' representations in November and December 2017 touting operations and 2Ku's performance were thus materially false and misleading. *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *19 (N.D. Ill. Feb. 13, 2013) (falsity alleged where defendants claimed that company equipment was in good operating condition while the company's facilities and equipment was degraded); *Sequel Capital, LLC v. Rothman*, 2003 WL 22757758, at *11 (N.D. Ill. Nov. 20, 2003) (where defendants have knowledge of the losses taking place within the company, future projections that speak glowingly of the company's future adequately alleged as misleading); *see also Jensen v. Thompson*, 2018 WL 1440329, at *11 (D.S.D. Mar. 22, 2018) (defendants' full year EBITDA estimate sufficiently alleged as materially misleading where complaint alleged facts demonstrating defendants knew of information contradicting their representations).

Gogo's issues with 2Ku and de-icing were highlighted by media reports of problems arising during the winter months of 2017-2018. One article, dated February 27, 2018, reported that Delta was compelled to create an "action plan," which Delta implemented in winter 2017-2018. The action plan required the airline to become "more involved in 2Ku maintenance."[10] Delta complained that Wi-Fi performance, specifically 2Ku, had been disappointing in recent months (winter 2017-2018), and "in some cases there [were] outages that took over 30 days to be corrected." Delta's action plan had TechOps stepping in to assist Gogo in troubleshooting

---

[10] Rabinowitz, *surpa* n.7.

and diagnostics of 2Ku, including managing multiple aspects of Gogo's operations.

Another article, dated January 22, 2018, was based on the author's demo of Gogo's 2Ku service.[11]  According to the article, Gogo provided the author a December 2017 round-trip ticket on Delta Air Lines, only for the article to report that:

> further testing on the return leg to DC ran into a hitch. Detroit is a cold place in December, and since ice and airplane control surfaces don't mix, a deicing stop on the way to the runway is often necessary. On this occasion, the deicing stop also wreaked havoc with the antennae . . .the flight attendant initiated a reset of the system just as it was about to finish rebooting, and since the rebooting process takes around 20 minutes, that basically ate up the entire flight time.

As is evident from these articles, the de-icing issues 2Kus experienced on Delta during winter 2017-2018 are documented on the internet, including the details about the 2Ku's antenna repairs.[12]  Plaintiffs are not required to list every source of information relied on in their investigation as long as the complaint pleads with particularity sufficient facts to support those beliefs.  *DeVry*, 2017 WL 6039926, at *6 ("under the PSLRA, private securities fraud plaintiffs not only must plead with particularity the factual circumstances constituting fraud, including by specifying the alleged misrepresentations and the basis for any allegations made on information and belief").  Plaintiffs have done so here.

Defendants' suggestion that the earliest Gogo knew about the de-icing issues is the end of December 2017 is a contrary factual assertion that may not be credited on a motion to dismiss.

---

[11] Gitlin, *surpa* n.6.

[12] Defendants assume that the AC's allegations stem from a confidential witness. But the *Runway Girl* article, for example, details Delta's complaints during winter 2017-2018 that the deicing fluid issue required a fix to prevent the ingestion of the fluid into the radome, reported that the system of making repairs to the 2Kus during overnight downtime with other cabin maintenance was unsatisfactory to Delta and required Delta to set hangar space aside for antenna replacements.  Moreover, even *if* some of the AC's allegations were based on other sources, the AC need only provide sufficient facts to provide an adequate basis for believing that the defendants' statements were false.  *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir. 2000) (holding that where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false).

Plaintiffs have alleged that Delta informed Gogo of 2Ku's de-icing issue in November 2017. The Court must credit the AC's factual allegation at the pleading stage. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007) ("*Tellabs II*") ("Faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.").

Moreover, the allegations are corroborated by publicly available information that Delta had complained about 2Ku's performance "in recent months" (preceding February 2018) and had already developed an action plan by February 2018 because Gogo's fixes to the radome were insufficient.[13] The AC states enough facts to "raise a reasonable expectation that discovery will reveal" additional evidence of falsity, or alternatively, to permit Defendants to marshal evidence disproving Plaintiffs' allegations, to survive Defendants' motion to dismiss. *DeVry*, 2017 WL 6039926, at *9.

