# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ASHLEY PIERRELOUIS, individually
and on behalf of all others similarly situated,

    Plaintiff,

v.

GOGO, INC., MICHAEL J. SMALL,
NORMAN SMAGLEY, BARRY ROWAN,
and JOHN WADE,

    Defendants.

No. 18 C 4473

Judge Jorge L. Alonso

## MEMORANDUM OPINION AND ORDER

Lead plaintiffs, Maria Zingas and Daniel Rogers[1] ("plaintiffs"), have filed an Amended Class Action Complaint For Violation of the Federal Securities Laws, asserting violations of sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 of the Securities Exchange Commission ("SEC"). Defendants, Gogo, Inc. ("Gogo"), Michael J. Small, Norman Smagley, Barry Rowan, and John Wade, move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under Rule 8, Rule 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the following reasons, the motion is granted.

## BACKGROUND

Gogo provides in-flight internet connectivity services to customers traveling by airplane. The individual defendants are current and former Gogo executives. This lawsuit centers on defendants' public statements concerning the performance of Gogo's new 2Ku system.

---

[1] This class action was initially brought by the above-captioned plaintiff, but after class members Zingas and Rogers moved for appointment as lead plaintiffs and the other movants withdrew, the Court ultimately granted Zingas and Rogers's motions and appointed them as co-lead plaintiffs. (Oct. 10, 2018 Order, ECF No. 41.)

Gogo's service works by integrating hardware and software installed on airplanes with satellite and ground-based networks. To provide internet access, Gogo relies for each flight on one of two systems—the "air to ground" ("ATG") system or its new 2Ku antenna-and-satellite-based system, first deployed in 2016. The 2Ku system, an upgrade on Gogo's earlier "Ku-band" satellite system, relies on the Ku open-architecture satellite network, from which Gogo purchases capacity as needed, to deliver in-flight internet connectivity at up to twice the speed of its earlier Ku-band system, as well as significantly faster than the ATG systems. Gogo announced the 2Ku system in 2014 and began marketing it to airlines. By the end of 2016, 2Ku had been installed on 94 airplanes. By the end of 2017, it had been installed on approximately 550 airplanes.

Each 2Ku system is installed in a ventilated compartment known as the "radar dome" or "radome." When airport personnel spray the aircraft with de-icing fluid, the fluid may permeate the radomes via the ventilation valves. The 2Ku hardware consists of disc-like antennas stacked on top of one another that rotate in different directions—but when de-icing fluid infiltrates the radomes, the antennas become "sticky" and unable to function due to the glycol in the fluid. (Am. Compl. ¶ 55, ECF No. 55.)

In November or December 2017, Delta Airlines, a major partner that accounted for 25% of Gogo's revenue in 2014, 2015, and 2016, placed calls to Gogo complaining that its 2Ku systems were not working and threatening to shut them down if they were not fixed. Gogo reacted promptly, and its employees worked overtime to address the problem. Gogo first attempted to change the antennas and install a part known as a deflector, a folded piece of rubber surrounding the antennas, to prevent the de-icing fluid from reaching the antennas. The deflectors did not fix the problem. Gogo's repair crews would often replace the radome entirely, but the repair would not prevent the problem from recurring. (*Id.* ¶ 59.) Repairs sometimes had to be postponed for

weeks because the airline could not afford to take the plane out of service long enough to complete them, and the longer a 2Ku system was down, the greater the potential decrease in Gogo's average revenue per aircraft ("ARPA"), an important accounting metric that Gogo—and its investors— used to track its financial performance.

Between February 27, 2017, and February 22, 2018, defendants made numerous statements to investors and analysts on conference calls, at conferences, and in documents filed with the SEC, in which, plaintiffs allege, defendants omitted to fully disclose that a defect in the 2Ku system or its installation was inhibiting its performance or concealed the defect's seriousness. In these statements, defendants described the company's outlook in optimistic terms, and they described any stagnation of ARPA as a short-term problem caused by "dilution" due to new installations, apparently because, when a Gogo system is first installed in a new aircraft, it takes time for the passengers who travel in that aircraft to adopt the habit of purchasing Gogo's internet services. Plaintiffs contend that defendants' omissions made these statements materially misleading.

In particular, in many of their allegedly misleading statements to investors and analysts, certain of the defendants summarized the advantages of the 2Ku system as "characterized by three numbers: 15, 98, 98. This means 15-plus megabits per second speed to connect the passengers; 98% coverage of global flight hours and 98% service availability." (*See, e.g., id.* ¶ 82.) Defendants allegedly suggested that Gogo's 2Ku systems were already achieving that level of performance, when, in reality, according to plaintiffs, the de-icing fluid infiltration problem was negatively affecting the systems' performance and requiring costly repairs.

