# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ASHLEY PIERRELOUIS, Individually and On Behalf of All Others Similarly Situated, | Case No.: 1:18-cv-04473 |
| | Hon. Jorge L. Alonso |
| | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| GOGO INC., MICHAEL J. SMALL, NORMAN SMAGLEY, BARRY ROWAN, and JOHN WADE, | **JURY TRIAL DEMANDED** |

Lead Plaintiffs Maria Zingas and Daniel Rogers ("Plaintiffs"), by their undersigned attorneys, individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gogo Inc. ("Gogo" or the "Company"), interviews with former employees, analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded securities of Gogo from February 27, 2017 through May 4, 2018, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants'

violations of federal securities laws. Plaintiffs allege that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder.

2.  Gogo provides in-flight internet connectivity equipment and services to airlines and airline passengers. At issue in this lawsuit is Gogo's "2Ku global satellite system," referred to herein as "2Ku." 2Ku was initially introduced to the market in early-2016. Gogo billed 2Ku as a new product capable of providing in-flight connectivity at up to twice the speed of its previous connectivity technology and generating upwards of 30% more revenue per aircraft.

3.  On or around August 2015, Gogo announced that it had received its Supplemental Type Certificate ("STC") from the FAA to begin in-flight testing for the 2Ku system. An STC is a certificate issued when an applicant has received FAA approval to modify an aeronautical product from its original design. The STC approves not only the modification but also how that modification affects the original design.[1]

4.  In 2016, following the 2Ku system's in-flight testing on Gogo's test plane, Gogo received a number of STCs to install its 2Ku systems on customers' planes. In 2016, Gogo installed its 2Ku systems on planes operated by, *inter alia,* AeroMexico, Delta Airlines and Virgin Atlantic.[2]

5.  After the initial testing and installations of the 2Ku systems, Gogo realized there was a problem. Unbeknownst to investors, the 2Ku was not working as intended. In fact, the 2Ku system suffered from a significant product design defect. The 2Ku's radar-dome, "radome," was vulnerable to contamination during "de-icing" treatments (*i.e.*, while being sprayed with de-icing fluid before take-off in cold weather). The de-icing fluid caused the 2Ku system to malfunction, necessitating expensive repairs and negatively impacting Gogo's revenue.

---

[1] Caroline Ku, *Gogo's 2Ku Antenna Receives STC for Commercial Aircraft Installation*, APEX (Aug. 24, 2015).
[2] Juliet Van Wagenen, *Gogo Hangs Hopes on More STCs to Increase 2Ku Installs*, VIA SATELLITE (Aug. 9, 2016); *see also* Juliet Van Wagenen, *Airbus to Retrofit A350 Fleets with Gogo's 2Ku*, VIA SATELLITE (Apr. 6, 2016).

6. As corroborated by former Gogo employees, Gogo used the "ServiceNow" program and the ThinKom "application," which notified Gogo engineers in real-real time when the 2Ku service failed. The "Service Now" database would generate "outage lists" that were received by everyone at the company, including the Chief Executive Officer. Meetings were held on a daily and weekly basis to discuss the 2Ku defect.

7. After realizing this de-icing fluid issue, Gogo started looking for a fix. As corroborated by former Gogo employees, Gogo tested various remedies, including, *inter alia*, the addition of a diverter or deflector flap, a splash screen with drainage components, and sealing the 2Ku radome adapter plate to the fuselage to prevent fluid from getting under the radome during the de-icing process.

8. During the heart of the Class Period, Gogo filed applications with the "FAA" that would authorize the Company to install or modify the 2Ku systems. Obtaining STCs from the FAA, however, often has a turnaround of up to six months to a year or more. Thus, due to (1) Gogo's continued testing of various radome fixes and (2) turnaround time for obtaining FAA approval, Gogo could not fully remedy the 2Ku's issues until mid-year 2018.

9. Indeed, Defendant Wade admitted this in February 2018 when he stated, "[w]e've identified the root cause of all of these issues, and have fixes for all of them that have either ***been deployed*** or in the process of being deployed. By midyear 2018, we expect the entire 2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving." (emphasis added).

10. Notwithstanding the defect, Gogo proceeded with expanding its customer base and installing the 2Ku systems on aircrafts throughout the Class Period. In late 2016, Gogo had 94 2Ku systems installed. By late 2017, however, the number of installed 2Ku systems had grown to 550. At this point, Gogo was aware of and attempting to identify a solution to prevent the deicing fluid from penetrating the radome.

11. As complaints from airline partners began to roll in, including from its customers Air Canada and Delta Airlines, Gogo's repair costs and expenses soared. Air Canada reported

problems associated with deicing fluid seeping under Gogo 2Ku radomes over the winter of 2017, and as reported by Ben Smith, President, Passenger Airlines, "We did have problems with the radome and deicing, and it delayed us with the first certification. Here in Canada you need both US and Canadian certification, and it delayed us about four months."[3]

12.     Delta Airlines also reported that its 2Ku systems were not working during the winter of 2017.  The issue with Delta's 2Ku systems escalated to such a point that in February 2018, Delta issued a memorandum to cabin crew highlighting 2Ku's reliability issues and detailing a Delta action plan which sees the carrier becoming more involved in 2Ku maintenance (the "McDermott memo").  The McDermott memo explained that Delta's "TechOps has stepped in to assist Gogo in troubleshooting and diagnostics of 2Ku, stating that TechOps 'is involving itself in multiple aspects of Gogo's operations. Some of these are on a temporary basis and some will be permanent.'"  The memorandum further explained that "TechOps has begun working directly with component manufacturers in order to design improvements into the 2Ku hardware, while Gogo is increasing its stock level in order to better facilitate antenna replacements."[4]

13.     As noted in the McDermott memo, Defendants knew about the de-icing problem during the Class Period, and had been in discussions with its clients about potential fixes, experimenting with different fixes in its laboratory, as well as filing applications for STCs with the FAA, but Defendants intentionally withheld material information about the 2Ku system defect because the Company needed to increase its stock price in order to facilitate a remedy (as confirmed by the McDermott memo) and keep up with its high operating costs.

14.     Indeed, Gogo was under additional pressure to keep its stock price high, as the Company desperately needed cash to find a permanent fix to the 2Ku de-icing problem and obtain approval to install the modifications to Delta's 2Ku systems. Gogo was not only facing pressure from competitors, but Gogo had also already lost significant business with a major

---

[3] Mary Kirby, *Air Canada enthusiastic about Gogo 2Ku despite delayed installs*, RUNWAY GIRL NETWORK (Jun. 1, 2018).
[4] Jason Rabinowitz, *Delta deepens involvement with 2Ku MRO in face of reliability issues*, RUNWAY GIRL NETWORK (Feb. 27, 2018).

client between 2016-2018 – American Airlines – and could not withstand to lose business from Delta as well.

15.     On February 22, 2018, Defendants hinted at a potential problem concerning the 2Ku system installations.  While Defendants disclosed some details about the radome and de-icing fluid causing "stickiness" within the antenna, Defendants concealed the true extent and severity of the problems.  Most investors and analysts overlooked the issue; however, some concerns started to develop within the market about Gogo's ability to meet expectations in terms of its 2Ku rollout. In response to Defendants' statements, Gogo's stock price declined from $10.51 per share on February 21, 2018 to close at $9.13 per share on February 22, 2018 (and, in fact, declined further the next day to close at $8.88 per share on February 23, 2018).

16.     On Friday, May 4, 2018, Gogo finally revealed the true extent of the damage. Due to the "de-icing fluid impact on 2Ku," "airlines held back on marketing the product" and Gogo was forced to "ramp[] up spending to fix reliability."  This had the effect of lowering revenue and increasing costs, which resulted in Gogo withdrawing its previous estimates for adjusted EBITDA "due to increased costs and lost revenue related to the 2Ku implementation challenges."

17.     On Monday, May 7, 2018, Moody's downgraded Gogo's credit rating over "weakening credit metrics, operational difficulties and deteriorating liquidity" arising from the Company's problems with the 2Ku systems.  Moody's wrote, in pertinent part, that "[t]he performance degradation of antennas in many recently installed 2Ku radomes caused by the infiltration of de-icing fluid, used to remove ice from fuselages in winter climates, resulted in slower performance of the company's 2Ku technology, as well as significant remediation costs. [Gogo's] adjusted EBITDA margin for the first quarter of 2018 was about 5%, down almost 1.5% from the prior year's quarter.  These operational issues are expected to negatively impact EBITDA for the year and result in a very low, or potentially slightly negative, company adjusted EBITDA for the second quarter of 2018 since the bulk of remediation expenses will be incurred during the quarter."

18.     In response to Gogo's revelations and Moody's downgrade, the Company's stock price fell from $9.59 per share on May 3, 2018 to $5.06 per share on May 8, 2018. Collectively, Gogo's investors lost millions of dollars.

19.     Following Defendants' revelations on May 4, 2018, numerous analysts expressed serious doubts about management's credibility. They specifically focused on the disclosures made by Defendants on February 22, 2018, referring to them as being dishonest. One analyst wrote: "Gogo had previously disclosed that de-icing fluid leaking into antenna radomes had caused service failure on some of its newly installed 2Ku aircraft. On its new CEO's first earnings call, the company revealed the problem was much worse than initially thought, with service availability plunging to the mid-80% vs. the company's targeted 98-100% level." Another analyst went so far as to incorporate an "infamous" quote from Mark Twain, that "If you tell the truth, you don't have to remember anything." That same analyst commended Gogo's new CEO, Oakleigh Thorne, for trying to "distance himself from the previous CEO's [Defendant Small] outlandish predictions and un-realistic financial targets and attempted to set a new more realistic / honest talk track on the company's Q1 conference call."

20.     Plaintiffs bring this suit in an effort to recover the money they lost on their investments in Gogo. As shown below, Defendants knew about the 2Ku system design defect throughout the Class Period, yet made public statements that concealed the truth and risks pertaining to the defect. But for Defendants' misleading statements, Plaintiffs would have been able to make an informed decision about whether to invest in Gogo and potentially avoid the losses they ultimately incurred.

21.     Defendants misled Plaintiffs and other similarly situated investors. Through no fault of their own, Gogo's shareholders have lost significant amounts of money. Defendants should be held accountable.

## JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

24.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company conducts business and is headquartered in this District.

25.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

26.    Plaintiffs acquired Gogo securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged fraudulent conduct. Plaintiffs' certifications filed in support of their motions for appointment as lead plaintiff are incorporated herein by reference (Dkt. Nos. 16-2, 23-3).

27.    Defendant Gogo provides inflight broadband connectivity and wireless entertainment services to the aviation industry in the United States and internationally. Gogo is a Delaware corporation with its headquarters located at 111 North Canal Street, Suite 1500, Chicago, Illinois 60606. Gogo securities trade on the NASDAQ under the ticker symbol "GOGO."

28.    Defendant Michael J. Small ("Small") served as the Company's Chief Executive Officer ("CEO") and President from February 16, 2010 until March 4, 2018.

29.    Defendant Norman Smagley ("Smagley") served as the Company's Chief Financial Officer ("CFO") from September 2010 until May 4, 2017.

30.     Defendant Barry Rowan ("Rowan") has been the Company's CFO since May 4, 2017.

31.     Defendant John Wade ("Wade") has been the Company's Chief Operating Officer ("COO") and Executive Vice President since August 2016.

32.     Non-party Oakleigh Thorne ("Thorne") has been a director on Gogo's Board since 2006. On March 4, 2018, Mr. Thorne succeeded Defendant Small and became the Company's President and CEO. Mr. Thorne has owned and/or controlled approximately 30% of the Company's common stock since Gogo became a public company (and continues to own and/or control approximately 30% of Gogo's common stock at the present time).

33.     Defendants Small, Smagley, Rowan, and Wade are sometimes referred to herein as the "Individual Defendants."

34.     Each of the Individual Defendants:

    a.   directly participated in the management of the Company;

    b.   was directly involved in the day-to-day operations of the Company at the highest levels;

    c.   was privy to confidential proprietary information concerning the Company and its business and operations;

    d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    g.   approved or ratified these statements in violation of the federal securities laws.

35.     Gogo is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful

acts complained of herein were carried out within the scope of their employment with authorization.

36.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Gogo under *respondeat superior* and agency principles.

37.     Defendant Gogo and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Gogo's 2Ku Global Satellite System

38.     Gogo provides in-flight internet connectivity services to customers traveling by airplane. Gogo integrates its hardware and software on airplanes with satellite and ground-based networks to provide internet and entertainment services for both commercial and business aircraft. In addition, Gogo provides support services including installation, maintenance and monitoring of connectivity services for their customers.

39.     Gogo relies upon two systems to provide internet access for its business – the "air-to-ground" system (also referred to as ATG) and the new 2Ku system, which was first deployed by Gogo in 2016.

40.     Gogo's 2Ku system is an antenna and satellite-based system which provides additional bandwidth and improved speeds for internet service on airplanes. The 2Ku system relies on the Ku open architecture satellite network, from which Gogo buys capacity on an as-needed basis. Throughout the class period, Gogo provided extensive information about the progress of the installations of the 2Ku system in the fleet.