**(b)     Defendants' February 2018 Statements Were False**

On February 22, 2018, Gogo held a call following its press release announcing its quarterly and year-end earnings. Defendant Small tasked his COO, Defendant Wade, with discussing 2Ku installation issues. Defendant Wade reported that 2Ku installs had not gone without challenges, chalking the issue up to "growing pains," reporting that "some aircraft [] saw degraded reliability." ¶ 122. Defendants assured investors that the Company had "identified the root cause of all of these issues, and ha[s] fixes for all of them that have either been deployed or in the process of being deployed." *Id.* In response to analyst questions about the Company's confidence in being able to fix 2Ku, Defendant Wade told investors that " [t]he fix to that [de-

---

[13] Moreover, Defendants' argument ignores that 2Ku systems were installed on planes during winter 2016-2017 and those 2Ku systems, like those 2Ku systems that experienced issues in the winter of 2017-2018, did not have the de-icing modification for the 2Ku antennas that prevented 2Ku system degradation, as the Company did not introduce the fix until ***December 2018***. *See infra*, n.14.

icing issue] was very easy to do, and we've deployed that on a number of aircraft and we're not seeing any further issues around that at this time." ¶ 124. Defendants' other statements during the conference call further obscured the truth about the extent and severity of 2Ku installations. For example, Defendant Small told investors that "we expect strong growth in consolidated revenue and EBITDA in 2018," even though Gogo was in the midst of the fallout from 2Ku installation problems. ¶ 126.

Although Defendants' statements touched upon 2Ku installation issues that were negatively impacting Gogo at the time, Defendants did not accurately portray the severity of the issue or disclose the financial toll the problems were exacting on Gogo. ¶ 125. Defendants' statements completely glossed over the issue with Delta, and their statements claiming that the "fix is very easy to do" were misleading because, among other things, Delta required TechOps to step in to fix the 2Kus alongside Gogo, which completely undercuts Defendants' claim that the Company had an "easy" fix and Gogo was not seeing any further issues.

Contrary to Defendants' assertions, these allegations provide a clear indication that as of February 22, 2018, Defendants understood that 2Ku's de-icing issue was worse than disclosed, and it was caused by a design defect that would require more extensive repairs than anticipated (*i.e.*, TechOps assistance) and was and would impact Gogo's future performance (*e.g.*, customers were unable to access Gogo's internet services impacting Gogo's take-rate and average revenue per aircraft, impacting yield, revenue, net income, and EBITDA).

"If one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995), *as amended* (Apr. 7, 1995). Here, when Defendants told investors the Company had a fix for 2Ku, Gogo was not seeing further issues, and even projected an increase in EBITDA and a decline in cash needs, Defendants failed to speak the whole truth.

*See Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*, 2018 WL 1071442, at *2 (N.D. Ill. Feb. 27, 2018) (material omission alleged despite partial disclosure where defendants misled investors about causes of increase in claims frequency); *Rothman,* 2003 WL 22757758, at *10–11 (falsity alleged where severe operational and financial problems were taking place during the time financial projections were given).

> **(c)** **Defendants' Pre-November 2017 Statements Were False When Made**

Gogo's 2Ku service became available on commercial aircraft in 2016. ¶ 74. By late 2016, Gogo had about 94 2Ku systems installed on aircrafts, and by February 2017, Gogo had installed 2Ku on 130 aircraft. ¶¶ 4, 32. Those 2Ku units were subject to the 2016-2017 winter conditions and did not have the de-icing modifications required to prevent fluid from getting under the radome during the de-icing process. Indeed, 2Ku antennas experienced the issue during winter 2017-2018. ¶¶ 58-61. It was not until *December 2018*, that Gogo reported that it had a de-icing modification for its 2Ku antennas that prevented 2Ku system degradation.[14] Defendants were undoubtedly aware of 2Ku system degradation earlier than November 2017 given that at least 94-130 aircraft had operated in a previous winter, and Defendants' suggestion to the contrary is illogical. *Cf. City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *11 (S.D.N.Y. Mar. 25, 2013) (recognizing that defendants "had the ability to track sales on a daily basis," and could undoubtedly surmise early in the spring selling season that the spring line was going to be less successful than the winter line had been and concluding "from those results, it is not at all illogical to infer that the summer was highly likely to be problematic as well").

Further, in *August 2017*, Defendants conceded that there was a problem with 2Ku. ¶ 96. On August 7, 2017, Defendants Small and Rowan hosted an earnings call, and during the

---

[14] As reported in Gogo's January 9, 2019 press release filed with the SEC on Form 8-K.

question-and-answer portion of the call, an analyst asked for information about the ARPA being realized from planes with 2Ku systems. Defendant Rowan explained that "***overall ARPA will be diluted beginning in the back half of 2017 by the new aircraft coming online,*** because as we mentioned, 150 of the installs this year would be attributable to ROW aircraft. ***So that meaningfully dilutes the ARPA***. But that's a meaningful number of aircraft, and that will have some ARPA dilution during the course of the year." ¶ 96.

Thus, as early as August 2017, Defendants conceded that there was an issue with ARPA as related to 2Ku installation (*i.e.*, seasoned planes that had the radome fix had increased ARPA, but newly installed 2Kus without radome fixes were bringing down ARPA), but omitted to disclose the specific de-icing problem with 2Ku and concealed the true cause of the decreased ARPA. *See Allstate Corp.*, 2018 WL 1071442, at *4 (falsity alleged where investors given incomplete information).