On February 22, 2018, in announcing Gogo's 2017 fourth quarter and year-end results, defendants acknowledged the de-icing fluid infiltration issue. During a conference call, Wade acknowledged that there had been "growing pains," and on "some aircraft [Gogo] saw degraded

3

reliability," but also stated that they had "identified the root cause of all of these issues, and have fixes for all of them that have either been deployed or [are] in the process of being deployed." (*Id.* ¶ 122.) When an analyst asked for more detail, Wade replied that the "reliability issues" were "actually really caused by the de-icing fluid, which was able to penetrate under some of the [radome], which caused the antennas to temporarily get sticky, if you will. The fix to that was very easy to do, and we've deployed that on a number of aircraft and we're not seeing any further issues around that at this time." (*Id.* ¶ 124.) According to plaintiffs, this explanation failed to convey how costly the 2Ku repairs were and how likely they were to affect earnings figures in subsequent reporting periods.

Plaintiffs allege that it was only on May 4, 2018, that Gogo's new CEO, Oakleigh Thorne, disclosed the full truth about the 2Ku defect and the associated installation and repair issues. In a conference call, Thorne revealed that Gogo's 2018 first-quarter earnings were poor because of the "de-icing fluid impact on 2Ku," which caused the airlines to "h[o]ld back on marketing the product" and Gogo to "ramp[] up spending to fix reliability" as soon as possible. (*Id.* ¶ 62.) Thorne acknowledged that Gogo had previously set forth its "goal" of "98% system availability, 98% flight route coverage and 15 megabits per second speeds," but the company had "slipped on the 98% system availability with [its] de-icing problems." (*Id.*) The winter weather and the accompanying de-icing stops had caused availability to "plunge[] down to the mid 80s." (*Id.*) However, according to Thorne, the company had conducted a "thorough analysis of root causes" and fixed certain software and manufacturing issues that had contributed to the de-icing problem, and it was already back up to 96% availability. In the second half of the year, Thorne reported, the company planned to "roll out a set of 2Ku modifications that will keep de-icing fluid out of the [antenna] raceways and get us back to our target of 98% system availability." (*Id.*)

4

Based on Thorne's May 4, 2018 revelations, Gogo's shares fell $1.73 per share to close at $7.86 on May 7, 2018 (a drop of over 18%). The same day, after the market closed, Moody's downgraded Gogo's credit rating, and the share price fell an additional $2.80 per share to close at $5.06. Plaintiffs allege that defendants' omission to fully disclose the defect in the 2Ku system before May 4, 2018, had inflated Gogo's share price, and the news of the full extent of the de-icing fluid issue caused the share price to fall, to the detriment of plaintiffs and other investors, and in violation of the Securities Exchange Act and Rule 10b-5 of the SEC. Additionally, plaintiff claims that the individual defendants are liable as "controlling persons" of Gogo under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t. Defendants have moved to dismiss for failure to state a claim under Federal Rule of Procedure 12(b)(6).

## **ANALYSIS**

Section 10(b) of the Securities Exchange Act prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j. Under SEC Rule 10b-5, it is unlawful for any person:

   (a) To employ any device, scheme, or artifice to defraud,
   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Thus, under § 10(b) and Rule 10b-5, "a plaintiff can obtain damages if she can prove (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages." *Makor Issues &*

*Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *vacated and remanded on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The required scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

"A motion [to dismiss] under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (ellipsis omitted)).

Under federal notice-pleading standards, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller*

*Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Additionally, any claims of or including acts of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires the pleading party to "state with particularity the circumstances constituting fraud." *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016). Although fraudulent or deceptive intent "may be alleged generally," Rule 9(b) requires a plaintiff to describe the "circumstances" of the alleged fraudulent activity with "particularity" by including such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated," *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008), or, to put it differently, by providing the "who, what, where, when and how" of the alleged fraudulent conduct. *See Bank of Am., Nat'l Ass'n, v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

The Private Securities Litigation Reform Act ("PSLRA") imposes heightened pleading requirements on private, class action claims of securities fraud under § 10(b) and Rule 10b-5:

> **(b) Requirements for securities fraud actions**
> **(1) Misleading statements and omissions**
> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>   **(A)** made an untrue statement of a material fact; or
>   **(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
> *the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.*
> **(2) Required state of mind**
>   **(A) In general**
>   Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that

7

> the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u-4 (italicized emphasis added). Thus, under the PSLRA, private securities fraud plaintiffs not only must plead with particularity the factual circumstances constituting fraud, including by specifying the alleged misrepresentations and the basis for any allegations made on information and belief, but they must also plead with particularity sufficient facts to give rise to a "strong inference" that the defendant acted with scienter. *See Tellabs I*, 437 F.3d at 594 ("[T]he PSLRA essentially returns the class of cases it covers [*i.e.*, private securities fraud class actions] to a very specific version of fact pleading—one that exceeds even the particularity requirement of . . . Rule . . . 9(b).").