41.     2Ku is an upgrade of Gogo's "Ku-band" satellite service. Gogo's Ku-band service was capable of delivering in-flight internet connectivity at speeds of up to 50 Mbps through use of satellite operators. 2Ku, according to Gogo, is capable of offering connectivity at twice the speed of Ku-band (*i.e.*, up to 100 Mbps), as well as significantly faster than the ATG systems.

42.     Gogo announced the 2Ku system in 2014. At that time, Gogo expected to deploy the 2Ku system for commercial use in the second half of 2015.

43.     On or around August 2015, Gogo announced that it had received its STC from the FAA to begin in-flight testing for the 2Ku system.

44.     In 2016, following the 2Ku system's in-flight testing on Gogo's test plane, Gogo received a number of STCs to install its 2Ku systems on customers' planes.

45.     Since 2Ku's introduction, the system has been installed (or selected for installation) on over a dozen domestic and international airlines. As of December 31, 2016, 2Ku was installed on 94 aircraft. As of December 31, 2017, 2Ku was installed on approximately 550 aircraft.

46.     2Ku was a major operational development for Gogo. In February 2015, before 2Ku was even commercially available Gogo, was promoting that it signed a "long-term agreement" with AeroMexico pursuant to which the 2Ku system would be installed on a portion of its fleet.

47.     At or around the same time, Gogo also announced that it had signed a "long-term agreement" with Virgin Atlantic Airlines pursuant to which a significant portion of Virgin Atlantic's fleet would be "retrofitted" with the 2Ku system.

48.     Gogo also announced at that time that Delta Air Lines had selected it to provide 2Ku on more than 250 aircraft with installations to begin by 2016. Delta Air Lines accounted for over 25% of Gogo's revenue for the years 2015, 2016, and 2016.

49.     2Ku's importance to Gogo increased as time went on. In February 2016, Gogo reported to investors that the 2Ku system was installed and undergoing testing in the company's "Boeing 737 test aircraft" and an aircraft operated by "one of [the company's] airline partners." Gogo told the public that 2Ku was expected to begin generating passenger revenue by June of that year (*i.e.*, the first half of 2016). As of February 21, 2016, 2Ku was scheduled to be deployed on over 500 aircraft pursuant to definitive contracts or amendments to existing contracts (with the majority of installations to be completed by the end of 2018) across a number of airlines, including Virgin Atlantic Airways, Vietnam Airlines, Japan Airlines, Delta Air Lines, and GOL (a Brazilian airline).

50.     During an investor presentation on November 9, 2016, Defendant Small promoted the 2Ku systems as a means to increase Gogo's average revenue per aircraft by 30%. In pertinent part, he stated that: "So the whole story is more bandwidth, more revenue, and that's a fundamental issue. And we are starting the process in North America of conversions to 2Ku, about 800 of the backlog is 2Ku conversions in North America. *As we start doing those, not only that those planes start seeing higher average revenue per aircraft, when we switch from ATG to 2Ku, we see about a 30% increase*" (emphasis added).

51.     Defendant Small also promoted the 2Ku systems' operational capacity. During an investor presentation on December 6, 2016, Small stated as follows:

> Yes, so 2Ku is a proprietary solution for Gogo. Its number one benefit is it's nearly twice as spectrally efficient. So, it is rare in business that you can have half the cost structure of your competition. But, we buy a given amount of satellite capacity, and we get twice as many bits out of it. That's benefit one.
>
> *Second, it has fewer moving parts and, frankly, we think better engineered. So, we get that 99% reliability. We often watch the competition struggle to get to 90% availability*. And even on our now two-year-old, three-year-old Ku technology, we're struggling to get to 98%. *So, this is inherently more reliable and available technology.*
>
> It also, because its round shape, it doesn't have the skew angle problems, which particularly for airlines that fly in equatorial regions, is a major advantage. So, we cover about a quarter of the earth's surface substantially better than any other competing technology.

(emphasis added)

52.     By February 2017, Gogo had installed 2Ku on 130 aircraft and had secured additional 2Ku contracts or agreements with Air Canada, British Airways, Iberia, and Air France-KLM. Gogo also told the public that it was expecting to install an additional 450 to 550 2Ku systems during 2017.

### Gogo Segments/Revenue

53.     Gogo has two reporting segments in the commercial aviation market: Commercial Aviation-North America ("CA-NA") and Commercial Aviation-Rest of World ("CA-ROW")

11

(together with CA-NA, "CA"). CA-NA utilizes both ATG and satellite systems, primarily 2Ku. CA-ROW relies upon satellite systems, primarily 2Ku. Gogo had an additional reporting segment in the business aviation market: Business Aviation ("BA"). The BA segment does not utlize or generate revenue from the 2Ku system. The CA segments generated approximately 65% of Gogo's total revenue for 2015, 2016, and 2017.

54.     As of December 31, 2017, CA-NA had 2,840 aircraft online, 416 of which were equipped with 2Ku. CA-NA segment profit was $66.8 million, $71.9 million and $41.9 million for the years ended December 31, 2017, 2016 and 2015, respectively. CA-NA's segment profit decreased 7.1% to $66.8 million for the year ended December 31, 2017 as compared with $71.9 million for the prior year, which Gogo reported was due to increases in cost of service revenue, engineering, design and development and general and administrate expenses and a decrease in equipment revenue, partially offset by an increase in service revenue and a decrease in cost of equipment revenue and sales and marketing expense.

55.     As of December 31, 2017, the CA-ROW segment had 391 aircraft online, 138 of which were installed with 2Ku. CA-ROW segment loss was $107.0 million, $87.6 million and $76.4 million for the years ended December 31, 2017, 2016 and 2015, respectively. CA-ROW's segment loss increased 22.1% to $107.0 million for the year ended December 31, 2017 as compared with $87.6 million for the prior year which Gogo reported was due to an increase in operating expenses.

56.     Due to the rapid growth, on September 20, 2017, Gogo announced the pricing of the previously announced private offering of $100 million aggregate principal amount of additional 12.500% senior secured notes due 2022. As of December 31, 2017, Gogo reported a total consolidated indebtedness of approximately $1.1 billion, including $690.0 million outstanding of our 12.500% senior secured notes due 2022 (the "Senior Secured Notes") and $361.9 million outstanding of our 3.75% convertible senior notes due 2020 (the "Convertible Notes").

57.     The cost of buying and installing the 2Ku was very expensive, particularly with regards to installation times, thus significant pressure existed to decrease installation times. In effort to justify these expenses and build hype around Gogo, Defendant Small routinely touted Gogo's 15/98/98 performance.

58.     In a November 17, 2017 Investor and Analyst Conference call Defendant Small stated, "We now have a global high capacity, highly available network. There's nothing left to do to make this happen. No need to launch new satellites, no new antenna design, no new modem design. This is out there and happening today. We describe the performance as 15, 98, 98. That's 15 megabits per second to the device, 98% of global flight hours, and 98% availability. This provides a ground-like experience everywhere aircraft fly."

59.     In addition to providing updates on 2Ku installation progress and quality of the network performance, Gogo also promoted the extent to which the Company monitored the performance.

60.     On November 17, 2017 in an Investor and Analyst Conference call, Defendant Rowan said, "As far as 2Ku, the vast majority of the flights, we get rave reviews on how it works. ***And we are hitting pretty good evidence of reliability as we pointed. When we -- when it does fail, we hear about it instantly, which the good news is we are hearing about instantly and it does correlate. When we know we have a bad flight, we hear about it. When we have a good flight, we get some tweets that it is good.*** So that is -- so I think that perception's going change and it's going to change a lot in 2018 as 2Ku gets out there" (emphasis added).

61.     At the November 29, 2017 Bank of America Merrill Lynch Leveraged Finance Conference, Defendant Rowan again provided updates on 2Ku installation progress and quality of the network performance, as well as the extent to which the Company monitored the performance:

> We talked a little bit about the importance of the operational support system, and ***we look at this from the beginning at post-award all the way through to ongoing support***. So there's a dedicated team that does this. We've invested very heavily in this in getting the type certifications for various aircraft, getting the

installations, the 2Ku installations, in particular, on planes. It used to take us about a week to do that. Our lowest time that we've reported is 30 hours. So dramatically reduced installation time. That is a benefit from the cost side, but particularly from the airline's side. So they don't have to have the aircraft out of service very importantly. So we continue to invest in that. ***We have the ability to monitor the network remotely. So our promise is to deliver 15, 98, 98, so 15 megabits per second for the satellite-based connectivity to the passenger device, 98% of the flight hours and with an uptime of 98%.***

(emphasis added)

62.     Gogo uses certain non-GAAP financial measurements to as a gauge of its financial health, including ARPA, EBITDA, Adjusted EBITDA, and Cash CAPEX.

63.     ARPA represented Gogo's average revenue per aircraft. ARPA is the aggregate service revenue plus monthly service fees, some of which are reported as a reduction to cost of service revenue for that segment for the period, divided by the number of months in the period, and further divided by the number of aircraft equivalents for that segment during the period, which is then annualized and rounded to the nearest thousand

64.     EBITDA represents net income (loss) attributable to common stock before income taxes, interest income, interest expense, depreciation expense and amortization of other intangible assets.

65.     Adjusted EBITDA represents EBITDA adjusted for (i) stock-based compensation expense, (ii) amortization of deferred airborne lease incentives (iii) loss on extinguishment of debt and (iv) adjustment of deferred financing costs.

66.     Cash CAPEX ("CAPEX") represents capital expenditures net of airborne equipment proceeds received from the airlines and incentives paid to us by landlords under certain facilities leases.

67.     Costs relating to the installation of the 2Ku were of great significance to Gogo as these costs were a major component of Gogo's CAPEX. Cash CAPEX were $(220,515), $(133,090), and $(79,950) for 2017, 2016, and 2015, respectively. Adjusted EBITDA was $58,483, $67,179, and $36,756 while EBITDA was $80,478, $64,463, and $39,369 for 2017, 2016, and 2015, respectively.

**The 2Ku Systems Were Defective**

68.     Gogo's 2Ku systems were defective. De-icing fluid would permeate the compartment in which the 2Ku was installed when sprayed on planes by airport personnel. The compartment, also referred to as the "radome" or "radar dome," had ventilation valves that allowed de-icing fluid to come into contact with the 2Ku system. The 2Ku contained disc-like antennas stacked on top of one another that would rotate in different directions. When de-icing fluid entered the 2Ku's compartment, the fluid would make the antennas "sticky" and unable to function properly due to the glycol in the de-icing solutions.

69.     According to Former Employee 1 ("FE1"), a senior software engineering manager for Gogo from July 2014 to July 2018, senior management was aware of the problem, as it was discussed regularly. There were "frequent meetings on the topic," FE1 explained. The senior management team was aware that fluid could affect the antenna function.

70.     FE1 reported that Gogo utilized a software tool to measure fluid in the rails and ball bearings in the 2Ku system. The tool would measure the fluid build-up and indicate whether it was interfering with the 2Ku system by preventing its antennas from turning.  The tool would ultimately measure blockage and if the antenna was struggling to cycle or turn at certain points. Fluid makes the antenna harder to turn, FE1 explained.

71.     According to FE1, Gogo was able to identify the deicing fluid as the cause of the defect "over a course of multiple months."  FE1 explained that the main problem was that it took a day or two before the fluid got "sticky" enough to cause issues with the antenna, and the ability to backtrack the path and location(s) of a plane to pinpoint exactly when, where, and how the issue started, or when the fluid started to accumulate, was a challenge.

72.     By the end of FE1's tenure (summer 2018), Gogo had begun to implement a possible fix to the 2Ku systems (although the fix yet had not yet been tested during a winter season).

73.     Former Employee 2 ("FE2"), worked for Gogo as an Aircraft Maintenance Controller on the Inflight Internet team from 2014 until August of 2018. FE2 reported to Dan

Polkowski, Manager of Maintenance Control at Gogo. While at Gogo, FE2 was among other maintenance controller's and technicians that worked on and maintained the 2Ku systems.

74.     FE2 confirmed that Gogo found out about 2Ku issues in the winter when deicing fluid was sprayed.  FE2 explained that 2Ku antennas were made of a disc-like structure, similar to a stack of Compact Discs (CDs) stacked on top of each other rotating in different directions. When de-icing fluid was sprayed it would infiltrate the dome and the fluid would make the discs "sticky" and unable to function properly.

75.     Gogo's first solution to the problem was to change out the antennas and install a "deflector," which failed.  FE2 believed the solution that GoGo came up with was never going to address the problem. FE2 said, "GoGo bought materials to 'deflect the fluid.'" At least that was the theory to keep the fluid from reaching the antennas. FE2 said, "[s]o this new addition [the purchased material] had a folded piece of rubber [and was placed] inside one of the moisture corks, [which are] all around the antenna." There are moisture corks around the antenna, FE2 explained. When [Gogo] asked which manufacturer provided the rubber materials, FE2 thought it might have been Thinkom, the same manufacturer that made the antennas. FE2 added, "[GoGo's] answer [the extra folded piece of rubber] didn't fix [the problem] though."