### B.       Defendants' Misrepresentations Are Not Protected By The Safe Harbor

Defendants point to a few statements – *i.e.*, those allegations related Gogo's expected costs and adjusted EBITDA for 2018 – and claim safe harbor protection. The safe harbor, however, does not protect statements of present or historical fact, and it does not protect material omissions. Very few of the statements challenged in the AC are forward-looking, and ***all*** of the statements in the AC are challenged ***both*** as affirmatively false misstatements ***and*** misleading due to material omissions. The safe harbor, therefore, only potentially applies to a relatively small subset of Plaintiffs' claims: those based on purely forward-looking statements – and only to the extent that those statements are challenged as untrue statements of fact, rather than for omitting facts necessary to make the statements not misleading.[15]

---

[15] To the extent that the safe harbor or the bespeaks caution doctrine potentially applies to any of Plaintiffs' claims, the challenged misstatements are not protected from liability because they were not

### 1. Many Of The Core Misrepresentations Are Not Forward-Looking Statements, But Statements Of Present Conditions

Defendants' few cherry-picked statements are not protected by the PSLRA's safe harbor for forward-looking statements. *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006) (statements that relate to "past, not future, performance" are not protected by safe harbor). Moreover, statements that incorporate both forward-looking elements and representations of present fact are not protected by the safe harbor with respect to their representations of present fact. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*") ("a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present").

The principal statements discussed above, including the statements regarding the status and success of 2Ku are not forward-looking, but statements of present or historical fact, and therefore are not protected by the safe harbor. *See, e.g.*, *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 818 (N.D. Ill. 2017) (finding statement regarding acquisition integrations to be materially false or misleading because the "statement plainly made representations about current facts, so it is not covered by the safe harbor.").

### 2. The Safe Harbor Does Not Protect Material Omissions

The AC's claims related to 2Ku are based entirely on omissions, and therefore the safe harbor does not apply. *See Takara*, 429 F. Supp. 2d at 974 ("it is axiomatic that the failure to make a statement cannot be forward-looking"); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) ("The safe harbor … does not protect material omissions."). This is true, "regardless of whether the statements thereby rendered misleading were forward-looking."

---

accompanied by adequate cautionary language and were made with contemporaneous actual knowledge of their falsity. *See infra* at Section III.B.3.

*Aeropostale, Inc.*, 2013 WL 1197755, at *12.[16]

In this case, the AC's principal allegations of falsity are based on a failure to disclose. In particular, the AC alleges that each of the alleged misstatements was ***both*** materially false and misleading (*i.e.*, made affirmative, material misstatements) ***and*** omitted to state material facts necessary to make the statements not misleading (*i.e.*, made material omissions). Specifically, the statements failed to disclose the significant issues that Gogo was experiencing with 2Ku's design flaw and the associated resulting costs thereto. *See* ¶¶ 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95, 97, 99, 101, 103, 105, 107, 109, 111, 113, 115, 117, 119, 125-26.

Thus, to the extent the AC's falsity allegations are based on omissions, the PSLRA's safe harbor provision is inapplicable. This is true as to the specific statements identified by Defendants, which Plaintiffs alleged were misleading due to the omission of material information.[17] *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1029 (N.D. Ill. 2004) ("Given

---

[16] *Accord In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("The safe harbor and bespeaks caution doctrines do not apply to … omissions."); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) ("[t]he 'bespeaks caution' doctrine, and the related statutory 'safe harbor' of the PSLRA …. apply to forward-looking statements only, and not to material omissions").

[17] *See* ¶77 ("Defendant Smagley's statements were misleading ***because they concealed the true costs associated with the 2Ku radome fix***, and instead portrayed Gogo as being on track for significant increases in adjusted EBITDA); ¶95 ("***statements were materially misleading*** because they communicated to the public that the Company expected the net costs for the airborne equipment and installations to decrease in 2018, while ***omitting to disclose*** the mounting costs from trying to fix the problems with the leaking 2Ku radomes. Rowan's statements misled the public to believe that CapEx was decreasing, ***while omitting material information*** about the increasing associated with the faulty 2Ku radomes."); ¶103 ("statements were misleading because they stated that the ARPA was diluted as a result of aircrafts when in reality, the dilution was due the problems with the leaking 2Ku radomes on all aircrafts installed with the 2Ku system. Rowan's statements ***omitted to disclose the problem with the 2Ku system*** and instead misattribute the decreased ARPA to the new planes"); ¶111 ("***statements were misleading*** because he stated "seasoned aircraft" would "mature to more seasoned ARPA levels," ***when in reality***, Gogo was searching for a solution to the leaking 2Ku radome problem, and that increased ARPA would not be from aircrafts becoming more "seasoned"' or "mature," but instead Gogo fixing the 2Ku radome problem"); ¶119 ("statements were ***materially misleading because***, given the increased expenses Gogo was facing from the faulty 2Ku installations, Rowan ***was in possession of facts that materially contradicted the statement*** that 2017 would be the 'peak' year for 'EBITDA loss.'"); ¶126 ("Defendants' other statements during the conference call further obscured and/or ***concealed the truth about the extent and severity of the 2Ku installations***").

the allegations that defendants knowingly omitted material information, the general disclaimers are not enough to save them from potential liability"); *see also Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 905 (N.D. Ill. 2004) (same).