A "strong inference" is one that is "strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). That is, it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. Determining whether allegations give rise to such an inference requires courts to "take into account plausible opposing inferences" because "[t]he strength of an inference cannot be decided in a vacuum," and "[t]he inquiry is inherently comparative." *Id.* at 323 (internal quotation marks omitted); *see Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 711 (7th Cir. 2008) ("*Tellabs II*") ("The plausibility of an explanation depends on the plausibility of the alternative explanations.").

The required state of mind under the PLSRA is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). Defendants acted with the required scienter if they spoke in disregard of a risk of falsity that was "'so obvious that

8

[they] must have been aware of it.'" *See Tellabs II*, 513 F.3d at 702, 704 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs II*, 513 F.3d at 704.

In support of their motion to dismiss, defendants argue[2] that (1) plaintiff does not meet its burden to plead falsity and (2) plaintiff's complaint fails to raise a strong inference of scienter.

I. **MATERIAL FALSITY**

Under the PSLRA, a complaint containing a Rule 10b-5 claim must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." *Tellabs I*, 437 F.3d at 595 (citing 15 U.S.C. § 78u–4(b)(1)). That does not mean that a complaint "automatically survives" if it states all the known facts that might support an inference of falsity, nor that it fails if it "leaves out a redundant detail." *Tellabs I*, 437 F.3d at 595. "[T]he relevant question is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet" the standard set by the PSLRA. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Plaintiffs list all of the materially misleading statements and omissions defendants are alleged to have made in a twenty-three-page, thirty-nine-paragraph section of their Amended

---

[2] Defendants make additional arguments in their opening brief concerning such issues as the safe harbor for forward-looking statements, *see* 15 U.S.C. § 78u-5, and control person liability under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), but the Court need not reach those issues because it agrees with defendants that plaintiffs' allegations are not sufficient to support a plausible inference that they were false when made or to create a strong inference of scienter, which are sufficient bases to grant defendants' motion.

9

Complaint. (Am. Compl. ¶¶ 72-131.) Defendants argue that plaintiffs have not alleged with particularity that the de-icing fluid problem had yet manifested itself in a such a serious way as to permit a factfinder to reasonably conclude that any of these statements were false, misleading, or without a reasonable basis when made; rather, according to defendants, plaintiffs are relying on an impermissible "fraud by hindsight" theory, *see Denny v. Barber*, 576 F.2d 465, 469-70 (2d Cir. 1978) (Friendly, J.).

Plaintiffs respond that the seriousness of the defect in the 2Ku systems must have been apparent long before its eventual disclosure in May 2018 or even its partial disclosure in February 2018. Defendants have admitted that the de-icing fluid sprayed on airplanes in wintry weather damaged the 2Ku systems, and dozens of 2Ku systems had been installed by the end of December 2016, when winter was just beginning, so, plaintiffs argue, the problem must have appeared during the winter of 2016-17. Certainly, according to plaintiffs, the problem must have manifested itself by the time of Delta's complaints in November or December 2017, which Gogo was unable to resolve through the following February.[3] Additionally, Gogo's service database sent outage lists to the entire company, and certain of the defendants publicly touted Gogo's ability to track and respond to service outages immediately, which, according to plaintiffs, reinforces the inference that the service disruptions caused by de-icing fluid infiltration would have been apparent as they occurred. For example, during a November 17, 2017 conference call, defendant Wade stated that

---

[3] In their response brief, plaintiffs cite a media report in support of these allegations. (*See* Pls.' Opp'n to Defs.' Mot. to Dismiss at 5 n.7 (citing Jason Rabinowitz, *Delta deepens involvement in 2Ku MRO in face of reliability issues*, Runway Girl Network (Feb. 27, 2018, https://runwaygirlnetwork.com/2018/02/27/delta-deepens-involvement-in-2ku-mro-in-face-of-wi-fi-reliability-issues/). Defendants cry foul, arguing that plaintiffs may not cite materials outside of the pleadings in response to a motion to dismiss. The Court is skeptical of the argument, *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 (7th Cir. 2012), but ultimately it need not reach it because defendants win anyway. Even if the Court assumes that it can properly consider the media reports that plaintiffs have cited, they fail to state a claim.