76.     FE2 recalled that Delta Air Lines began to complain about the 2Ku system as early as November or December 2017.  FE2 said, "We [company employees] were told to assign a solution quickly for the aircraft." "We had multiple calls from Delta," according to FE2, "saying that their 2Ku systems were not working." Delta Air Lines threatened to shut the 2Ku systems down if they were not fixed. At that point, Gogo "hit the ground kicking and screaming" and started to mandate overtime for employees to rapidly address some fix or solution to the problem, according to FE2.

77.     The 2Ku defect was severe, as admitted by Gogo's Vice President of Product Management, Blane Boynton, in an interview on January 22, 2018. According to Mr. Boynton,

"[m]uch like a DirecTV dish has problems in heavy rain, deicing fluid is like a concentrated thunderstorm."[5]

78.     In fact, the 2Ku defect was so severe that, by February 2018, Delta had issued 'the "McDermott memo."[6] The McDermott memo explained that Delta's "TechOps" (Delta's maintenance, repair and overhaul division) had stepped in to assist Gogo in troubleshooting and diagnostics of 2Ku, stating that TechOps "is involving itself in multiple aspects of Gogo's operations. Some of these are on a temporary basis and some will be permanent." The memorandum further explained that "TechOps ha[d] begun working directly with component manufacturers in order to design improvements into the 2Ku hardware, while Gogo is increasing its stock level in order to better facilitate antenna replacements."

79.     Delta was not the only customer that complained about Gogo's 2Ku.  Air Canada also reported problems associated with deicing fluid seeping under Gogo 2Ku radomes over the winter of 2017.  Air Canada reported delays with installations due to the 2Ku de-icing problem and also had to wait for related certification from the FAA and Canadian authorities.

**Gogo's Internal Reporting Process for 2Ku Outages and Repairs**

80.     Former Employee 3 ("FE3") worked for Gogo as an Aviation Maintenance Controller from November of 2016 until July of 2018. While working for Gogo, FE3 focused on the on problems arising from the 2Ku system and with vendors, mainly Delta Air Lines.  FE3 remembered that, "[m]ost of the 2Kus were just falling apart in the winter."

81.     FE3 recalled that during FE3's tenure with the Company, the 2Ku's problems persisted into 2017. The problems with the 2Ku systems increased beginning in November 2017, especially among Delta Air Line's northern routes. FE3 reported that there were issues with the radome where, with the changes in pressure, the ventilation system valves were letting deicing fluid into the 2Ku system. FE3 recalled that Gogo was trying a number of valves, many other

---

[5] Jonathan M. Gitlin, *An end to in-flight Wi-Fi misery is at hand with Gogo's 2Ku*, ARS TECHNICA (Jan. 22, 2018).
[6] Rabinowitz, *supra* n.4.

types of valves in an effort to get the system to work without leaking. FE3 also noted that FE3's team – Maintenance Control – would have meetings every day to discuss the issues.

82.     FE3 recounted that Gogo would be notified of the 2Ku failure almost immediately. According to FE3, when the 2Ku system failed, a passenger would report the outage to the pilot. The pilot would then generate an "ACARS" message (Aircraft Communications Addressing and Reporting System) to maintenance controllers. Gogo would receive notice of the ACARS message and, upon receipt, create a ticket for the aircraft. The ticket would be dispatched throughout the company, including engineering and design. These tickets (or "outage tickets") would be entered into Gogo's "Service Now" database. The "Service Now" database would generate "outage lists" that were received by everyone at the company, including the Chief Executive Officer. The "outage lists" were populated when the ticket was created after receipt of the ACARS message.

83.     FE3 explained that tickets created in connection with 2Ku problems contained a "wifi inop" message. When there was a "wifi inop" ticket, first a mechanic would verify the cause of the problem, and then, if it was a 2Ku issue, there was a special team that would be dispatched to work on the 2Ku system. Repairs would often include replacement of the radome, however the repair would not prevent a reoccurrence of the problem. Tickets would be updated based upon reports from mechanics.

84.     FE3 further explained that, given the nature of the repair process, planes would often go several weeks before being fixed. The repair process required the plane to be put in a hanger at least overnight, if not a few days, and airlines would not be able to use the plane during that time period (*i.e.*, the period during the repair in the hanger). The delay in the repair process was due to the fact that the airline would have to plan to ground the plane, remove the radome, fix the 2Ku system, restore the radome, and then place the plane back into service.

85.     The de-icing issue was important because when a 2Ku system was down, customers were unable to access Gogo's internet services. As a result, Gogo's take-rate and average revenue per aircraft (ARPA) would decrease. Higher take-rates by customers would help

increase Gogo's ARPA. The number of functioning aircrafts multiplied by the ARPA would yield an important part of Gogo's revenue. In turn, this revenue was an important factor in determining Gogo's net income and EBITDA—all other factors being equal, greater revenue resulted in greater EBITDA. Additionally, increasing both the number of aircraft online and the ARPA, and thus net revenue and EBITDA, was important to Gogo's long-term growth. By not disclosing that a number of aircrafts with the 2Ku system were having issues with their 2Ku radomes, Gogo misled the public to believe that both more aircraft were online and that, correspondingly, ARPA would at least maintain current levels, if not increase.

86.     Former Employee 4 ("FE4") worked for Gogo as an Aircraft Integration Engineer from April 2014 to July 2019. FE4 was part of Gogo's Aircraft Field Support team. FE4's team monitored an "application" that was developed by ThinKom (the manufacturer of the 2Ku system) that would detail performance for the antennas, including connectivity. When the 2Ku systems lost connectivity, the Aircraft Field Support team would know and then open "tickets" in "ServiceNow."

87.     According to FE4, the Aircraft Field Support team held daily meetings, at which the 2Ku problems were discussed on a regular basis. As confirmed by FE4, the Aircraft Field Support team was writing 2Ku tickets "left and right." During the winter months, the frequency of the tickets increased to "10 per week." Due to the defect, the 2Ku antennas were failing within a week of being installed. Glycol (*i.e.*, the deicing agent) was getting to the inner components of the 2Ku system through screens and covers.

88.     FE4 reported that one of Gogo's implemented fixes to 2Ku systems was the installation of a splash screen with drainage components and acrylic plastic covers to better seal the 2Ku system.

89.     Former Employee 5 ("FE5") was a Senior Program Manager for GoGo from April of 2015 until September of 2017. FE5 reported to Scott Weber. While at Gogo, FE5 worked on engineering aspects of the 2Ku system which required him to be present during installations. FE5 recalled attending weekly meetings about the 2Ku defects. These meetings were held in a "war

room" where the problems concerning the 2Ku system were "discussed, not hidden." These problems, according to FE5, were reported by Delta Air Lines in the winter months of 2017.

90.     FE5 believed that in attempts to remedy the 2Ku's issues, Gogo had a laboratory that the Company used to test the effects of deicing fluids.

### Gogo's New CEO Finally Discloses the Truth about the 2Ku Defects

91.     On May 4, 2018, Gogo held a conference call to discuss its first quarter of 2018 earnings. On the call, Gogo's new CEO, Oakleigh Thorne, revealed that Gogo's financial and operational results for the first quarter were terrible. The reason for Gogo's poor results was, in large part, to persisting issues arising from the faulty 2Ku. Mr. Thorne's statements, in relevant part, are below:

> *The other big issue in the quarter was the de-icing fluid impact on 2Ku. I'll get into this issue in more detail later, but the impact on Q1 was two-fold. First, airlines held back on marketing the product, which hurt revenue. And two, we ramped up spending to fix reliability as soon as we could, which hurt costs. We'll see even higher spending in Q2 as our remediation plans ramp up further in that quarter. The costs are primarily around maintenance expense and CapEx for new antenna inventory*.
>
> . . .
>
> My predecessor, Michael Small, talked about 98/98/15. That's 98% system availability, 98% flight route coverage and 15 megabits per second speeds, and that's still our goal. We're achieving the 98% coverage, and we're achieving average 15 megabits per second speeds globally. *But we slipped on the 98% system availability with our de-icing problems*.
>
> The good news is that we're back to over 96% reliability as of yesterday, and that project's underway that will get us back to 98% reliability by year-end. Now the cynics amongst you will say, "Of course the de-icing is better, the weather got warm." Well, actually, we saw a considerable improvement before the weather improved, mostly driven by new software releases.
>
> . . .
>
> I'm not going to go into all of our objectives and initiatives, but I'd like to give you a taste for what we're up to and how that will drive my four priorities. So let's start with the quality priority. Our first quality priority is, obviously, fixing 2Ku. Last summer, 2Ku was our most successful product launch ever with greater than 98% service availability. *And then came winter and availability plunged*

*down to the mid 80s. The major cause with de-icing fluid getting into the antenna raceways in which the antenna discs spin.*

*We've done a thorough analysis of root causes and discovered that while de-icing is the biggest issue there are also some manufacturing issues and software issues at fall. We also discovered the de-icing fluid entered the antenna ray down through far more pathways than we originally thought.* We fixed the software issues and we fixed the manufacturing issues. We are in the process of replacing all contaminated antennas of by the end of this quarter. Our goal was to hit 95% availability by June 30. And I want to repeat this week we are at 96%. So we're well ahead of plan.

In the second half of this year, we are planning to roll out a set of 2Ku modifications that will keep de-icing fluid out of the raceways and get us back to our target of 98% system availability. The benefits of getting 2Ku operating well again are obvious. First, we will get uptick in penetration rates in ARPA, and two prospective airlines will have confidence that the product will work and hopefully sign valuable contracts.

(emphasis added)

92.     On the earnings call, Defendant Rowan spoke about the de-icing issues and its financial impact, stating in relevant part:

*The third major impact on our financials this quarter are the 2Ku operational issues Oak described in detail. These are resulting in increased operational costs and lower service revenue. The bulk of the cost will be incurred in the first half of this year.*

. . .

We continue to upgrade our North American aircraft to 2Ku and completed 50 FLEX conversions. CA-North America segment profit declined by approximately $9 million from the prior year to $1.7 million. As a reminder, the first quarter of 2017 included a $9.4 million ATG Next Gen milestone expense.

Excluding this cost, CA-NA segment profit declined $19 million year-over-year. It was impacted by the increased satellite capacity cost to support the rollout of 2Ku, *increased operational cost to improve 2Ku performance and resolve the de-icing issues and lower service revenue.*

. . .

*Adjusted EBITDA is expected to be below the previously provided range of $75 million to $100 million due to increased costs and lost revenue related to the 2Ku implementation challenges we cited.*

. . .

> *With regard to the primary expense buckets related to the issues associated with the de-icing, there are several of them. First, as Oak described, we are replacing antennas. So there's an incremental cost of antenna purchases. There's also the cost of additional airline touches and the work associated with that, and the maintenance personnel. So those are some of the primary buckets that we see.*
>
> *And also it's important to recognize the revenue impact of this, in that the airlines are not going to be motivated to market aggressively until they see the 2Ku system performing at the level that we all expect, and to that point that they can be more aggressive in the marketing and drive the revenues as we planned.*

(emphasis added)

93.     In addition to the statements made during the investor conference call, Gogo also revealed in a press release issued that same day that it was "withdrawing its previously provided 2018 guidance for Adjusted EBITDA, airborne Cash CAPEX, and airborne equipment inventory purchases related to airline-directed installations, as well as Free Cash Flow guidance."

94.     On this news, the Company's shares fell $1.73 per share or over 18% over the next two trading days to close at $7.86 per share on May 7, 2018, damaging investors.

95.     On May 7, 2018, after the market closed, Moody's downgraded Gogo's credit rating, stating in relevant part:

> New York, May 07, 2018 -- Moody's Investors Service (Moody's) downgraded Gogo Inc.'s (Gogo) corporate family rating (CFR) to Caa1 from B3, downgraded the company's probability of default rating (PDR) to Caa1- PD from B3-PD, and changed the outlook to negative. Moody's also downgraded Gogo's speculative grade liquidity (SGL) rating to SGL-3 from SGL-2. The company's B2 senior secured rating was affirmed. *The downgrade of Gogo's CFR and change in outlook to negative reflects the company's weakening credit metrics, operational difficulties and deteriorating liquidity.* The downgrade of Gogo's SGL rating to SGL-3 reflects Moody's expectation that Gogo's liquidity will weaken.
>
> . . .
>
> RATINGS RATIONALE
>
> Gogo's Caa1 CFR reflects its small scale, competitive operating environment, low margins, high leverage (12.9x Moody's adjusted at year end 2017), and the expectation of negative free cash flow into at least 2019 as the company heavily invests in the rollout of in-flight connectivity technology to additional carriers outside the North American market, where it currently benefits from critical mass

in the commercial aviation segment and a dominant position in business aviation. The rating is supported by this currently strong North American market position, long-term carrier contracts, difficult barriers to entry, and diversified carrier relationships. Gogo's revenue growth profile, which is driven by international expansion and capacity and connectivity upgrades, is dependent on depleting cash balances to fund negative operating cash flow during a protracted growth phase.