### 3. The Safe Harbor Does Not Protect Any Of Defendants' Misstatements From Liability

Even to the extent that the safe harbor potentially applies in this case,[18] it does not protect Defendants' misstatements from liability. ***First***, in order to be protected under the safe harbor, forward-looking statements must be accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the . . . statement . . . ." 15 U.S.C. §78u-5(c)(1)(A). To satisfy the safe harbor, the purported cautionary language must be "meaningful" (*see* 15 U.S.C.S. §78u-5(c)), which is a fact-intensive issue that is "difficult if not impossible" to adjudicate, particularly "at the pleading stage, before plaintiffs have access to discovery." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004), *as amended* (Sept. 3, 2004); *see also Blatt v. Corn Prods. Int'l, Inc.*, 2006 WL 1697013, at *5 (N.D. Ill. June 14, 2006) ("[W]hether the cautions at issue here were adequate is not a question to be answered on a motion to dismiss .... The sufficiency of Defendants' cautionary tone (if, indeed, one was required) is a question of fact, or possibly a question of law, that can only be answered on a more developed record"). Accordingly, at this preliminary pleading stage, the Court should reject Defendants' safe harbor argument.

Further, while the term "meaningful" is not strictly defined, it is clear that "'boilerplate' warnings won't do; cautions must be tailored to the risks that accompany the particular projections." *Asher*, 377 F.3d at 732. "To be effective, the cautionary language 'must be

---

[18] The safe harbor only potentially applies to Defendants' statements that are purely forward-looking statements and to the extent that the AC challenges those statements as affirmative misstatements rather than statements made misleading by omission.

substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."' *Lindelow v. Hill*, 2001 WL 830956, at *4 (N.D. Ill. July 20, 2001).

Here, the cautionary language cited by Defendants referred to the risk of "any inability to timely and efficiently deploy our 2Ku service" and "the effects of service interruptions or delays, technology failures and equipment failure or malfunctions arising from defects or errors in our software or defects in or damages to our equipment." MTD at 18. This cautionary language was meaningless in light of the significant issues that Gogo was ***already*** having with 2Ku's design flaw and the associated costs that resulted throughout the Class Period. *See* ¶¶ 55-60. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).[19]

Moreover, even "[w]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011). Here, for example, Defendants point to risk disclosures regarding potential interruptions and delays in its Annual Report issued February 2018. However, as discussed herein, Defendants were certainly aware of the design defects (Delta had informed Gogo of these issues) at this time. *See* Section II.C., *supra*; *Siracusano v. Mattrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (risk disclosures are not sufficiently cautionary and are instead misleading when they describe risks "in the abstract" that "already have come to fruition").[20]

---

[19] *See also In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304-05 (S.D.N.Y. 2013) ("[c]autionary language that is misleading in light of historical fact cannot be meaningful").

[20] *MF Global*, 982 F. Supp. 2d at 318 ("[W]arning of possible risks while failing to disclose critical facts [is like] someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"); *See also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) ("to caution that it is only possible for the

*Second*, statements made with actual knowledge of their falsity are not protected by the safe harbor. *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 841 (N.D. Ind. 2018). A speaker is liable if the statement contains an omission of a known material fact which makes the affirmative statement misleading or false, *Kas v. Caterpillar, Inc.*, 815 F.Supp. 1158, 1171 (N.D. Ill. 1992), or "unreasonable." *Stransky*, 51 F.3d at 1335. A defendant thus may be liable for issuing a projection of earnings if the defendant "ignored facts seriously undermining the accuracy of the forecast." *Good v. Zenith Elecs. Corp.*, 751 F.Supp. 1320, 1322 (N.D. Ill. 1990); *see also In re Next Level Sys., Inc.*, 1999 WL 387446, at *7-8 (N.D. Ill. Mar.31, 1999).

Here, Defendants had actual knowledge of the adverse material facts that they failed to disclose. Thus, because Defendants had actual knowledge of 2Ku's issues, they are not protected by the safe harbor. *See, e.g., Zimmer Biomet,* 348 F. Supp. 3d at 842 (finding that defendants' cited cautionary language mentioning manufacturing interruptions and quality system regulation and their potential adverse impacts on [the company], "cannot inoculate otherwise misleading statements, especially when the company was alleged to have known the specific facts relating to the quality system issues at its major North Campus plant which would inevitably be a regulatory disaster"); *see also In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009) (safe harbor does not protect defendants where complaint alleges that defendants had knowledge of contrary information and operating problems omitted from statements).