"we have a network operation center that monitors around 8,000 aircraft globally, 24/7. . . . [W]e have a very detailed view into what's happening in those aircraft as they fly." (Am. Compl. ¶ 136.) During the same call, defendant Rowan explained, "As far as 2Ku, the vast majority of the flights, we get rave reviews on how it works, . . . [and] when it does fail, we hear about it instantly . . . . When we know we have a bad flight, we hear about it." (*Id.* ¶ 137.)

But these do not amount to sufficiently particularized factual allegations to support a reasonable belief that defendants' statements were false or misleading at the time they were made. "When one of the circumstances indicating falseness is the alleged existence of contemporaneous information inconsistent with a particular statement that was allegedly known only to the defendants, some detail about the alleged information, other than that its substance contradicted the substance of the identified statement, must be provided." *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 995-96 (9th Cir. 1999) (citing *Arazie v. Mullane*, 2 F.3d 1456, 1466-67 (7th Cir. 1993)). For example, if a plaintiff asserts a securities fraud claim based on "internal documents" predicting that a corporation's cash flow would prove to be inadequate in the coming months, without indicating "who prepared the projected figures, when they were prepared, how firm the numbers were, . . . which [of the corporation's] officers reviewed them," or "whether [the documents] reflected a final determination that cash flow would be inadequate," the plaintiff's "scanty descriptions of internal memoranda" are insufficient to state a claim with particularity. *Arazie*, 2 F.3d at 1467.

In this case, without more "specific facts," *Metzler*, 540 F.3d at 1070, to demonstrate when the 2Ku problems showed themselves to be of "a sufficient magnitude," *see Karam v. Corinthian Colleges, Inc.*, No. 10-CV-6523, 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012), plaintiffs' allegations do not support a reasonable belief that defendants' statements were false, misleading,

or without a reasonable basis at the time they were made. Merely alleging that (a) Gogo could and did track service outages, (b) defendants had access to outage reports, and (c) at some time prior to May 4, 2018, during or after the "winter," the 2Ku system's "availability plunged down to the mid 80s" (Am. Compl. ¶ 62), without other details, does not provide sufficiently specific and particularized information about *when* the data revealed that the de-icing problem had caused a precipitous drop in availability, or when it became clear that costly remediation efforts were necessary. *See Yourish*, 191 F.3d at 995-96; *Arazie*, 2 F.3d at 1467; *see also Zerger v. Midway Games, Inc.*, No. 07 C 3797, 2009 WL 3380653, at *9 (N.D. Ill. Oct. 19, 2009) ("Plaintiffs' bald allegation . . . does [not] show that the financial consequences of that decision were known, or could have been known, at the time those guidances were issued. Plaintiffs thus fail to plead the "when" of Defendants' alleged fraud with enough particularity."), *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 987 (E.D. Wis. 2009) ("[A]llegations regarding the preparation and dissemination of daily reports do not actually mention any reports that contained statistics materially inconsistent with the defendants' public statements.").

True, while the Court must ensure that "the grounds for the plaintiff's suspicions . . . make the allegations plausible," it must do so while "remain[ing] sensitive to information asymmetries that may prevent [plaintiff] from offering more detail" based only on its pre-complaint inquiry, which it conducts without the benefit of discovery. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). But even bearing in mind that plaintiffs cannot yet obtain documents or data that only defendants possess, plaintiffs must still plead sufficient factual matter to make the alleged fraud plausible. Plaintiffs do not carry this burden by pleading that defendants merely had access to data that may have shown that their statements to investors were misleading when made, without describing specific documents

12

containing that data or otherwise alleging that the data was available to the defendants in some specific form. *See Yourish*, 191 F.3d at 995-96; *cf. Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2017 WL 6039926, at *8-9 (N.D. Ill. Dec. 6, 2017) (plaintiffs sufficiently alleged falsity by identifying documents that they could not obtain but that were compiled by a government agency during an exhaustive investigation and described in some detail in a Joint Rule 26(f) report that the agency filed in separate litigation); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1020-21 (N.D. Ill. 2010) ("These allegations set forth in very clear and specific terms [by way of specific figures] the information available to Corus and why, given its possession of this information, Corus's statements about the adequacy of its reserves were misleading."). Plaintiffs have not made sufficiently particularized allegations to make plausible, rather than merely possible, that defendants' statements were misleading when made.

## II. SCIENTER

As stated above, the PSLRA requires plaintiffs to make not general but *particularized* allegations of "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4.