Despite a strong performance from Gogo's business aviation segment in the first quarter of 2018, both of the company's two commercial aviation segments – CANA and CA-ROW -- had weak operating performance which diminished consolidated results. ***The performance degradation of antennas in many recently installed 2Ku radomes caused by the infiltration of de-icing fluid, used to remove ice from fuselages in winter climates, resulted in slower performance of the company's 2Ku technology, as well as significant remediation costs. Company adjusted EBITDA margin for the first quarter of 2018 was about 5%, down almost 1.5% from the prior year's quarter. These operational issues are expected to negatively impact EBITDA for the year and result in a very low, or potentially slightly negative, company adjusted EBITDA for the second quarter of 2018 since the bulk of remediation expenses will be incurred during the quarter.*** While Gogo believes it will have all operational issues related to this execution setback addressed by early summer, visibility is very limited as to the timing of any reversal of current negative revenue and EBITDA trends. Gogo also announced a series of leadership and organizational changes in April 2018, including the hiring of a new CEO. The company is midway through implementation of a new business plan focused on service quality improvement, revenue growth and cost structure optimization, with a June completion date targeted.

Moody's expects deteriorating operating performance in 2018 and projects Moody's adjusted leverage to remain above 12x. A rapidly declining cash balance will likely impair operating flexibility in 2019. More importantly, and with $362 million of convertible notes coming due on March 1, 2020, Moody's believes a near term refinancing is critical for Gogo to improve its long-term liquidity outlook.

Gogo's SGL-3 short-term liquidity rating indicates Moody's expectation that the company will sustain adequate liquidity through the next 12 to 18 months, but not beyond, with its existing cash balance. We expect negative free cash flow of at least $150 million over the next 12 months due to continued operating performance deterioration and a likely protracted reversal of current negative trends. As of March 31, 2018, Gogo had $300 million in cash and short term investments and no revolver outstanding, and faces a $362 million convertible notes maturity in about 22 months. Given the company's cash usage rate, the SGL rating would likely be downgraded to SGL-4 if these convertible notes are not refinanced by the end of the third quarter of 2018.

The negative outlook reflects Moody's expectation that operating metrics will remain weak in 2018. If negative free cash flow is greater than Moody's

anticipates or if the company fails to improve overall liquidity and address its $362 convertible note maturity due March 2020 by the end of the third quarter of 2018, Moody's could further downgrade the ratings.

Given the expectation for high leverage and negative free cash flow, an upgrade is unlikely. However, upward rating pressure would ensue if Gogo were on a path towards sustainable free cash flow generation. Downward rating pressure could develop if liquidity becomes further strained, revenue growth does not turn positive, or if the company is unable to migrate towards free cash flow generation and improve that free cash flow profile over time. Additionally, debt financed acquisitions and investments which result in a deterioration in cash flow or a material increase in leverage could result in a downgrade.

(emphasis added)

96.     On this news, the Company's shares fell $2.80 per share or over 35.6% to close at $5.06 per share on May 8, 2018, damaging investors.

97.     Numerous analysts reported on the issues with Gogo's 2Ku system, with many downgrading their price targets. Andrew Spinola of Wells Fargo wrote in his May 4, 2018 report:

The new management team is taking steps to reassess every aspect of the business. As a result, the company withdrew its prior '18 guidance and stated that it now expects '18 EBITDA below the bottom-end of the prior range. '18 is to be a transition year for Gogo. *A major driver of the weaker EBITDA is the spend associated with fixing the De-Icing problem with installed 2Ku units.*

. . .

*We are reducing our estimates to reflect the greater than expected pressures on the business from the De-Icing issue*, the ramp of satellite expenses, and the transition of the major US customer to the Airline-Directed model. Given the lack of visibility into the business, we are reducing our price target to $7 on a lower multiple of '20E EBITDA.

. . .

Current Model Requires Some Additional Capital; Growth Capital Could Be Needed for New Wins – Gogo was frank about its capital position. The company's current focus is the refinancing of the 2020 convertible, but it is also focused on the long-term need. *Gogo will need a little additional capital to fund the current business, but might look to raise growth capital if new business wins require it.*

(emphasis added)

24

98.     Simon Flannery of Morgan Stanley noted in his May 4, 2018 report that key focus areas post release and call were to "Expect "extremely low" 2Q EBITDA on the back of 2Ku fix costs: Results are currently being negatively impacted by 2Ku performance issues related to de-icing fluid, manufacturing issues and software problems, which pushed service availability to the mid-80% range during the winter vs the company's planned 98%. While availability has rebounded to 96% now (partially due to better weather), Gogo is expecting to incur ~$25M in costs (weighted to 2Q) as it seeks to address these problems and is working to rollout a set of 2Ku modifications in 2H." He also noted that "'Some' additional capital likely needed; leverage more elevated following $109M of cash burn in 1Q: With the company conducting a new financial planning process, management noted that the business as it currently stands would require "some but not a lot of additional capital" compared to the previous view that they were fully funded and would reach full year positive FCF by 2020. Gogo is also looking to address its 2020 convertible notes. Net leverage now sits at ~15.5x annualized 1Q EBITDA and ~12.5x TTM EBITDA."

99.     Paul Penny of Northland Capital Markets wrote on May 7, 2018 in his report:

At a high level, GOGO's Q1 results and subsequent conference call reminded us of yet another infamous Mark Twain quote – "If you tell the truth, you don't have to remember anything", which was a slight upgrade from last quarter's Mark Twain quote of "Get your facts first then you can distort them as you please". In other words, while the operating and financial risks continue to mount for GOGO, *we were impressed that new CEO Oakleigh Thorne at least tried to distance himself from the previous CEO's outlandish predictions and un-realistic financial targets and attempted to set a new more realistic / honest talk track on the company's Q1 conference call.*

. . .

Above and incrementally more important than the Q1 results, was management's proactive admission to a challenging EBITDA and strained B/S backdrop in pulling away from the previously forecasted adjusted EBITDA guidance of $75-100M and *explicitly conceding that "they would need some but not a lot of additional capital".*

. . .

*As we've always suspected (through our cash flow statement work), GOGO finally admitted that they will need to raise money going forward, as the company burned ~$109M of cash in the quarter and retracted its 2018 FCF guidance.*

. . .

On a side note and on the conference call, *we were pleased to hear new CEO Oakleigh Thorne explicitly withdraw from previous CEO's outlandish prediction that "ARPA will double by 2021" (which would equate to ~$263K).*

*Escalating reliability issues with their new 2Ku antennas, which is clearly much more than a simple "de-icing" equipment issue. This admission comes post last quarter's conference call where the previous management team vocalized minimal / contained damage.* We believe the issues for GOGO are wide reaching: 1) Massive new customer reputational damage (as we've highlighted the material increase in customer complaints of late) as flying customers not just want, but expect reliable / predictable IFC, 2) Incremental OPEX to repair (hard to quantify but we estimate in the $20-40M range) and 3) Increases the probability of de-selection risk by GOGO sole-sourced Delta (draconian scenario – rip and replace like American / conservative scenario - adding a 2nd IFC provider to new aircraft fleets).

(emphasis added)

100.     Meanwhile, Cowen analyst Lance Vitanza seemingly felt misled as well. In his May 8, 2018 report he wrote, "Gogo had previously disclosed that de-icing fluid leaking into antenna radomes had caused service failure on some of its newly installed 2Ku aircraft. On its new CEO's first earnings call, the company revealed the problem was much worse than initially thought, with service availability plunging to the mid-80% vs. the company's targeted 98-100% level. The issue has largely been resolved, with service availability back up to 96% (vs. management's interim target for 95% by June 30)."

## FALSE AND MISLEADING STATEMENTS

101.     Defendants provided investors and analysts with materially misleading information about the problems with the 2Ku system and expected revenue. These misrepresentations and omissions occurred between February 27, 2017 and May 7, 2018. As alleged below, these misrepresentations and omissions concealed the truth about the 2Ku system that was ultimately disclosed.

**February 27, 2017**

102.    On February 27, 2017, Gogo filed an annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendants Small and Smagley. The 2016 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Small and Smagley attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

103.    The 2016 10-K discussed the Company's 2Ku antenna and its installation:

*We may be unsuccessful or delayed in widely deploying and operating our 2Ku technology.*

Our 2Ku solution, which offers additional bandwidth and improved speeds for our connectivity service, as compared to our ATG service, became available to commercial aircraft in 2016. As of December 31, 2016, we had approximately 1,400 aircraft awarded, but not yet installed, and ***there can be no assurance that we can meet our installation goals on our current timeline, due to, among other things, the failure of any 2Ku-related technology and equipment to perform as expected, problems arising in the manufacturing process***, our reliance on single-source suppliers to provide certain necessary components and delays in obtaining or failures to obtain the required regulatory approvals for installation and operation of such equipment and the provision of service to passengers. In addition, other providers of satellite-based connectivity services currently have services available for commercial deployment that are intended to compete directly with 2Ku, and airlines may choose to adopt such a service over 2Ku. We currently have agreements with seven airlines to provide 2Ku to all or a portion of such airlines' fleets. ***The failure of 2Ku to perform as expected, or significant delays in our ability to install it, could result in material breaches of such agreements which could in turn result in termination of such agreements and liability to Gogo***. In addition, five airlines have agreed or announced their intent to enter into definitive agreements with us. If 2Ku fails to perform as expected or its commercial availability is significantly delayed as compared to the timelines for which we have contracted, our business, business prospects and results of operations may be materially adversely affected. . . .

(emphasis added)

104. The above statements from the 2016 10-K were misleading because they concealed the significant issues that Gogo was already having with the 2Ku systems and the associated costs that came from trouble-shooting the problems and often repeatedly replacing the radome seals. These statements misrepresented installed 2Ku systems as being viable, working, and providing revenue. The significant costs in the form of new equipment, labor, decreased ARPA, and lost revenue in addressing the radome issues were not disclosed, but instead misleadingly portrayed as a mere risk.

105. Accordingly, Gogo, Small, and Smagley materially misled investors by merely suggesting that a "failure of the 2Ku to perform" *could* occur at some unknown point in the future, given that the 2Ku was *already* suffering from a design failure. Discovery will confirm precisely how many time, money, and effort Gogo had already expended by this point, which will underscore the materially misleading nature of the 2016 10-K.

106. Also, on February 27, 2017, Defendants Small and Smagley hosted a conference call to discuss Gogo's fourth quarter earnings for 2016. During the call, Defendant Smagley discussed 2Ku's impact on the Company:

> *We expect a significant decline in cash needs in 2018 versus 2017 due to a substantial decline in Gogo's average investment for 2Ku installation and a significant increase in consolidated adjusted EBITDA.* We expect 2018 cash CapEx of between $70 million and $120 million. The decrease in cash CapEx versus prior guidance includes an estimate that 70% to 80% of 2018 2Ku equipment transactions will be under our airline-directed business model. Under this model equipment transactions are accounted for as revenue and cost of goods sold rather than as capital expenditures and deferred airborne leasing proceeds.
>
> In summary, we remain well-positioned on our path to profitability as we increase aircraft online, ARPA and margin while simultaneously reducing our investment per aircraft. Accelerated 2Ku installs and improved operating leverage will enable us to reach free cash flow now in 2019.

(emphasis added)

107. Defendant Smagley's statements were misleading because they concealed the true costs associated with the 2Ku radome fix, and instead portrayed Gogo as being on track for

28

significant increases in adjusted EBITDA. In reality, the costs of the 2Ku fix would decrease adjusted EBITDA as well as contribute to Gogo's need to raise additional capital to continue as a going concern. Given that the winter was coming to a close at the time of the above statement, Smagley knew about the 2Ku's design defect and that the costs associated with fixing it would increase exponentially the following year as additional 2Ku systems were installed and came online.

108.    During the call, Defendant Small also discussed 2Ku's impact on the Company:

As far as the funnel and our business, ***2Ku is performing exceptionally well.*** The airline industry is seeing that. Not only are we saying it but flyers are increasingly saying it and fleets and reporter articles.

So we are feeling good about how that is being received. I mentioned in the script we are emphasizing Asia and the Middle East this year. As you look out over the next decade or two that is where a lot of the planes are going to be.

And I am looking forward to adding to Japan Airlines in that region. And then to maintain long-run growth rates getting into the OEM channel is critical and we will make significant progress there this year. We expect to deliver with our equipment on it a new 787 and the new A350 this year.

That will happen. So those are the two things, two areas of focus for us to keep our growth rate and aircraft high.

109.    Defendant Small's statement above was misleading because it omitted to disclose the significant problems with the de-icing and anti-icing fluids causing the 2Ku system to malfunction costs and decreased ARPA and revenue, and instead portrays to the public that the 2Ku systems are "performing exceptionally well."

110.    In response to an analyst question about marketing costs for the 2Ku systems, Defendant Small also stated as follows:

2Ku will sell itself at least out-of-the-box. The challenge to grow revenue and increase take rate is getting more bandwidth into the system. And, yes, we are actively talking with all our airline partners how we will better market our service once the bandwidth is there.