### C.   Defendants Acted With Scienter

To plead scienter, a complaint must state specific facts giving rise to a strong inference that a defendant either knew "or was reckless in disregarding a substantial risk" that its statement

---

unfavorable events to happen when they have already occurred is deceit"); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 13 (D.C. Cir. 2015) ("there is an important difference between warning that something '*might*' occur and that something '*actually* had' occurred") (emphasis in original).

was false or misleading. *Tellabs III*, 513 F.3d at 704. The scienter inquiry is holistic and asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322-23. Scienter may be inferred from indirect and "circumstantial evidence of conscious misbehavior or recklessness." *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 854 (N.D. Ill. 2017). For the majority of Plaintiffs' claims at issue here, the required state of mind is recklessness.

The Seventh Circuit defines "reckless conduct" in the context of securities fraud as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Tellabs III*, 513 F.3d at 704. The closer the alleged misstatement or omission is related to a business' "core operations" or "key products," the more reasonable it is to infer that senior management was aware of a problem regarding those situations. *Id.* at 709-11. Examples of such circumstantial evidence of misconduct include allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate . . . or . . . failed to check information they had a duty to monitor." *Bear Stearns*, 763 F. Supp. 2d at 486. "An egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000).

Irrespective of which precise state of mind is required, scienter is adequately alleged if the facts give rise to an inference that Defendants intentionally or recklessly misled the public which is at least as compelling as any non-culpable inference. *Tellabs III*, 551 U.S. at 324. Scienter allegations "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.

Under this holistic approach, the AC pleads a strong inference of scienter. Defendants received notifications, *i.e.*, "outage reports," alerting them to 2Ku outage-related problems "instantly," and its executives monitored these alerts in real-time (¶ 137); Delta, a major customer that accounted for over 25% of Gogo's revenue for the years 2015-2017, informed Gogo that 2Ku was not working and had been complaining for months about the inoperable 2Ku systems (¶¶ 35, 56), and threatened to shut 2Ku systems down if they were not fixed, ultimately requiring TechOps to step in; moreover, Gogo's newly appointed CEO admitted that the Company had been forced to "ramp up" spending during winter 2017-2018 to fix reliability and knew that 2Ku service availability had "plunged down" to about 80% (¶ 62). These facts, along with the others discussed *infra*, give rise to a strong inference that Defendants intentionally, or severely recklessly, misled investors.

### 1. Defendants' Knowledge Of Facts And Access To Information Contradicting Their Public Statements Support A Strong Inference Of Scienter

Certain facts are not in dispute. For example, there is no dispute that 2Ku was defective. As explained in the AC:

> De-icing fluid would permeate the compartment in which the 2Ku was installed when sprayed on planes by airport personnel. The compartment, also referred to as the "radome" or "radar dome," had ventilation valves that allowed de-icing fluid to come into contact with the 2Ku system. The 2Ku contained disc-like antennas stacked on top of one another that would rotate in different directions. When de-icing fluid entered the 2Ku's compartment, the fluid would make the antennas "sticky" and unable to function properly due to the glycol in the de-icing solutions. ¶ 55.

Defendants further cannot, and do not, contend that this was not the case throughout the entire Class Period. In fact, it was not until December 2018 (almost a year after the end of the Class Period) that Gogo reported that it had a de-icing modification for its 2Ku antennas that

prevented 2Ku system degradation.[21]  As such, it belies belief that none of the 94-130 aircraft that had operated in the winter before the Class Period (2016-2017) had suffered from this defect and that the Company's executives were unaware of this fundamental flaw in their most important project.  The most logical inference is that Defendants were aware of 2Ku's defect throughout the Class Period.

Defendants' Class Period admissions further confirm their knowledge of 2Ku's defect.  For example, the Company conceded this fact in both August of 2017 and November of 2017 when Defendant Rowen admitted that "seasoned" aircraft drove the "significant acceleration in ARPA," that dilution of ARPA was due to "***new aircraft airlines coming online***" and those 2Ku systems had less service margin and greater ARPA[22] than planes that had just had the system installed.  ¶¶ 96, 104, 110-11.  The most logical inference to draw from the fact that new 2Ku systems caused a decrease in ARPA is that Defendants investigated the decrease and became aware of the root cause of the problem.  Any argument that Defendants failed to investigate these issues is illogical and does not negate a finding of scienter.  *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness.").