The Court has already explained that plaintiffs do not make sufficiently particularized allegations of falsity because they do not allege when the 2Ku de-icing problem manifested itself as such a severe problem as to make defendants' statements to investors misleading. Similarly, plaintiffs do not make sufficiently particularized allegations of scienter because they do not allege when defendants knew or should have known of the magnitude of the de-icing problem. Again, plaintiffs allege, in pertinent part, that (a) Gogo could and did track service outages, (b) defendants had access to outage reports, and (c) at some time prior to May 4, 2018, during or after the "winter," the 2Ku system's "availability plunged down to the mid 80s" due to de-icing fluid infiltration (Am.

13

Compl. ¶ 62). (*See id.* ¶¶ 132-39.) But these allegations do not answer the critical question of when defendants had sufficient knowledge to put them on notice that there was at least a substantial risk that Gogo would have to incur considerable remediation costs to prevent service outages due to de-icing fluid infiltration.

"[A] complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information." *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 602 (7th Cir. 2019). While 2Ku performance may well have been "vital" to defendants' business, that fact alone is not sufficient to "create a strong inference" that defendants knew in 2017 and early 2018 that the de-icing problem was serious enough to merit mention in any statement to investors about the 2Ku system. *See Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *10 (N.D. Ill. Mar. 27, 2012). This Court has previously explained that an inference of scienter based on the argument that the defendants "had to be monitoring the data because the numbers were so important" is "weak at best." *Pension Tr. Fund for Operating Eng'rs*, 2017 WL 6039926, at *13 (internal quotation and alteration marks omitted) (citing *Boca Raton*, 2012 WL 1030474, at *10-11); *see Harley-Davidson*, 660 F. Supp. 2d at 999 ("[N]ot only is mere receipt of reports insufficient to establish scienter, the inferential leap required to tie [such general allegations] to the conclusion that defendants acted knowingly or recklessly when presenting relevant information to the market is untenable given the heightened pleading standards [of the PSLRA]."). A complaint asserting claims under the PSLRA must make "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made." *Harley-Davidson*, 660 F. Supp. 2d at 1000. But plaintiffs have not described with particularity what defendants are meant to have known that was

contrary to their public statements to investors. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) ("[P]laintiffs have not pointed to any particular reports or information—available to defendants before the announced financial restatements—that are contrary to the restatements."); *cf. Tellabs II*, 513 F.3d at 706-07, 709 (describing complaint's particularized factual allegations of weakening demand for the company's most important products due to "the bursting of the fiber-optics bubble", as evidenced by a reduction in orders for its "flagship" product and an absence of orders for its "heralded successor").

Even apart from the particularity requirement, plaintiffs' allegations do not support a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007). Because plaintiffs have not alleged that, before or during the class period, defendants were presented with any specific information that demonstrated the scope and magnitude of the de-icing problem, the inference that defendants recklessly disregarded a serious problem in omitting to disclose it to investors is not "cogent and compelling" in light of opposing, nonfraudulent inferences. For example, defendants could have reasonably believed subordinates who told them erroneously that the problem was not serious or widespread and could be easily repaired or avoided, and it may have taken time to realize that they were wrong. *Cf. Tellabs II*, 513 F.3d at 709; *see Boca Raton*, 2012 WL 1030474, at *10 (distinguishing *Tellabs II* on similar grounds); *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").

Indeed, because the complaint contains so little factual detail about what defendants knew and when, there might be any of a number of different plausible explanations for why defendants

did not disclose more facts about the 2Ku de-icing problems to investors at an earlier date. They may have thought outages were caused by other factors apart from the de-icing fluid that were easier to fix (Thorne mentioned software and manufacturing issues as contributing factors, as well as the de-icing fluid); they may not have known how expensive and difficult the necessary repairs would be at first; the weather may have been different from what they expected, preventing the problem from revealing itself right away or worsening it once it did, and so on and so forth. As the Seventh Circuit explained in *Tellabs II*, an inference that the defendants acted with fraudulent intent is not sufficiently "cogent" if it is only one of many possible explanations:

> Suppose a person woke up one morning with a sharp pain in his abdomen. He thought it was due to a recent operation to remove his gall bladder, but realized it could equally well have been due to any number of other things. The inference that it was due to the operation could not be thought cogent.

513 F.3d at 710-11. This case is one in which, even if fraud is one possible explanation for why defendants did not disclose the issue earlier, the fraudulent inference is not "cogent" because "it could equally well have been due to any number of other things."

## CONCLUSION

For the reasons set forth above, the Court grants defendant's motion to dismiss [63]. The complaint is dismissed without prejudice. Plaintiff may file an amended complaint by November 15, 2019.

**SO ORDERED.**                          **ENTERED: October 16, 2019**

                                                           **HON. JORGE ALONSO**
                                                           **United States District Judge**