***But the fundamental issue is bandwidth***. And you saw how much take rate went up this quarter, and you will see continued increase in take rate.

So I agree with you, Carter, we are going to have to spend more focused on marketing now that we have the bandwidth. But fundamentally what is going to make revenue growth is that we are moving to an era of much greater bandwidth abundance.

111.     Defendant Small's statement was materially misleading because it omitted that the true "fundamental issue" affecting the 2Ku systems was the installation design defect. The response he gave to the analyst's questions concealed the fact that Gogo's 2Ku design was defective and that it was necessitating (and would continue to necessitate) expensive repair costs which, in turn, would directly impact revenue.

## May 4, 2017

112.     On May 4, 2017, Defendants Small and Rowan hosted an investor conference call to discuss Gogo's earnings for the first quarter of 2017. During the call, Defendant Small discussed 2Ku's impact on the Company:

> We also have the lowest bandwidth cost structure in the industry for the following reasons. First, our 2Ku antenna is far more efficient than any other competitors', due to its proprietary design, which yields nearly twice as many megabits per megahertz of capacity.
>
> . . .
>
> Add it all up, and *2Ku is delivering the best performance in the industry, characterized by 3 numbers: 15, 98, 98. This means 15-plus megabits per second speed to connect the passengers; 98% coverage of global flight hours and 98% service availability. This is the performance we are delivering today to 2Ku aircraft around the world.* We are driving continued improvements across all 3 performance metrics. With the new modem in HTS coming this year, we will see rapid improvement in speed on our satellite network.
>
> *Wrapping up, we're delivering what airlines care about: 15, 98, 98, which means high speeds everywhere they fly, all the time.* With that, I'd like to turn it over to John Wade.

(emphasis added)

113.     Defendant Small's above statements were materially misleading because they omitted to disclose that de-icing and anti-icing fluid easily leaked into the 2Ku units rendering

them non-functional. Thus, the 2Ku systems were not yielding the "15, 98, 98" performance "all the time."

114.    During the question-and-answer portion of the call, analyst Lance William Vitanza from Cowen and Company asked for an "update on the 2Ku install time." In response, Defendant Wade stated that:

> [W]e continue to set the record here and we have now achieved installations with experienced crews of under 3 days, which as far as we know, is by far the fastest installation of our large radar systems. So it's going great."

115.    This statement was materially misleading because, by omitting the fact that the installation was defective, it created the false impression that the installation process of the 2Ku's were meeting and/or exceeding technical expectations. Moreover, while the installation may have improved, the 2Ku system being installed was known to be defective.

116.    Analyst James Breen of William Blair & Company also asked for information about the status of the 2Ku systems and their effect on ARPA. Defendant Small replied, in relevant part:

> What we're seeing is a phenomenal customer experience. It's like people, I guess, are used to using the Internet on the ground in their homes, and in their offices. We've seen the entire plane, for all practical purposes, get on it at one time and use it. Streaming, works great. We summarized the experience because we're trying to put rigorous performance metrics around this, and be able to communicate them to you is that 15 plus megabits per second, 98% coverage of global flight hours, and 98% service availability. ***And not only that, that's what we're delivering today, and it's getting better every day.***

(emphasis added)

117.    Defendant Small's above statement was materially misleading because it omitted to disclose that de-icing and anti-icing fluid easily leaked into the 2Ku units rendering them non-functional. Even if that problem was not occurring at this particular point in time (being that it was spring), the defect had not yet been resolved. Thus, when winter returned, the 2Ku systems

would not be able to provide a "phenomenal customer experience" or meet the "15, 98, 98" performance metrics.

### June 14, 2017

118.    On June 14, 2017, the Company participated in the William Blair Growth Stock Conference. During the conference, Defendant Small stated:

> So 2Ku, it's our new global satellite solution. We deployed it last year, a first plane. We now have over 200 plane flying, and *we now have proven performance on the 2Ku. And that is to deliver 15 or more megabits per second to the user, do it over 98% of the global flight hours -- so all over the globe -- and do it with 98%-plus availability.* Those are industry-leading stats. We've demoed this extensively with equity analysts and investors, with the media. And of course it's been flying on the planes, and to consistently rave reviews.

(emphasis added)

119.    Defendant Small's comment above was materially misleading because it yet again failed to disclose the unresolved problems that Gogo had with the 2Ku system. Small misleadingly promoted the "15, 98, 98" performance metrics without disclosing that 2Ku systems (over 200 at this time, according to Small's statement) suffered from a serious defect that caused them to malfunction when de-icing fluid was applied to the radomes. Thus, Small misled the public to believe that over 200 planes flying meant that over 200 planes had fully functional 2Ku systems which provided meaningful contribution to ARPA, revenue, adjusted EBITDA, and ultimately, free cash flow. In reality, the problems with the 2Ku systems were increasing costs and decreasing ARPA, revenue, adjusted EBITDA, and free cash flow.

### August 7, 2017

120.    On August 7, 2017, Defendants Small and Rowan hosted an investor conference call to discuss Gogo's second quarter earnings for 2017. During the call, Defendant Small discussed 2Ku's impact on the Company:

> Our proprietary 2Ku technology continues to set the standard for aircraft connectivity in terms of performance, market adoption and cost.

> ***On performance, we deliver what we call 15, 98, 98. That means 15 megabits per second to the passenger device, service coverage on 98% of flight hours around the world, with service availability 98% of the time.*** No other provider can match this performance.

(emphasis added)

121.    Defendant Small's comment above was materially misleading because it provided investors with the "15, 98, 98" performance metrics without disclosing that Gogo's 2Ku systems suffered from a serious defect that caused them to malfunction when de-icing fluid was applied to the radomes. Thus, Small misled the public to believe the 2Ku systems were fully functional while in reality, the problems with the 2Ku systems were increasing costs through repair and decreasing ARPA, revenue, adjusted EBITDA, and ultimately, free cash flow.

122.    Defendant Wade discussed Gogo's supposed "achievements" with regard to 2Ku installation time:

> We now have the capability to install our airborne connectivity systems at an unprecedented speed and scale, and have raised the bar for the industry on what is considered achievable. One of our most significant operational achievements this year has been to reduce the 2Ku installation time to less than 2 days, something none of our competitors has come close to achieving. This progress results in significant cost savings for us and even more importantly, enables our airline partners to keep their aircraft in service and generating revenue.

123.    This statement was materially misleading because, by omitting the fact that the installation was defective, it created the false impression that the installation process of the 2Ku's were meeting and/or exceeding technical expectations. Moreover, while the installation may have improved, the 2Ku system was known to be defective.

124.    Defendant Rowan also discussed 2Ku's impact on the financials:

> Let me expand briefly on the profile of our capital expenditures. As you know, a key driver of our CapEx spend is the capital we invest to bring new 2Ku aircraft online, particularly the cost and installation of airborne equipment.

> We believe it is helpful to look at the business before and after these success-based investments. Segregating the financials in this way helps reveal the underlying economics of the ongoing business by breaking out our co-investment with our airline partners for new installations. While this airborne equipment

represents significant current investment, it is a source of future growth and profitability.

We expect approximately 70% of the $230 million to $260 million in 2017 CapEx to be for the success-based 2Ku airborne equipment costs, and it will continue to represent a significant portion of our CapEx as we install our 2Ku backlog. The returns associated with this investment represent attractive customer economics, and *we expect the net cost to Gogo for the airborne equipment and installations to come down in 2018 versus 2017.*

. . .

Regarding EBITDA, we have made significant investments in our next-generation technologies and bringing new aircraft online during the first half of the year. Based on expected revenue growth and some abatement in investments in the back half of the year, we expect EBITDA to approximately double from the first half of 2017 to the second half, putting us at the low end of the $60 million to $75 million EBITDA guidance we provided. *We continue to expect EBITDA to be significantly higher in 2018 than 2017 and reaffirm our guidance of achieving positive free cash flow in 2019.*

(emphasis added)

125.    Defendant Rowan's above statements were materially misleading because they communicated to the public that the Company expected the net costs for the airborne equipment and installations to decrease in 2018, while omitting to disclose the mounting costs from trying to fix the problems with the leaking 2Ku radomes. Rowan's statements misled the public to believe that CapEx was decreasing, while omitting material information about the increasing associated with the faulty 2Ku radomes. Further, his statements about the EBITDA and free cash flow also failed to address the 2Ku radome problem, as well as failed to disclose that Gogo in fact needed capital, was not on track for positive free cash flow, and was in fact planning a note offering. Given the ongoing problems with the 2Ku radomes, additional repair expenses were going to materially detract from adjusted EBITDA. Rowan's expectations concerning adjusted EBTIDA for 2018 were not reasonable in light of the facts known at that present point in time.

**November 2, 2017**

126.    On November 2, 2017, Defendants Small and Rowan hosted an investor conference call to discuss Gogo's third quarter earnings. During the call, Defendant Small discussed 2Ku's impact on the Company:

> Our rapid deployment of 2Ku is transformative. We will have much more to say about this at our upcoming Investor Day on November 17, but at a high level, the increase in bandwidth transforms our offerings in several ways. First, it gives us the ability to vastly improve the customer experience, including, very importantly, across our North American networks. Second, it allows us to accelerate take rate growth through Gogo, airline and third-party programs. And third, it positions us to begin offering new products and services.
>
> We are confident this transformation will accelerate revenue growth and drive long-term profitability. ***In fact, we are already seeing evidence of this in the form of increased take rates and improved ARPA on our satellite systems***.
>
> We recognize that having great technology is not enough. We need to get that technology on planes quickly. ***To that end, we have made significant progress in improving our installation times and reducing installation costs***.

127.    Defendant Small's statements above were materially misleading because they omitted to disclose the serious defects that caused the 2Ku systems to malfunction when de-icing fluid was applied to the radomes. As FE2 and FE3 reported, Delta Air Lines was complaining about the 2Ku system at this time and had even threatened to take them off-line. 'Thus, Small misled the public to believe the 2Ku systems were fully functional with increased bandwidth and higher take rates which would have had positive impacts on revenue growth and long-term profitability. In reality, the problems with the 2Ku systems were increasing costs through repair and decreasing ARPA and revenue.

128.    Defendant Wade also discussed Gogo's installations of the 2Ku systems:

> Thanks, Michael. During the quarter, we continued to ramp our 2Ku install pace in Commercial Aviation. In October, we installed 76 aircraft, up from 50 in September, bringing total 2017 installed aircraft to 322. Our installation time has dropped to about 36 hours. We are well positioned to hit our install guidance and ramp from here.

129.     This statement was materially misleading because, by omitting the fact that the installation was defective, it created the false impression that the installation process of the 2Ku's were meeting and/or exceeding technical expectations.

130.     On the call, Defendant Rowan provided guidance for Gogo's financials, stating in relevant part:

> Over all, *ARPA was flat compared to Q2, reflecting the expected dilution from newly launched airlines which represented 25% of aircraft online for Q3. We continue to expect strong double-digit growth from our existing fleet, although consolidated CA-ROW ARPA is likely to be lower in Q4 and during 2018 due to new aircraft additions throughout that period.*
>
> . . .
>
> We expect adjusted EBITDA to approximately double from the first half of 2017 to the second half of the year, putting us at the low end of the $60 million to $75 million range, excluding the $4.5 million in charges we incurred this quarter. *We expect adjusted EBITDA to be significantly higher in 2018 than in 2017.*

(emphasis added)

131.     Defendant Rowan's above statements were misleading because they omitted to disclose the problem with the 2Ku systems and given the ongoing problems with the 2Ku radomes, additional repair expenses were going to materially detract from adjusted EBITDA. Rowan's expectations concerning adjusted EBTIDA for 2018 were not reasonable in light of the facts known at that present point in time.

132.     Defendant Rowan also fielded calls from a number of analysts on the call:

> <Robert Ari Gutman - Guggenheim Securities>: In terms of the ROW [ARPA] dilution that you're expecting, going forward, from the new installations, what would be the magnitude there of the impact? And if you could provide us a little more detail on this tail-mounted, high-throughput satellite antenna going on the business jets? How does that compare to the 2Ku antenna and how do you provide that level of throughput on a smaller antenna tail mounted?
>
> . . .

<Defendant Rowan>: I think it is worth reiterating that the ARPA for ROW is very robust, at $226,000. And in this quarter is about a quarter of the ROW aircraft, including Virgin Atlantic and GOL. ***The dilution that we expect, going forward, is totally related to the new aircraft airlines coming online***. So it will have a relatively meaningful impact, over all, but I think it's important to look at the fact that we expect the ARPA for the existing aircraft to grow in a continuing double-digit rate throughout that period.

(emphasis added)

133. Defendant Rowan's above statement was misleading because he stated that the ARPA 'dilution" was "totally related to the new aircraft airlines coming online," when in fact the decreased ARPA was due, at least in part, to the problems with the leaking 2Ku radomes on all aircrafts installed with the 2Ku system which caused the radomes to malfunction.