Corporate executives, including the Individual Defendants, had access to the up-to-date results of 2Ku systems.  As explained in the AC:

> When the 2Ku system failed, a passenger would report the outage to the pilot. The pilot would then generate an "ACARS" message (Aircraft Communications Addressing and Reporting System) to maintenance controllers. Gogo would receive notice of the ACARS message and, upon receipt, create a ticket for the aircraft. The ticket would be dispatched throughout the company, including engineering and design. These tickets (or "outage tickets") would be entered into Gogo's "Service Now" database. The "Service Now" database would generate

---

[21] *See supra*, n.14.

[22] ARPA represented Gogo's average revenue per aircraft. ¶ 50.

"outage lists" that were received by everyone at the company, including the Chief Executive Officer. The "outage lists" were populated when the ticket was created after receipt of the ACARS message. ¶ 58.

While Defendants argue that the allegation is unsupported, Defendants' argument is bellied by their own Class Period admissions, including Defendant Wade's November 2017 unequivocal statement that:

> Today, we have a network operation center that monitors around 8,000 aircraft globally, 24/7. We are able to monitor the aircraft. We're able to monitor the network. We can see exactly what is going on. With the investment we put into the software that runs this network operation center, we have a very detailed view into what's happening in those aircraft as they fly. ¶ 136.[23]

On that same date, Defendant Rowan also clarified that "As far as 2Ku, … When we -- when it does fail, we hear about it instantly, which the good news is we are hearing about instantly and it does correlate. When we know we have a bad flight, we hear about it…" ¶ 137. Certainly, it makes sense that corporate executives would track this vital information as non-working 2Ku systems meant that the Company was not making any revenue on those flights. ¶ 61. The statements of certain Defendants should be taken at face value, and as such, these admissions demonstrate Defendants had actual knowledge of the issues with 2Ku.

While Defendants claim that the allegations in the AC related to Delta are unsupported, this assertion is clearly contradicted by the articles discussed above. One article quotes a Gogo vice president, who admitted 2Ku's issues related to de-icing fluid; and the other reports that Delta informed Gogo of the substantial issues with 2Ku and was involving itself in Gogo's operations because the Company was not able to get the job done. *See* Section II.C., *supra*. At an absolute minimum, these facts demonstrate that Defendant Wade's statement on February 22,

---

[23] Likewise, Defendants claim that "the specific nature of the information was contained in those reports" is without merit as the outage lists informed Gogo that the 2Ku system was inoperable, which is only fact that truly matters because the Company was not making any money when 2Ku was not working. *Compare* MTD at 23 *with* ¶¶ 58-61.

2018 that the fix to the deicing problem "was very easy to do" and "we're not seeing any further issues around that at this time" were knowingly false when made.

The most logical inference is that Defendants were aware of Delta's concern months prior because organizations as large as Delta do not simply decide on a whim – without months of meetings, both internally and with Gogo, and substantial research – to "involv[e] itself in multiple aspects of Gogo's operations."[24]  Delta represented that some of its involvement would be "on a temporary basis and some will be permanent" and Delta would begin "working directly with component manufacturers in order to design improvements into the 2Ku hardware, while Gogo is increasing its stock level in order to better facilitate antenna replacements."  *Id.*

Throughout the Class Period, the Individual Defendants repeatedly discussed "98/98/15," which refers to 98% system availability, 98% flight route coverage and 15 megabits per second speeds, and the importance of 2Ku maintaining these metrics.  *See, e.g.*, ¶¶ 45,[25] 48, 82, 86, 90, 106, 112.  Undoubtedly, sustaining these metrics was a point of pride for Gogo and a point of differential between 2Ku and Gogo's competitor's products.  Even in December of 2017, Defendant Small touted "98/98/15" as "industry-leading stats."  ¶ 112.  These stats were information that the Company's executives were tracking, particularly because the statistics were often asked about and discussed during investor calls.  Defendant Small, however, did not disclose in December 2017 or February 2018 that 2Ku was not meeting these crucial metrics. Instead, only *after* Defendant Small's removal from his position as CEO of Gogo, did the new CEO, Oakleigh Thorne, disclose that during the winter of the "availability plunged down to the

---

[24] Rabinowitz, *surpa* n.7.

[25] For example, on November 17, 2017, Defendant Small stated: "We now have a global high capacity, highly available network. There's nothing left to do to make this happen. No need to launch new satellites, no new antenna design, no new modem design. This is out there and happening today. We describe the performance as 15, 98, 98. That's 15 megabits per second to the device, 98% of global flight hours, and 98% availability. This provides a ground-like experience everywhere aircraft fly." ¶ 45.

mid 80s." ¶ 62. Defendant Small's failure to disclose that the "plunge" in 2Ku availability was intentionally and severely reckless. At a minimum, Defendant Small had knowledge of facts and access to information contradicting his public statements, which supports a strong inference of scienter.

In sum, "[t]he way in which [the above facts] fit together and reinforce one another strongly suggests a conscious course of conduct." *See Crowell*, 343 F. Supp. at 16.