## November 17, 2017

134. On November 17, 2017, Defendants Small and Rowan hosted Gogo's Investor and Analyst Day. During the presentation, Defendant Small represented to investors that Gogo's 2Ku systems were providing in-flight connectivity in line with the Company's previously-stated "15, 98, 98" performance metrics. In pertinent part, Small told investors:

We now have a global high capacity, highly available network. There's nothing left to do to make this happen. No need to launch new satellites, no new antenna design, no new modem design. ***This is out there and happening today. We describe the performance as 15, 98, 98. That's 15 megabits per second to the device, 98% of global flight hours, and 98% availability***. This provides a ground-like experience everywhere aircraft fly.

(emphasis added)

135. Defendant Small's comment above was materially misleading because it provided investors with the "15, 98, 98" performance metrics without disclosing that Gogo's 2Ku systems suffered from a serious defect that caused them to malfunction when de-icing fluid was applied to the radomes. Thus, Small misled the public to believe the 2Ku systems were fully functional while in reality, the problems with the 2Ku systems were increasing costs through repair and decreasing ARPA, revenue, adjusted EBITDA, and ultimately, free cash flow. Small's statement was also misleading due to the fact that, at the time of this statement, Gogo was receiving an

increased number of 2Ku system complaints from Delta Air Lines as de-icing fluid was being applied to planes with greater frequency during the winter months of 2017 and 2018. As would later be revealed, 2Ku system coverage was materially less than 98%; *indeed, Mr. Thorne confirmed on May 4, 2018 that "availability [had] plunged down to the mid 80s" during this time frame*.

136.    Defendant Wade also presented concerning the installation process for the 2Ku systems. In pertinent part, he stated:

> Another important aspect of what we do is the installation itself. So for all those aftermarket aircraft, whether (inaudible) an STC or a service bulletin, somebody has got to put the equipment on the airplane. Gogo today has over 3,000 aircraft where we've done those form of installations either through air-to-ground or through 2Ku. In fact, when I stood here a year ago, the average time to install a 2Ku system or a large radome system was about a week. Well, we took a look at that and said, "There's got to be a better way." And today, we managed to optimize that. So today, our fastest install is now just a mere 30 hours. Aircraft comes in, 30 hours later, it goes out. We were able to take a lot of our experience on air-to-ground where we reduced that installation time to as low as 10 hours to optimize the 2Ku installation down to 30. And with the arrival of ATG NextGen next year, we're very, very confident this is going to merely be an overnight installation, all those of which give us a competitive advantage in terms of the downtime on that aircraft. The sooner it can return to service, the less cost the airline has to justify in terms of bringing it out of service for installation. And in fact, all those abilities, you put them together in terms of the certification and the installation time, we can take any airline fleet from no connectivity to full connectivity in about a 2-year period. Now you put all those things together and we're going to give you a demonstration almost in real time of what a 2Ku installation looks like.
>
> . . .
>
> But today, we scale that. And as you can see from this graph here, we're now operating at a very high level of installations. In September, we achieved 50 2Ku installations. In October, we achieved 76. And at the rate we're going the first 3 weeks into November, we will exceed that by the end of November. So again, a year ago, I stood here and said we were going to develop a plan to install 750 2Kus in a year, and today, I can stand here in front of you and say, "We did it. It's done. We're capable of installing at that rate."

137.    This statement was materially misleading because, by omitting the fact that the installation was defective, it created the false impression that the installation process of the

2Ku's were meeting and/or exceeding technical expectations. As FE2 and FE3 reported, Delta Air Lines was complaining about the 2Ku system at this time and had even threatened to take them off-line.

138.    Defendant Rowan discussed Gogo's ARPA in relation to the 2Ku systems being installed and coming online:

> So you can see the data today for these are 3 key metrics. The average for the first 3 quarters of 2017 and there's some variability here across various airlines, but it averaged $240,000 for the first 3 quarters. That's a new number, we've not previously disclosed that. Secondly, is if you look at the ARPA for the Commercial Aviation business, excluding the RJs, it's about $180,000. And the service margin for this business is 48%, but let me talk a little bit about the blend that's buried in that 48%. You saw that we achieved about 61% service revenue margins in our CA North America business and we still have negative in the most recent quarter, a negative 28% service revenue margin in our ROW business. So ***you can see the reason we see that this level of service margin is going to grow over time as those ROW aircraft get more seasoned.***
>
> . . .
>
> First is with the foundation for growth is the seasoning of ARPA as aircraft come online over time. There's a significant differential between ARPA for existing aircraft and new aircraft, and we are providing this new information for you to give you better visibility into this. So just to orient you to the chart, if you look at the total line there, those are the numbers we reported in Q3. So 295 aircraft flying and $226,000 in annualized ARPA, so over 25% of those aircraft were new aircraft during that period***. But you can see the substantial differential in ARPA from $282,000 for the existing aircraft versus the $76,000.*** And then we looked at where this was 3 years ago. So if you go back to the third quarter of 2014, what are now today's existing aircraft were the new aircraft, so you can see that they were at $69,000 and they're now at $280,000. So you can see the progression over time as the aircraft gets seasoned. So there are really 2 drivers of Rest of World growth. ***One is the increased number of aircraft online and secondly is the increase in ARPA as these seasoned aircraft mature to more seasoned ARPA levels.***
>
> . . .
>
> So what is the CA-ROW path to profitability? Let me just summarize it here. So you can see what's happening on revenue, you can see the aircraft online on the lower left-hand side of this chart. The profitability levers for ROW are the same as they are for the rest of the company. So in terms of aircraft, the awards that we already have in place triples the number of aircraft online. With regard to ARPA, it's very strong. ***Currently, it's the highest ARPA in the company, and these tenured aircraft will offset the dilution from new fleets as they come online.*** And

they will be substantial percentages of new fleets because of the high numbers of aircraft that we have won. And thirdly, is we get very high incremental margin from additional aircraft. This is particularly true in this part of the world because we have established a global network coverage and we're now flying more and more aircraft across that. ***So you saw the steep decline in those costs, which we expect to continue as we add the additional aircraft flying over that network.***

. . .

So final point on Gogo's economics at the company level, and that is that 2018 is really the first year that we expect to see significant benefits from classical operating leverage. That as the revenues grow, ***that we're able to hold the expense levels relatively flat***. You're going to see more of that fall to the EBITDA line. So on the core investments, as Michael described, they are comprised of both cost of service and operating expenses. You can see, so we've talked a lot about how the improved network utilization is going to drive financial performance there.

On the operating expense side, with it representing over 40% of the cost structure, this is the classical operating leverage that we expect to see. ***We said that we expect 2018 EBITDA to be substantially higher than 2017 and this is the reason for that, in a nutshell***.

(emphasis added)

139.    Defendant Rowan's above statements were misleading because he stated "seasoned aircraft" would "mature to more seasoned ARPA levels," when in reality, Gogo was searching for a solution to the leaking 2Ku radome problem, and that increased ARPA would not be from aircrafts becoming more "seasoned" or "mature," but instead Gogo fixing the 2Ku radome problem.  Rowan also states that there is a "steep decline" in costs while failing to discuss the increased costs from trying to fix the 2Ku radome problem. Moreover, given the ongoing and intensifying problems with the 2Ku radomes as winter set in, additional repair expenses were going to materially detract from adjusted EBITDA. Rowan's expectations concerning adjusted EBTIDA for 2018 were not reasonable in light of the facts known at that present point in time.

## December 6, 2017

140.    On December 6, 2017, Defendants Small and Rowan participated in the UBS Global Media and Communications Conference on behalf of Gogo. During the conference,

Defendants answered questions from analysts about the 2Ku systems and their impact on the Company's EBITDA. Defendants Small and Rowan responded as follows:

> <John Christopher Hodulik - UBS>: Got you. And obviously, the move to 2Ku, it's a big priority for the company and sort of key to your competitiveness. Can you just talk about the benefits of 2Ku maybe versus the existing solutions that Gogo has on planes? And what else is out there in the market?

> <Defendant Small>: Yes. ***Gogo -- our 2Ku is the best-performing solution in the marketplace. We describe that as 15/98/98. 15 megabits per second to a device, 98% of the global flight powers covered and 98% availability***. And those are industry-leading stats. In our view, it's a function of the design of the antenna. It's bigger and rounder, so it gets -- converts megahertz into megabits twice as efficiently. And it has better coverage characteristics everywhere in the globe. And it has fewer moving parts, so it works more reliably. So we have the superior technical solution in the marketplace and that it's a major cost and performance advantage.

(emphasis added)

141.    Defendant Small's comment above was materially misleading because it provided investors with the "15, 98, 98" performance metrics without disclosing that Gogo's 2Ku systems suffered from a serious defect that caused them to malfunction when de-icing fluid was applied to the radomes. Small's statement was also misleading due to the fact that, at the time of this statement, Gogo was receiving an increased number of 2Ku system complaints from Delta Air Lines as de-icing fluid was being applied to planes with greater frequency during the winter months of 2017 and 2018. As would later be revealed, 2Ku system coverage was materially less than 98%; ***indeed, Mr. Thorne confirmed on May 4, 2018 that "availability [had] plunged down to the mid 80s" during this time frame***.

142.    Later in the interview, Mr. Hodulik inquired as to the time it would take Gogo to generate expected ARPA from newly installed 2Ku system aircrafts:

> <John Christopher Hodulik - UBS>: Yes, I mean, if we talk about the difference, I mean, what does it mean in terms of sort of the economics of the business for you? So the take rates, pricings, the -- I think the focus is sort of revenue per plane, how do you expect -- I mean, you've got some decent evidence, how is that filtered through?

<Defendant Small>: Yes, so at the end of the day, the difference between what happens in the air and not on the ground has been driven by a difference of bandwidth. There's been limited bandwidth on the plane and there's been more bandwidth on the ground, then we see 100% take rates on the ground and we see 7% in the air. And narrowing dramatically that gap between the air and the ground is what's going to drive our business. And I'm highly confident that translates into ARPA, now -- or average revenue per aircraft. In the short run, in 2018, we have said it will be flattish in North America because we -- you kind of got to get to critical mass to implement the marketing programs to really capitalize on the additional bandwidth, and to some degree, the migration of some of the American planes off our network. ***The -- in Rest of World, we are going to be launching many new airlines. And when you bring on a new airlines, they -- before you get to full fleet or nearly full fleet deployment, you tend to see a lower ARPA and it takes a couple of years for those aircraft to season***. But overall, bandwidth will translate into revenue.

(emphasis added)

143.    Defendant Small's statement was materially misleading because it concealed the true reason why ARPA is lower among newly installed 2Ku aircrafts. Instead of "season[ing]," ARPA on new 2Ku aircrafts was in fact lower because of the ongoing radome problem.

144.    Mr. Hodulik also asked Defendants Small and Rowan about "increasing expenses" associated with the 2Ku system installations. Defendants responded as follows:

<John Christopher Hodulik - UBS>: Got you. So looking at the increase in ARPA, maybe some of the increasing expenses you get along with that as you roll those out, how does the margin picture sort of shape up as -- when we look at the North American segment?

<Defendant Small>: So well, we've made a few comments that actually have been really consistent since we went public. We see a 50% gross margin in this business. We see that in both Rest of World and North America, we've actually gotten more in the zip code of 60% in North America, and we've said we'd get to there in 2019 in the Rest of the World. So margins are attractive.

<Defendant Rowan>: Yes. And you really see very strong leverage on increased utilization of the satellite network in the Rest of World. So you're seeing a very significant improvement there along -- towards the targets of market that Michael outlined. And for example, just to give you a couple of numbers, it was maybe a little over 60% for the first 3 quarters of this year, but in the most recent quarter, it was less than a negative 30%. So you can see that, that has been improved by a factor of 2, just from a -- the most recent 4-quarter period to the most recent period. So what -- and the reason for that is that as we begin to fly more aircraft over that global network, you get significant bandwidth benefits, and so our cost per effective megabyte has come down by about 80% over a 2-year period. And

then very importantly, as we install these -- the significant backlog in Rest of World, it about triples the number of planes flying. And so as we get those planes installed, that enables us to achieve a positive segment margin for that Rest of the World business, right? So we've been investing about $100 million over the most recent 4 quarters, and so that goes basically to breakeven by the installation of those aircraft. So it meaningfully derisks the international business.

145.     Defendants' above statements were materially misleading because they omitted to disclose that installation and/or repair expenses were increasing as Gogo faced more and more difficulty with regard to the 2Ku systems during the winter months. At this point in time, Gogo had not yet resolved the radome design defect. Accordingly, when discussing installation costs and ARPA in the context of the 2Ku systems, they should have disclosed the significant problems that Gogo was facing at that point in time. These problems directly impacted the margins that Defendants were promoting as positive aspects of Gogo's operations.

146.     Mr. Hodulik also asked Defendants Small and Rowan about anticipated EBITDA and expenses for the upcoming year as Gogo increased its 2Ku system installations. Defendant Rowan responded as follows:

> <John Christopher Hodulik - UBS>: Right. And what was -- I think you guys updated at the Analyst Day, but what was your latest in terms of when that -- you would -- I think if you already have seen peak EBITDA losses, then when do you expect to be at EBITDA breakeven on the international?