### 2. Additional Factors Further Strengthen The Inference Of Scienter

Beyond the facts indicating that Defendants had knowledge of facts and access to information contrary to their public statements, several additional factors substantially strengthen the inference of scienter. ***First***, the closer the alleged misstatement or omission is related to a business' "core operations" or "key product," the more reasonable it is to infer that senior management was aware of a problem regarding those situations. *Tellabs III*, 513 F.3d at 709-11. Here, Delta was Gogo's largest client, accounting for over 25% of the Company's revenue (¶ 25), and 2Ku was the primary product that Gogo was relying on for its future success and profitability. ¶¶ 33-38. Given the centrality of 2Ku to Gogo's operations, the inference that Defendants acted with scienter is supported by the "core operations" doctrine. *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Officers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'").

***Second***, Defendant Small, served as Gogo's CEO for over eight years, from February 16, 2010 until March 4, 2018, to be replaced by Oakleigh Thorne, the Company's largest shareholder, who, just two months later (May 2018) revealed that Gogo had been misleading shareholders about 2Ku performance and operations (¶ 62). Defendant Smalls' departure from

the Company, just weeks before Gogo revealed its misrepresentations regarding 2Ku systems, supports a strong inference of scienter. ¶¶ 18, 62. *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012) (timing of CEO's resignation, which soon preceded the disclosure of company's improprieties, lends weight to a finding of scienter).

**Third**, the short interval between the removal of Small as CEO in March and the reporting of 2Ku operational problems on May 4 strengthens an inference of scienter. ¶ 62 ("My predecessor, Michael Small, talked about 98/98/15. That's 98% system availability, 98% flight route coverage and 15 megabits per second speeds, and that's still our goal. We're achieving the 98% coverage, and we're achieving average 15 megabits per second speeds globally. But we slipped on the 98% system availability with our de-icing problems."). *Cf. Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 483 (E.D. Va. 2002) ("the brief lapse of time between the unqualified audit opinion and the reporting by HM of total financial devastation provides further support for Deloitte's knowledge that its unqualified audit opinion was false when issued").[26]

**Fourth**, Defendants' claims that they were highly focused on monitoring the costs and status of 2Ku systems, and their responses to detailed analyst questions on those topics, bolster an inference of scienter. For example, on earnings calls with analysts, Wade explained that "We're able to monitor the network. We can see exactly what is going on" and Defendant Rowan said with respect to 2Ku systems that "when it does fail, we hear about it instantly, which the good news is we are hearing about instantly and it does correlate. When we know we have a bad flight, we hear about it…" ¶¶ 136-37.[27] Courts have held that an inference of scienter is

---

[26] *See also In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]he fact that the new CEO . . . discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly."); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *14 (S.D.N.Y. Aug. 8, 2012) ("[Q]uick discovery of an alleged error" "support[s] an inference of recklessness.").

[27] *See also* ¶ 48 ("We have the ability to monitor the network remotely").

strengthened when defendants have represented to themselves as closely monitoring the subjects of their false statements[28] or answered detailed questions from analysts or investors on those subjects.[29]

*Fifth*, Defendants argue that the AC does not plead any facts showing that Defendants had a motive to commit fraud.  Both the U.S. Supreme Court and the Seventh Circuit, however, have made it clear that a showing of motive is unnecessary to plead scienter. *See Tellabs II*, 551 U.S. at 325 ("absence of a motive allegation" is "not fatal"); *Tellabs I*, 437 F.3d at 601 (plaintiffs may state claim "by pleading *either* motive and opportunity *or* strong circumstantial evidence of recklessness or conscious misbehavior"). The AC pleads strong circumstantial (and direct) evidence of reckless and/or conscious misbehavior; it is unnecessary to enhance these allegations with evidence of motive.

In *Tellabs III*, the Seventh Circuit explained that even in the absence of an apparent motive, defendants might still commit securities fraud because prompt disclosure of the truth would cause an immediate drop in the company's stock price, whereas waiting might allow the situation to correct itself or allow other events to overtake the bad news: "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not

---

[28] *See, e.g.*, *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at *2-3 (S.D.N.Y. Sept. 14, 2012) (scienter adequately pled where defendants represented "they closely monitored" the subject of their false statements because they either "failed to perform the monitoring they claimed to have performed or they uncovered [the truth and] knowingly or recklessly misrepresented the circumstances to plaintiffs"); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (defendant's repeated statements "weigh strongly in favor of the inference that" he "paid special attention" to the subject of the fraud "or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

[29] *See, e.g., Tellabs, I*, 437 F.3d at 597-98 (specific statements to analyst "went well beyond puffery: it was a direct response to an analyst's inquiry about a possible decline" in sales). *vacated in part on other grounds*, 551 U.S. 308 (2007); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (actionable misrepresentations found where "[m]any of the statements at issue were provided in direct response to questions from financial analysts"); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 397-98 (S.D.N.Y. 2012) (CEO's detailed responses to questions from investors at presentation bolstered inference of scienter).

inconsistent with its having been a considered, though because of the risk a reckless, gamble." 513 F.3d at 710. Here, Defendants may have been gambling that a solution to 2Ku's defect would be uncovered before the public learned of the defect and its impact on the Company, resulting in the benefits that Defendants were already touting.