> <Defendant Rowan>: Yes, *so we said that we expect 2017 to be the peak in EBITDA loss year*, improving from this point forward, and that we are, as a company, trying to achieve positive free cash flow in 2019 and free cash flow positive for the full year 2020. And Rest of the World is an important contributing factor to that because as we install these planes over the next 2 to 3 years, that is what's going to enable us to achieve that breakeven point in Rest of World, which is about $100 million contribution to EBITDA relative to where we are today.

> < John Christopher Hodulik - UBS>: Right. So you've got a sort of a doubling of sort of 2Ku planes coming onboard, you've got doubling of the sort of ARPA over the next several years. How much of that, and this is -- might be a little -- you might need an Excel spreadsheet up here, but how much of that, sort of broadly speaking, flows through to EBITDA, given that you've got -- you would seem -- you're already buying, as you said, all this satellite capacity. You've already put the -- a lot of these price -- these costs are capitalized. I mean, it would seem that we should see a real nice ramp in -- at the EBITDA line.

. . .

<Defendant Rowan>: Yes, but really it's that inflection point now. As we said, **we expect the EBITDA in the fourth quarter of this year to be meaningfully higher than it has been throughout this year. And we expect 2018, really, to be the first year that we get the real benefits of classical operating leverage. So -- and we're going to see that translate into meaningfully higher EBITDA in 2018.** And the operating leverage is both across the satellite network as well as for the operating expenses. And about 2/3 of the expenses are on the operating expense side, so you begin to get real leverage on that as you -- as we get increased revenue with the increased plane installations.

(emphasis added)

147.    Defendant Rowan's above statements were materially misleading because, given the increased expenses Gogo was facing from the faulty 2Ku installations, Rowan was in possession of facts that materially contradicted the statement that 2017 would be the "peak" year for "EBITDA loss."

## February 22, 2018

148.    On February 22, 2018, Gogo announced its fourth quarter and year-end operating and financial results for 2017. It was at this time that Gogo first revealed to the market that the Company had encountered problems in terms of installing the 2Ku systems. Despite these disclosures, however, investors and analysts remained uninformed and materially misled.

149.    Gogo issued a pre-market press release announcing its quarterly and year-end earnings on February 22, 2018. The press release noted that Gogo had met or exceeded its full-year 2017 guidance, including total revenue, adjusted EBITDA, cash CAPEX, and 2Ku installations. In fact, the press release presented Gogo's fourth quarter and full-year revenue as a "record" for the Company and provided an estimate of $75 million to $100 million adjusted EBITDA for 2018. The press release did not make any mention of the 2Ku installation problems, except to note that "Cash CAPEX increased to $220.5 million, up 66% from $133.1 million in 2016, primarily due to increased success-based airborne equipment purchases for 2Ku installations."

150. During the call, Defendant Small tasked his COO, Defendant Wade, with discussing the 2Ku installation issues. Defendant Wade stated, in pertinent part, that:

> Our extraordinary pace of 2Ku installs and modem upgrades has not been without its challenges. The performance of the systems has been expected; however, any time you introduce high-tech systems of this scale and speed we've been doing it, there are likely to be early-stage growing pains. 2Ku is not exempt from that phenomenon; on some aircraft we saw degraded reliability. We've identified the root cause of all of these issues, and have fixes for all of them that have either been deployed or in the process of being deployed. By midyear 2018, we expect the entire 2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving.

151. Defendant Rowan, in his prepared remarks, discussed the quarterly and year-end results in detail. Despite extensive financial information about all of Gogo's operations, his only remarks with respect to the 2Ku installation problems were as follows: "Cash CapEx of $220 million was up $87 million from the prior year, reflecting purchases of 2Ku equipment to support 2017 and 2018 installations, but it did come in below the $230 million to $260 million guidance range we provided for the year."

152. One analyst, Landon Hoffman Park from Morgan Stanley, pressed Rowan for additional details about the 2Ku installation problems during the question-and-answer portion of the conference call. Mr. Park asked, and Rowan responded, as follows:

> <Landon Hoffman Park – Morgan Stanley>: Okay. And just 2 quick follow-ups. Are you able to give more specific guidance around what kind of spread that would be? ***And then also, just to follow up on John's comments earlier regarding the 2Ku issues, regarding the new modem. Can you give any more details on what exactly was going wrong? And what was the degree of the issue? And what gives you confidence in being able to have that fixed?***

> <Defendant Rowan>: Let me take the first part of that question, which is on the ARPA spread. As Michael mentioned, we did break that out during the Investor Day, and you saw about a 3 to 1 difference in the airlines that have -- are coming online versus those that have been seasoned. So you can look at those numbers and see that mix change. We also highlighted on this call that the ARPA had grown year-over-year for the existing airlines that have been in service for a period of time in Rest of World. So that really is the dynamic, is just bring those new airlines on with lower ARPA; as those build, and particularly as the airlines

45

get -- the aircraft get installed for an airline to the point that they can then market it comprehensively as a fleet, that's when you start to see the benefit of the growth in ARPA as a larger percentage to those fleets gets installed.

<Defendant Wade>: ***And on the reliability issues. It was actually really caused by the de-icing fluid, which was able to penetrate under some of the [radar,] which caused the antennas to temporarily get sticky, if you will. The fix to that was very easy to do, and we've deployed that on a number of aircraft and we're not seeing any further issues around that at this time***.

(emphasis added)

153.    Although the above statements from Small, Rowan, and Wade touched upon the 2Ku installation issues that were negatively impacting Gogo at the time, they did not accurately portray the severity of the issue or disclose the financial toll the problems were exacting on Gogo. Defendant Small did not even address the issue in his prepared remarks, opting instead to congratulate Gogo for a "record" quarter. Likewise, Defendant Rowan barely mentioned the effect of the 2Ku issues despite discussing Gogo's other financial results at length. Finally, although Defendant Wade identified that a problem with the 2Ku installations existed, he omitted material information from his disclosure concerning the extent of the problem in terms of operations and finances. As would later be disclosed by Mr. Thorne on May 4, 2018, 2Ku system "availability plunged down to the mid 80s."

154.    Defendants' other statements during the conference call further obscured and/or concealed the truth about the extent and severity of the 2Ku installations. For example, Defendant Small told investors that "***we expect strong growth in consolidated revenue and EBITDA in 2018***" (emphasis added), even though Gogo was in the midst of the fallout from the 2Ku installation problems (being that the winter months were coming to a close at this point). Defendant Wade continued to promote Gogo on the basis of its 2Ku installation operations, stating that "***we've shortened installation times for 2Ku to as low as 30 hours, which is less than half the time it typically takes to install a broadband satellite system***" (emphasis added), notwithstanding the fact that the installations were defective. Defendant Rowan even went so far as to state that, "***We believe these awarded aircraft and our demonstrated capacity to rapidly***

*install 2Ku aircraft meaningfully de-risk the financial projections for our ROW business*"
(emphasis added), even though Gogo's installations had been and would continue to cause
additional instability and uncertainty regarding the Company's finances in terms of rising repair
expenses and installation costs.

155. A number of analyst reports prove that Defendants' statements were materially
misleading, notwithstanding the fact that Defendants mentioned the 2Ku installation issues. For
example, analysts from William Blair in a report dated February 22, 2018, identified the "dip" in
Gogo's market price as a buying opportunity and paid no attention to Defendants' statements
about the 2Ku installation problems. Analysts from Morgan Stanley in a report dated February
22, 2018, classified the 2Ku installation problems described by Defendants as mere "growing
pains." Analysts from J.P.Morgan in a report dated February 23, 2018 overlooked Defendants'
comments almost entirely, stating that Gogo's "transition to 2Ku remains on course."

156. Defendants' disclosures about Gogo's 2Ku installations served as a partial
corrective disclosure. In response to the information, Gogo's stock price fell steadily throughout
the day. Gogo's stock closed at $10.51 per share on February 21, 2018. By close of market on
February 22, 2018, the price had declined to $9.13 per share (and, in fact, declined further the
next day to close at $8.88 per share on February 23, 2018). The decline in Gogo's stock price
following the February 22, 2018 conference call was caused by increased concerns over the
Company's 2Ku installation process, among other things.

157. On February 22, 2018, after the market closed, Gogo filed an annual report on
Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC, which
provided the Company's annual financial results and position. The 2017 10-K was signed by
Defendants Small and Rowan. The 2017 10-K contained signed SOX certifications by
Defendants Small and Rowan attesting to the accuracy of financial reporting, the disclosure of
any material changes to the Company's internal control over financial reporting and the
disclosure of all fraud.

158. The 2017 10-K discussed the Company's 2Ku and its installation, stating in relevant part:

> ***We may be unsuccessful or delayed in widely deploying and operating our 2Ku technology.***
>
> As of December 31, 2017, we had more than 550 2Ku systems installed and more than 1,400 aircraft awarded, but not yet installed. There can be no assurance that we can meet our installation goals on our current timeline, due to risks that include the failure of 2Ku-related equipment and software to perform as expected during testing or following installation, problems arising in the manufacturing process, our reliance on single-source and other suppliers to provide certain components and services, and delays in obtaining or failures to obtain the required regulatory approvals for installation and operation of such equipment and the provision of service to passengers. ***We have encountered delays and quality problems as we deploy 2Ku, which we are in the process of remediating, and may continue to do so given the aggressive installation schedule that we are undertaking and the demands that the schedule places on employees, suppliers and other resources.***
>
> In addition, other providers of satellite-based connectivity services currently have services available for commercial deployment that are intended to compete directly with 2Ku, and airlines may choose to adopt such a service over 2Ku. Fifteen domestic and international airlines have selected 2Ku for installation on all or a portion of their fleets. The failure of 2Ku to perform as expected, or significant delays in our ability to install 2Ku systems, could result in material breaches of such agreements which could in turn result in the imposition of penalties, claims by airlines for damages or termination of such agreements.
>
> If 2Ku fails to perform as expected or we fail to meet the installation timelines and performance metrics for which we have contracted, our business, financial condition and results of operations may be materially adversely affected. In addition, our failure to timely deliver 2Ku could have a material adverse effect on our ability to alleviate capacity constraints in our network. . . . .

(emphasis added)

159. The above statements from the 2017 10-K were misleading because they concealed the extent of the severity of the issues that Gogo was already having with the 2Ku systems. Contrary to the 2017 10-K's disclosure, Gogo's "delay and quality problems" had already mushroomed into significant expenses and repair costs. As later revealed, these expenses and repair costs resulted in a dramatic decline in adjusted EBITDA and caused Gogo to withdraw its projection for 2018 adjusted EBITDA. Moreover, although the cause for these

problems related to an installation design defect, the 2017 10-K falsely attributed it to an "aggressive installation" (which further concealed the truth about the cause of the 2Ku system failures). The lack of information in the 2017 10-K, combined with Defendants outwardly positive statements about the quarter and prospects for the 2Ku systems in general during the investor conference call (as discussed above), failed to accurately or sufficiently inform investors about the true facts that existed at the time of the 2017 10-K. Had investors known the truth about the 2Ku's installation problems, they would have been able to make an informed decision and avoid the losses they ultimately incurred when the full truth was revealed on May 4, 2018.

## ADDITIONAL SCIENTER ALLEGATIONS

160.    Defendants acted with scienter when making the above representations concerning Gogo's 2Ku systems. At all relevant times, Defendants knew or had access to information that materially contradicted their public statements. Defendants deliberately disregarded this information when discussing the 2Ku system and its impact on Gogo's financial performance and operations.

### The 2Ku Was Gogo's Most Important Product and Defendants Closely Monitored It

161.    Gogo relied heavily on 2Ku's commercialization during the Class Period. It was portrayed by Gogo's senior management as a major development in the context of the Company's overall operations. From the moment it was introduced to the public, it was billed as a means to obtain higher average revenue per aircraft of about 30%.

162.    The importance of the 2Ku system to Gogo caused Defendants to actively monitor the performance of Gogo's 2Ku systems once installed. The "Service Now" database would generate "outage lists" that were received by everyone at the Company, including the Chief Executive Officer. The "outage lists" were populated when the ticket was created after receipt of the ACARS message.

163.    In addition to receiving "outage lists" whenever a 2Ku system failed, Defendant Small in particular strived to ensure that the Company's 2Ku systems were meeting his

"98/98/15" performance criteria. This referred to 98% system availability, 98% flight route coverage, and 15 megabits per second speeds.

164. Defendant Small frequently discussed these performance requirements with investors, confirming that he studied them on a routine basis.

165. For example, during an investor conference call on November 17, 2017, Defendant Small stated that, "We now have a global high capacity, highly available network. There's nothing left to do to make this happen. No need to launch new satellites, no new antenna design, no new modem design. This is out there and happening today. We describe the performance as 15, 98, 98. That's 15 megabits per second to the device, 98% of global flight hours, and 98% availability. This provides a ground-like experience everywhere aircraft fly."