Defendant Smalls' purchases of stock, while appearing to be large, only constituted a quarter of his stock holdings, *before* taking into account the substantial future stock and options afforded by his employment agreement.[30] A more reasonable inference is that Small's purchase was an attempt to prop up the Company's stock price[31] at a time when Gogo needed continued access to financing for its continued operations[32] and Small could maintain his position at the Company he had overseen since before it went public in 2013 in the face of a hostile Board of Directors, who would soon replace him with one of its members, Gogo's largest shareholder. *See Cabletron Sys. Inc.,* 311 F.3d at 39 (serious and worsening deterioration of company's financial health properly alleged motive as "[t]his is more than the usual concern by executives to improve financial results; the executives' careers and the very survival of the company were on the line").

### 3. Gogo Acted With Corporate Scienter

A plaintiff may "draw a strong inference of corporate scienter without...nam[ing] the individuals who concocted and disseminated the fraud." *Tellabs III*, 513 F.3d at 708, 710. The

---

[30] For example, upon his removal as CEO, Small retained control of stock and options worth about $3.1 million and a $650,000 in cash, far dwarfing his purchase of stock during the Class Period.

[31] On the day Defendant Small's purchase was reported to the SEC, Gogo's stock price rose more than 7% on abnormally high volume.

[32] At all relevant times, Gogo relied on debt financing to maintain operations. For example, during the Class Period, on September 20, 2017, Gogo announced a private offering of $100 million in senior secured notes. As of December 31, 2017, Gogo reported a total consolidated indebtedness of approximately $1.1 billion. ¶ 43. In fact, after the Class Period, Gogo again had to close a $238 million convertible notes private placement. *See Gogo Announces Closing of $238 Million Convertible Notes Offering*, available at http://gogoair.mediaroom.com/2018-12-06-Gogo-Announces-Closing-of-238-Million-Convertible-Notes-Offering

AC pleads facts demonstrating Gogo's corporate scienter.[33]  In *Tellabs III*, the alternative hypothesis that "a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements [] [was] far less likely than the hypothesis of scienter at the corporate level at which the statements were approved." *Id*.  Here, as in *Tellabs III*, the alternative hypothesis—that a "cascade of innocent mistakes" resulted in a failure to disclose a fundamental design defect in its most important product that was causing 2Ku to be non-operational and revenue producing—is less likely than Gogo's management knew of, or recklessly disregarded, the issues with 2Ku in hopes that those issues could be fixed before the public ever learned the truth about 2Ku's problems. When the totality of the AC's allegations are considered collectively, the inference of corporate scienter is overwhelming.

## IV.  <u>DEFENDANTS ARE LIABLE AS CONTROL PERSONS</u>

Defendants do not dispute that the AC sufficiently pleads that the Individual Defendants were control persons of the Company, and therefore liable for Gogo's primary violations under Section 20(a) of the Exchange Act. ¶¶ 167-72.  Defendants only argue that the claims should be dismissed for lack of a primary violation and because those claims are sufficiently alleged, Defendants cannot establish any pleading deficiency as to the control person claims.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court grant the motion in any part, Plaintiffs respectfully request leave to replead.

---

[33] Even if the Court were to conclude that the AC failed to allege scienter for any of the Individual Defendants, which in light of the above facts it should not, the AC identifies a factual basis for inferring scienter as to all Individual Defendants, and attributes false statements to each.  *See Kohut v. KBR, Inc.*, 2015 WL 11995250, at *12 (S.D. Tex. Sept. 3, 2015).

Dated:  April 9, 2019

**GLANCY PRONGAY & MURRAY LLP**


By:  *s/ Casey E. Sadler*
Robert V. Prongay
Casey E. Sadler (*admitted pro hac vice*)
Jennifer Leinbach
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 432-1495
Email: rprongay@glancylaw.com
Email: csadler@glancylaw.com

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton (*admitted pro hac vice*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Co-Lead Counsel for Lead Plaintiffs*
*and the Class*

**LUBIN AUSTERMUEHLE**
Peter S. Lubin
1 S Wacker Drive,  #3140
Chicago, IL 60606
Tel:  (630) 333-0333
Fax:  (630) 445-1848
Email:  Peter@l-a.law

*Liaison Counsel for Lead Plaintiffs*
*and the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On April 9, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Illinois, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 9, 2019.


*s/ Casey E. Sadler*
Casey E. Sadler