166. During the same conference, Defendant Wade also confirmed that Gogo monitored the performance of the 2Ku systems in real-time. In pertinent part, Wade stated as follows:

> ***Today, we have a network operation center that monitors around 8,000 aircraft globally, 24/7. We are able to monitor the aircraft. We're able to monitor the network. We can see exactly what is going on. With the investment we put into the software that runs this network operation center, we have a very detailed view into what's happening in those aircraft as they fly***. That's important because we can change the network almost in real time. We understand what's happening on the aircraft. So if something does go wrong, we can give the mechanics a very clear insight into what's happening on that aircraft, ensure the parts are available, ensure that the maintenance activity can happen very, very efficiently.

(emphasis added)

167. Defendant Rowan's statements during the Class Period further confirm that Defendants actively monitored Gogo's 2Ku system performance and thus knew the true extent of the 2Ku service problems.

168. During the same November 17, 2017 conference call described immediately above, Defendant Rowan told investors that, "As far as 2Ku, the vast majority of the flights, we get rave reviews on how it works. And we are hitting pretty good evidence of reliability as we

pointed. ***When we -- when it does fail, we hear about it instantly, which the good news is we are hearing about instantly and it does correlate. When we know we have a bad flight, we hear about it…***" (emphasis added).

169.    Two weeks later, during another investor presentation on November 29, 2017, Defendant Rowan again emphasized the fact that Gogo had the "ability to monitor the network remotely." This shows that Defendants were keenly aware of the 2Ku's performance and received "instant[]" feedback as to the 2Ku failures.

170.    Although the de-icing issue did not severely impact Gogo's financial results for early-2017, that was largely because Gogo had only 98 2Ku systems installed at that time. The following year, Gogo had installed over 500 2Ku systems. Without having fixed the root cause of the de-icing issue, Defendants knew that Gogo was heading straight into significant difficulties between November 2017 and February 2018.

171.    On February 22, 2018, even as the 2Ku system problems were at a near all-time high, Defendants concealed the severity of the issues they faced by portraying the rampant failures as "early-stage growing pains" that resulted in temporary "degraded reliability." Analysts later commented that the descriptions of these problems were not accurate, and that "the problem was much worse than initially thought, with service availability plunging to the mid-80% vs. the company's targeted 98-100% level." Defendants' attempts to cover-up or conceal the growing 2Ku problems further supports the conclusion that they acted with scienter when making the public statements identified above.

172.    The Individual Defendants were aware of the details of the 2Ku system implementation since it was the Company's most important product and Gogo's future success was tied to products success; or if the Company's CEOs and CFOs were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members. However, the most reasonable inference from this fact is that the Individual Defendants were aware that the 2Ku system as beset with issues.

### During the Class Period Gogo Was Trying to Fix the 2Ku System

173.     During the Class Period, Defendants were aware of the 2Ku's de-icing issues and were attempting to come up with a solution, but intentionally withheld the information from investors because, as confirmed by the McDermott memo, Defendants needed to increase the Company's stock price to in the face of mounting competition, to keep up with high operating costs, file costly STCs and develop a fix to the 2Ku system.  This pressure was only increased after Gogo lost business from a major client, American Airlines, and was facing threats from another large customer – Delta – if it didn't come up with a solution for its 2Ku systems.

174.     Former employees corroborate this allegation. FE1 recalled that Gogo had spent "multiple months" trying to identify the defect prior to developing a repair.  FE5 believed that in attempts to remedy the 2Ku's issues, Gogo had a laboratory that the Company used to test the effects of de-icing fluids.  This further demonstrates that Defendants made knowingly false statements about the status of the 2Ku systems during the Class Period.

175.     FE2 also corroborates the conclusion that Gogo spent the entirety of the Class Period struggling to identify a repair for the 2Ku. Delta Air Lines, according to FE2, pressed Gogo for a repair in November 2017 and even threatened to take the entire system offline. Thus, the issues concerning the 2Ku defect had fully escalated externally to Gogo's most important customer (by percentage of 2Ku revenue) by November 2017 at the absolute latest.

176.     Defendant Wade admitted that Gogo had been working on developing a remedy for the 2Ku's de-icing problem throughout the Class Period *and had already developed a fix* when he stated on the February 2018 earnings call, "[w]e've identified the root cause of all of these issues, and have fixes for all of them that have either ***been deployed*** or in the process of being deployed.  By midyear 2018, we expect the entire 2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving."  (emphasis added).

177.     Gogo's Vice President of Product Management, Blane Boynton, further confirms that the severity of the 2Ku defect was known internally at Gogo well in advance of the end of the Class Period. In an interview on January 22, 2018, Mr. Boynton described the 2Ku defect as:

"[m]uch like a DirecTV dish has problems in heavy rain, deicing fluid is like a concentrated thunderstorm."

178. FE3, FE4 and FE5 also confirm Gogo's use of the "ServiceNow" program and the ThinKom "application." Thus, when the 2Ku systems were failing, Gogo engineers, controllers and C-suite management, would be notified in real-real time. Meetings were held on a daily and weekly basis to discuss the 2Ku defect. The sheer number of people, teams, and departments devoted to monitoring and repairing the 2Ku system strongly suggests that Gogo's senior management was fully aware of the 2Ku issue and the havoc it was wreaking on the Company's employees and customers.

**The Full Truth Was Only Revealed After the Long-Standing CEO Was Removed**

179. On March 4, 2018, Defendant Small, who was the Company's largest shareholder along with his affiliated entities, was removed from control of Gogo after serving as CEO since 2010. As the Company framed it, Oakleigh Thorne took over the Company after a "mutual decision" between the Board of Directors and CEO Small that Small would step down immediately.

180. The most logical inference from the fact that it took new management to disclose the truth regarding the Company is that Small, had knowledge of, or was reckless in not knowing, the full-extent and impact of the 2Ku defects, and the Board of Directors wanted to bring in new management to ensure that such a debacle could not occur again

**CORPORATE SCIENTER ALLEGATIONS**

181. Throughout the Class Period, Defendants Small, Smagley, Rowan, and Wade served as CEO, CFOs, and COO. The CEO and CFO Individual Defendants signed each of the Class Period SEC filings on behalf of Gogo. Defendants Small, Smagley, Rowan, and Wade, therefore, acted with apparent authority to speak on behalf of the Company and their statements were made with the imprimatur of the Company that selected them to speak on its behalf. Moreover, Individual Defendants were highly involved in the preparation, review, finalization,

and issuance of the Company's financial statements, and investors relied on their honesty and integrity.

182.    Based on the foregoing, Defendants Small, Smagley, Rowan, Wade, actions, knowledge and scienter are imputable to Gogo at all times during the Class Period. Defendants Small, Smagley, Rowan, and Wade acted as an agent of Gogo, both with respect to the SEC filings that they signed and also with respect to the SEC filings and earnings releases that they assisted in preparing and/or that they oversaw or participated in the accounting for. Therefore, Defendants' Small, Smagley, Rowan, and Wade, knowledge and states of mind are imputable to Gogo for all of the challenged statements in this Complaint, whether or not they personally signed those statements.

183.    As alleged herein, corporate scienter can be inferred separately and apart from the scienter of the Individual Defendants.

## LOSS CAUSATION

184.    During the Class Period, as detailed herein, Gogo and the defendants made false and misleading statements and omissions and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Gogo's securities and operated as a fraud or deceit on Class Period purchasers of Gogo's securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Gogo's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Gogo's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

185.    Plaintiffs first sustained damages in connection with Defendants' partial corrective disclosure on February 22, 2018. At that time, Defendant Wade briefly mentioned that Gogo experienced challenges in connection with the rollout of its 2Ku product; specifically, that the installation was defective because de-icing fluid was entering the 2Ku's housing

compartment and causing the system to malfunction. Concerns about the extent and severity of these installation problems, among other things, prompted a sudden decline in Gogo's stock price (notwithstanding the fact that Gogo's financial results for the quarter were otherwise at or above expectations). For example, Northland Capital Markets identified Gogo's "2Ku equipment issues" as a "negative" in its report dated February 23, 2018. In response to Gogo's partial corrective disclosure, Gogo's stock price fell steadily throughout the day. Gogo's stock closed at $10.51 per share on February 21, 2018. By close of market on February 22, 2018, the price had declined to $9.13 per share (and, in fact, declined further the next day to close at $8.88 per share on February 23, 2018).

186.     Thereafter, on May 4, 2018, investors finally discovered the true extent and severity of the 2Ku installation problems. While discussing the Company's first quarter financial earnings for 2018, Defendants disclosed that the installation design defect for the 2Ku systems was much worse than previously disclosed. One analyst, in particular, wrote that "Gogo had previously disclosed that de-icing fluid leaking into antenna radomes had caused service failure on some of its newly installed 2Ku aircraft. On its new CEO's first earnings call, the company revealed the problem was much worse than initially thought, with service availability plunging to the mid-80% vs. the company's targeted 98-100% level." In response to Defendants' May 4, 2018 disclosures, the Company's shares fell $1.73 per share to close at $7.86 per share on May 7, 2018 (from $9.59 per share on May 3, 2018).

187.     On May 8, 2018, the next day, Moody's downgraded Gogo Moody's decision to downgrade Gogo was based, in large part, on the financial and operational difficulties the Company encountered with its 2Ku systems. The Company's shares fell an additional $2.80 per share, on exceptionally high trading, to close at $5.06 per share on May 8, 2018. The decline in the price of Gogo's stock as a result of the Moody's downgrade was causally related to the fraud alleged herein.

188.     From an intra-Class Period high of $14.84 per share on September 11, 2017, Gogo's stock declined to $5.06 per share following the close of the Class Period. In total, Gogo's

market capitalization declined by more than $750 million. Plaintiffs and other similarly situated investors lost millions of dollars as a result of the alleged fraud.

## RELIANCE

189.    At all relevant times, the market for Gogo's common stock was an efficient market for the following reasons, among others:

(a)    Gogo's common stock met the requirements for listing and was listed and actively traded on the NASDQ Exchange, a highly efficient and automated market;

(b)    Gogo communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Gogo was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Gogo was reflected in and incorporated into the Company's stock price during the Class Period.

190.    As a result of the foregoing, the market for Gogo's common stock promptly digested current information regarding Gogo from all publicly available sources and reflected such information in Gogo's stock price. Under these circumstances, all purchasers of Gogo's common stock during the Class Period suffered similar injury through their purchase of Gogo's common stock at artificially inflated prices, and a presumption of reliance applies.

191.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to

recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## SAFE HARBOR

192.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

193.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

194.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Gogo who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

195.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Gogo securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

196.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gogo securities were actively traded on the NASDAQ market. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Gogo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 30, 2018, 87,004,342 shares of Gogo common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

197.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

198.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

199.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Gogo;

(c)     whether the Individual Defendants caused Gogo to issue false and misleading financial statements during the Class Period;

(d)     whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Gogo's securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

200.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**Against Defendants for Violations of Section 10(b) and SEC Rule 10b-5**

201.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

202.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

203.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gogo securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Gogo's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

204.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Gogo's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Gogo's finances and business prospects.

205.    By virtue of their positions at Gogo, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

206.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers

and/or directors of Gogo, the Individual Defendants had knowledge of the details of Gogo's internal affairs.

207.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Gogo. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Gogo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Gogo's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Gogo's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Gogo's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

208.    During the Class Period, Gogo's securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Gogo's securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Gogo's securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Gogo's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

61

209. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

210. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a)

211. Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212. During the Class Period, the Individual Defendants participated in the operation and management of Gogo, and conducted and participated, directly and indirectly, in the conduct of Gogo's business affairs. Because of their senior positions, they knew the adverse non-public information about Gogo's misstatement of income and expenses and false financial statements.

213. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Gogo's financial condition and results of operations, and to correct promptly any public statements issued by Gogo which had become materially false or misleading.

214. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Gogo disseminated in the marketplace during the Class Period concerning Gogo's operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Gogo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Gogo within the meaning of

Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Gogo's securities.

215.    Each of the Individual Defendants, therefore, acted as a controlling person of Gogo. By reason of their senior management positions and/or being directors of Gogo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Gogo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Gogo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

216.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Gogo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: December 20, 2019       Respectfully Submitted,

**LUBIN AUSTERMUEHLE**

/s/ Peter S. Lubin
Peter S. Lubin
360 West Butterfield Road, Suite 325
Elmhurst, IL  60126
(630) 333-0002
Email: Peter@L-A.law

*Liaison Counsel for Plaintiffs*

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton (*admitted pro hac vice*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

      -and-

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 432-1495
Email: rprongay@glancylaw.com
Email: csadler@glancylaw.com

*Counsel for Co-Lead Plaintiffs*
*and Co-Lead Counsel for the Class*

<u>CERTIFICATE OF SERVICE</u>

I, Peter S. Lubin, the undersigned attorney, hereby certify that on the 20th day of December 2019, I caused to be served a copy of the Second Amended Class Action Complaint for Violation of the Federal Securities Laws via the Court's CM/ECF system, on all counsel of record.

/s/ Peter S. Lubin _____