**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ASHLEY PIERRELOUIS, Individually
and On Behalf of All Others Similarly
Situated,

             Plaintiff,

             v.

GOGO INC., MICHAEL J. SMALL,
NORMAN SMAGLEY, BARRY
ROWAN, and JOHN WADE,

             Defendants.

Case No. 18-cv-04473

Hon. Jorge L. Alonso

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Jonathan S. Quinn
Andrew G. May
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Chicago, IL 60602
(312) 269-8000
jquinn@nge.com
amay@nge.com

Jerome S. Fortinsky (admitted *pro hac vice*)
Brian H. Polovoy (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000
jfortinsky@shearman.com
bpolovoy@shearman.com

*Attorneys for Defendants Gogo Inc.,*
*Michael J. Small, Norman Smagley,*
*Barry Rowan and John Wade*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    The Defendants ...................................................................................... 3

    B.    Gogo's 2Ku System ................................................................................ 4

    C.    Summary Of Plaintiffs' Claims ............................................................. 7

    D.    Plaintiffs' New Allegations................................................................... 9

ARGUMENT ........................................................................................................................ 12

    I.    PLAINTIFFS FAIL TO PLEAD SECURITIES FRAUD UNDER
        SECTION 10(b) ..................................................................................... 12

        A.    Plaintiffs Fail To Plead That Any Statement Was False When
            Made ........................................................................................... 12

            1.    Plaintiffs Still Fail To Plead Facts Showing That
                Defendants' Pre-November 2017 Statements Were False
                When Made ................................................................... 13

            2.    Plaintiffs Still Fail To Plead Facts Showing That
                Defendants' Statements In November And December 2017
                Were False When Made ................................................ 14

            3.    Plaintiffs Still Fail To Plead Facts Showing That
                Defendants' February 22, 2018 Statements Were False
                When Made ................................................................... 17

        B.    Plaintiffs Still Fail To Plead That Any Defendant Acted With The
            Intent To Defraud..................................................................... 19

            1.    Plaintiffs Still Have Not Pleaded That Smagley Knew Or
                Recklessly Disregarded Design Problems With Gogo's 2Ku
                Systems ........................................................................ 20

            2.    Plaintiffs Still Have Not Pleaded That Any Other
                Defendant Knew Or Recklessly Disregarded Design
                Problems With Gogo's 2Ku Systems ........................... 21

            3.    Plaintiffs Still Have Not Alleged Any Stock Sales Or Any
                Other Motive To Commit Fraud.................................... 23

        C.    Defendants' Forward-Looking Statements Regarding Expected

Cost Declines And Increased Adjusted EBITDA In 2018 Are Not Actionable Under The PSLRA Safe Harbor ............................................. 25

1.     The Statements Of Expectation Were Identified As Forward-Looking And Were Accompanied By Meaningful Cautionary Language ................................................................... 26

2.     Plaintiffs Fail To Plead That Defendants Actually Knew Their Statements Were False Or Misleading ............................... 29

CONCLUSION ......................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arazie v. Mullane*,
   2 F.3d 1456 (7th Cir. 1993) ...................................................................................15

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
   2020 WL 60186 (N.D. Ill. Jan. 7, 2020), *app filed*, (7th Cir. Feb. 4, 2020) ...........................25

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) .................................................................................29

*In re Biogen Inc. Sec. Litig.*,
   193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*, 857 F. 3d 34 (1st Cir. 2017).................................24

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
   2012 WL 1030474 (N.D. Ill. Mar. 27, 2012)............................................................15, 17, 24

*In re Career Educ. Corp. Sec. Litig.*,
   2007 WL 1029092 (N.D. Ill. Mar. 29, 2007), *vacated pursuant to settlement*,
   2008 WL 8666579 (N.D. Ill. June 26, 2008) ...............................................................4

*In re Century Bus. Servs. Sec. Litig.*,
   2002 WL 32254513 (N.D. Ohio June 27, 2002)............................................................24

*Chu v. Sabratek Corp.*,
   100 F. Supp. 2d 827 (N.D. Ill. 2000) .......................................................................19

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) .................................................................................24

*In re Eros Int'l Sec. Litig.*,
   2017 WL 6405846 (S.D.N.Y. Sept. 22, 2017), *aff'd sub nom.*
   *Eisner v. Eros Int'l PLC*, 735 F. App'x 15 (2d Cir. 2018) ....................................................22

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
   778 F.3d 228 (1st Cir. 2015)..................................................................................24

*Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
   675 F.3d 1047 (7th Cir. 2012) ...............................................................................12

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
   2011 WL 1303387 (N.D. Ill. Mar. 31, 2011).................................................................12

*In re Harley-Davidson, Inc. Sec. Litig.*,
   660 F. Supp. 2d 969 (E.D. Wis. 2009)....................................................................18, 30

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ....................................................................12, 15, 23

*IBEW Local 697 Pension Fund v. Ltd. Brands, Inc.*,
  788 F. Supp. 2d 609 (S.D. Ohio 2011) ....................................................................24

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..........................................................................20, 23

*McCready v. eBay, Inc.*,
  453 F.3d 882 (7th Cir. 2006) ....................................................................................4

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ....................................................................29

*Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
  2017 WL 6039926 (N.D. Ill. Dec. 6, 2017) ............................................................15

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
  895 F.3d 933 (7th Cir. 2018) ..................................................................................25

*Pierrelouis v. Gogo Inc.*,
  414 F. Supp. 3d 1164 (N.D. Ill. 2019) ........................................................... *passim*

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
  673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd*, 679 F.3d 952 (7th Cir. 2012) ....................24, 25

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) ..........................................................................20, 30

*Searls v. Glasser*,
  64 F.3d 1061 (7th Cir. 1995) ..................................................................................24

*Stavros v. Exelon Corp.*,
  266 F. Supp. 2d 833 (N.D. Ill. 2003) ......................................................26, 29, 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................4, 19, 24

*Zerger v. Midway Games, Inc.*,
  2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)....................................................14, 15

**Statutes**

15 U.S.C. § 78u-4(b).............................................................................................1, 30

15 U.S.C. § 78u-5(c)....................................................................................21, 26, 30

15 U.S.C. § 78u-5(i)(1)............................................................................................26

Defendants Gogo Inc. ("Gogo" or the "Company"), Michael J. Small, Norman Smagley, Barry Rowan, and John Wade (the "Individual Defendants") respectfully submit this memorandum and the accompanying Declaration of Brian H. Polovoy ("Polovoy Decl." or "Polovoy Declaration") in support of their motion to dismiss plaintiffs' Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC") (ECF No. 73) pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

This Court dismissed plaintiffs' first Amended Complaint because it found that plaintiffs' allegations were "not sufficient to support a plausible inference that [Gogo's statements about its 2Ku system] were false when made or to create a strong inference of scienter." ECF No. 68; *Pierrelouis v. Gogo Inc.*, 414 F. Supp. 3d 1164, 1172 n.2 (N.D. Ill. 2019). The Court gave plaintiffs leave to file a second amended complaint, but made clear that to successfully overcome the pleading deficiencies of the prior amended complaint, plaintiffs must allege "more 'specific facts'" to demonstrate *when* the 2Ku problems showed themselves to be of 'a sufficient magnitude,'" and "*when* defendants had sufficient knowledge to put them on notice that there was at least a substantial risk that Gogo would have to incur considerable remediation costs to prevent service outages due to de-icing fluid infiltration." *Id.* at 1174, 1175.[1]

The Second Amended Complaint fails again in both respects. There are very few new allegations, and those new allegations still do not identify with the specificity required by the PSLRA "when the 2Ku de-icing problem manifested itself as such a severe problem as to make

---

[1] Unless otherwise indicated, all emphasis has been added.

defendants' statements to investors misleading" or "when defendants knew or should have known of the magnitude of the de-icing problem." *Id.* at 1175. The amended complaint does not—and cannot—make new factual allegations establishing falsity or scienter. Instead, as a blackline showing the changes to the first amended complaint reveals, the plaintiffs now merely attribute the same (and a few new, similarly vague) allegations to three internet articles published in 2018 and five anonymous former Gogo employees. *See* Polovoy Decl. Ex. A (blackline); SAC ¶¶ 11-12, 69-90 & nn. 3-6. The Court already held that two of the three internet articles fail to state a claim (414 F. Supp. 3d at 1173 n.3) and need not revisit that conclusion here. And the third article postdates the putative Class Period and similarly fails to resolve the unanswered temporal ambiguity in plaintiffs' prior amended complaint.

As for the anonymous former employees, the Second Amended Complaint ***still*** alleges that the significance of the problems began to be known in the "winter" of 2017-18: Delta "began to complain about the 2Ku system *as early as November or December 2017*" (SAC ¶ 76); "problems with the 2Ku systems increased *beginning in November 2017*" (*id*. ¶ 81); problems with 2Ku were reported by Delta "in the *winter months of 2017*" (*id*. ¶ 89); Air Canada and Delta Airlines reported problems during "*the winter of 2017*" (*id*. ¶¶ 11-12); "Gogo was able to identify the deicing fluid as the cause of the defect '*over a course of multiple months* '" (*id*. ¶ 71); "Gogo found out about 2Ku issues *in the winter*" (*id*. ¶ 74); and "[d]*uring the winter – months* the frequency of the tickets [reporting lost connectivity] increased to '10 per week'" (*id*. ¶ 87). These allegations—like those in the first amended complaint—fail to address the "when" questions identified by the Court in its opinion and hence do not give rise to a strong inference that defendants acted with scienter. *Pierrelouis*, 414 F. Supp. 3d at 1175-1177.

The Second Amended Complaint undercuts plaintiffs' case. Plaintiffs add allegations

(attributed to an anonymous Former Employee 1 ("FE 1")) that, instead of bolstering plaintiffs'
claims of fraud, support the opposite, nonfraudulent inference. According to FE1, the root cause
of the 2Ku problems was difficult to pinpoint and only became apparent "over a course of
multiple months." SAC ¶ 71. Identifying the cause of the problem "was a challenge," as FE1
allegedly told plaintiffs (*id.*), and the plausible inference to be drawn is that Gogo and its
executives provided the best information they had at the time of each public statement, and
updated investors in February and May 2018, as more information became known to them.

Because it dismissed the prior complaint for failure to plead falsity and scienter, the
Court did not need to address defendants' additional arguments for dismissal. *See Pierrelouis*,
414 F. Supp. 3d at 1172 n.2. Nothing in the Second Amended Complaint affects those
arguments: certain of defendants' statements remain non-actionable under the PSLRA's safe
harbor for forward-looking statements, and, as to all of plaintiffs' claims, any inference of
scienter is eviscerated by the fact that Gogo's then-CEO, Michael Small, made significant
purchases of additional Gogo stock during the putative Class Period. Thus, even if the Court
were to find that the Second Amended Complaint alleges some inference of scienter (and it does
not), any such inference is not strong, cogent or compelling when viewed in light of Gogo's
then-CEO's purchase of large amounts of Gogo stock at a time when, according to plaintiffs, he
knew the stock price was artificially inflated.

This is the third complaint. It should be dismissed with prejudice.

## STATEMENT OF FACTS[2]

### A. The Defendants

Gogo is the leading provider of inflight broadband connectivity and wireless

---

[2] The statement of facts is based on the allegations of the Second Amended Complaint, which are
accepted as true solely for purposes of this motion, or from documents referred to in the Second

entertainment services in the United States and internationally.  SAC ¶ 27; Polovoy Decl., Ex. B

(Gogo Inc. Form 10-K for year ended Dec. 31, 2017 ("2017 10-K")) at 2.  Michael J. Small was

Gogo's CEO and President from February 16, 2010 to March 4, 2018.  SAC ¶ 28.  Norman

Smagley was Gogo's CFO from September 2010 to May 4, 2017.  *Id.* ¶ 29.  Barry Rowan has

been Gogo's CFO since May 4, 2017.  *Id.* ¶ 30.  John Wade was Gogo's Chief Operating Officer

and Executive Vice President at the time of the alleged events at issue.  *Id.* ¶ 31.

### B.    Gogo's 2Ku System

Plaintiffs assert claims based on defendants' statements during the period from February

27, 2017 through May 4, 2018 (the "putative Class Period") about Gogo's next generation 2Ku

global satellite system, which was announced in 2014.  SAC ¶¶ 1, 42.  Gogo began rolling out

2Ku in 2016 and, by the end of 2016, had installed the system on 94 aircraft and expected to

install it on 450 to 550 more in 2017.  *Id.* ¶¶ 44-45; Polovoy Decl., Ex. C (Gogo Inc. Form 10-K

for year ended Dec. 31, 2016 ("2016 10-K")) at 21.  By the end of 2017, Gogo had installed 2Ku

on more than 550 aircraft.  SAC ¶ 45; Polovoy Decl., Ex. B (2017 10-K) at 2.  At that time, the

2Ku system was capable of delivering peak speeds of 100 megabits per second to the aircraft.

Polovoy Decl., Ex. B (2017 10-K) at 2, 6.  According to Gogo's current CEO, Oakleigh Thorne,

2Ku was Gogo's "most successful product launch ever with greater than 98% service

availability" in summer 2017.  SAC ¶ 91; Polovoy Decl., Ex. D (Edited Transcript Q1 2018

---

Amended Complaint or other public documents filed with the SEC, of which the Court may take
judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts
must consider . . . sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,
in particular, documents incorporated into the complaint by reference, and matters of which a court may
take judicial notice."); *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) ("[D]ocuments
attached to a motion to dismiss are considered part of the pleadings if they are referred to in the
plaintiff's complaint and are central to his claim.") (citations omitted); *In re Career Educ. Corp. Sec.
Litig.*, 2007 WL 1029092, at *1 n.5 (N.D. Ill. Mar. 29, 2007) (same; court can also take judicial notice
of SEC filings on a Rule 12(b)(6) motion), *vacated pursuant to settlement*, 2008 WL 8666579 (N.D. Ill.
June 26, 2008).

Gogo Inc. Earnings Call, May 4, 2018 ("Q1 2018 Earnings Call Tr.")) at 6.

As in their previous Amended Complaint, Plaintiffs still allege that in winter 2017-18, Gogo began to hear about problems with the reliability of its 2Ku system, which were caused by de-icing fluid used to de-ice the fuselage of aircraft in winter months. SAC ¶¶ 68-76. In its February 22, 2018 earnings call (reporting results for the fourth quarter of 2017 and 2017 as a whole), Gogo disclosed that it was experiencing reliability problems with 2Ku. *Id*. ¶¶ 150, 152; Polovoy Decl., Ex. E (Edited Transcript Q4 2017 Gogo Inc. Earnings Call, Feb. 22, 2018 ("Q4 2017 Earnings Call Tr.")) at 4. Wade explained that "on some aircraft [installed with 2Ku] we saw degraded reliability. We've identified the root cause of all of these issues, and have fixes for all of them that have either been deployed or [are] in the process of being deployed. By midyear 2018, we expect the entire 2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving." SAC ¶ 150; Polovoy Decl., Ex. E (Q4 2017 Earnings Call Tr.) at 4.

Similarly, in the risk factor section of its annual report on Form 10-K for the year ended December 31, 2017, under the heading "[w]e may be unsuccessful or delayed in widely deploying and operating our 2Ku technology," Gogo explained:

> We have encountered delays and quality problems as we deploy 2Ku, which we are in the process of remediating, and may continue to do so given the aggressive installation schedule that we are undertaking and the demands that the schedule places on employees, suppliers and other resources. . . . If 2Ku fails to perform as expected or we fail to meet the installation timelines and performance metrics for which we have contracted, our business, financial condition and results of operations may be materially adversely affected.

SAC ¶ 158; Polovoy Decl., Ex. B (2017 10-K) at 25-26. Gogo's 2017 10-K also warned in the MD&A section that key factors that may affect the Company's future performance include "costs associated with the implementation of, and our ability to implement on a timely basis our technology roadmap, upgrades and installation of our . . . 2Ku . . . technologies (including

failures or delays on the part of antenna and other equipment developers and providers) . . . ."

Polovoy Decl., Ex. B (2017 10-K) at 56.

Several weeks later, on May 4, 2018, when the scope and cause of the issues with 2Ku were more fully apparent and understood, Gogo's new CEO, Oakleigh Thorne, explained during Gogo's earnings call for first quarter 2018 that a

> big issue in the quarter was the deicing fluid impact on 2Ku. . . . [T]he impact on Q1 was twofold. First, airlines held back on marketing the product, which hurt revenue. And two, we ramped up spending to fix reliability as soon as we could, which hurt costs. We'll see even higher spending in Q2 as our remediation plans ramp up further in that quarter. The costs are primarily around maintenance expense and CapEx for new antenna inventory.

SAC ¶ 91; Polovoy Decl., Ex. D (Q1 2018 Earnings Call Tr.) at 4-5. Thorne disclosed on May 4, 2018, that although in summer 2017, 2Ku was Gogo's "most successful product launch ever with greater than 98% service availability," when winter came, "we slipped on the 98% system availability with our deicing problems" caused by de-icing fluid in "the antenna [raceways] in which the antenna discs spin." SAC ¶ 91; Polovoy Decl., Ex. D (Q1 2018 Earnings Call Tr.) at 5, 6. Although service availability had dropped to the mid-80s, Thorne explained that it improved considerably "before the weather improved" and was back over 96% as of May 3, 2018 and would be back to 98% by year end. SAC ¶ 91; Polovoy Decl., Ex. D (Q1 2018 Earnings Call Tr.) at 5. Thorne further explained that Gogo had completed

> a thorough analysis of root causes and discovered that while deicing was the biggest issue, there are also some manufacturing issues and software issues at fault. We also discovered the deicing fluid entered the antenna [radome] through far more pathways than we originally thought. We fixed the software issues, and we fixed the manufacturing issues. We're in the process of replacing all contaminated antennas by the end of this quarter. Our goal was to hit 95% availability by June 30. And I want to repeat, this week, we're at 96%. So we're well ahead of plan. In the second half of this year, we're planning to roll out a set of 2Ku modifications that will keep deicing fluid out of the [raceways] and get it back to our target of 98% system availability.

SAC ¶ 91; Polovoy Decl., Ex. D (Q1 2018 Earnings Call Tr.) at 6. During that same call, Rowan

stated that "[a]djusted EBITDA is expected to be below the previously provided range of $75 million to $100 million due to increased cost and lost revenue related to the 2Ku implementation challenges we cited. Based on the timing of these expenses, we expect adjusted EBITDA to be extremely low in the second quarter and to then ramp significantly in the second half of the year similar to last year." SAC ¶ 92; Polovoy Decl., Ex. D (Q1 2018 Earnings Call Tr.) at 10.

Gogo also announced on May 4, 2018 that it was "withdrawing its previously provided 2018 guidance for Adjusted EBITDA, airborne Cash CAPEX, and airborne equipment inventory purchases related to airline-directed installations, as well as Free Cash Flow guidance." SAC ¶ 93; Polovoy Decl., Ex. F (Press Release, "Gogo Announces First Quarter 2018 Financial Results," May 4, 2018 ("Q1 2018 Earnings Release")) at 2. Gogo explained that "[t]he Company is currently undergoing an integrated business planning process to evaluate ways to further drive revenue growth, streamline business processes, prioritize operational initiatives and improve its cost structure" and that it planned to provide updated guidance no later than its Q2 2018 earnings conference call. Polovoy Decl., Ex. F (Q1 2018 Earnings Release) at 2.

### C. Summary Of Plaintiffs' Claims

Plaintiffs continue to allege that defendants intentionally and fraudulently made material misstatements of fact (a) in the risk disclosure sections of Gogo's annual reports on SEC Forms 10-K for the years ended December 31, 2016 and 2017, filed on February 27, 2017 and February 22, 2018, respectively; (b) in Gogo's quarterly earnings conference calls by Small and Smagley on February 27, 2017, Small and Wade on May 4, 2017, Small, Wade and Rowan on August 7, 2017, Small, Wade and Rowan on November 2, 2017, and Wade and Rowan on February 22, 2018; (c) at investor conferences and presentations by Small on June 14, 2017, Small, Wade and Rowan on November 17, 2017, and Small and Rowan on December 6, 2017; and (d) in Gogo's earnings press release on February 22, 2018. SAC ¶¶ 101-159. Plaintiffs assert that these

7

statements were false or misleading because they discussed 2Ku and expected revenue for 2018 without disclosing that Gogo was allegedly already having problems with the performance of its installed 2Ku systems due to what the Second Amended Complaint variously describes as a "product design defect" or an "installation design defect." *Id.* ¶¶ 3, 5, 20, 107, 111, 145, 159, 186. The Second Amended Complaint, like its predecessor, contains no factual allegations suggesting that any defendant was aware of the extent of the problems and the significant costs of remediation at the time they made the statements at issue.

More specifically, plaintiffs contend that each of the statements was false and/or misleading at the time it was made because defendants did not disclose until February 22, 2018 that de-icing fluid was able to enter the compartment housing the 2Ku system on some aircraft (known as a radome) to the extent that it caused the system to malfunction. *Id.* ¶¶ 15, 101. Plaintiffs further contend that these disclosures on February 22, 2018 were only "partial[ly] corrective" because defendants did not fully disclose the extent of the 2Ku problems and their impact on expected costs and adjusted EBITDA until May 4, 2018. *Id.* ¶¶ 156, 159.

Plaintiffs allege that when the "truth" about the 2Ku problems was fully disclosed on May 4, 2018, the per-share price of Gogo's stock dropped from $9.59 at the market close on May 3 to $7.86 at the market close on May 7, 2018, resulting in losses to Gogo's stockholders. *Id.* ¶¶ 142, 144. Plaintiffs claim that all defendants committed federal securities fraud under Section 10(b), and assert control person liability claims under Section 20(a) against the Individual Defendants. Plaintiffs' own allegations, however, still show that reliability issues were not apparent until de-icing operations began in the winter of 2017, that the issues were timely disclosed and that appropriate cautionary language accompanied the Company's forward-looking statements. The allegations of the Second Amended Complaint are thus just as self-defeating as

8

those of the Amended Complaint and should be dismissed, this time with prejudice.

### D.    Plaintiffs' New Allegations

Plaintiffs' only bases for claiming that defendants knew but failed to disclose that deicing problems would have a significant impact on Gogo's financial results are (1) Oakleigh Thorne's end-of-class-period statement that, when winter came, 2Ku service availability dropped to "the mid-80s" from "greater than 98%" in summer 2017 (SAC ¶ 91)—which the Court already determined was an insufficient basis for plaintiffs' claims of fraud; (2) media reports on January 22, February 27, and June 1, 2018 discussing 2Ku issues on Delta and Air Canada planes (*id.* ¶¶ 11, 12, 77-79)—two of which were cited in plaintiffs' opposition (ECF No. 66) to defendants' motion to dismiss the prior complaint and which the Court held also failed to state a claim; and (3) alleged statements from five unnamed former Gogo employees (*id.* ¶¶ 69-90), much of which was already alleged in plaintiffs' first amended complaint (albeit without attributing the allegations to anonymous former employees).

The January 22, 2018 article reports the author's positive experience with 2Ku on an outbound Delta flight from Washington, DC to Detroit, but states that a deicing stop on the way to the runway on the return flight "wreaked havoc with the antennae."  Polovoy Decl., Ex. G (Jonathan M. Gitlin, *An end to in-flight Wi-fi misery is at hand with Gogo's 2Ku*, Ars Technica (Jan. 22, 2018) ("Gitlin")) at 5.  The article quotes Gogo's vice president of product management telling the author that "[m]uch like a DirecTV dish has problems in heavy rain, deicing fluid is like a concentrated thunderstorm."  *Id.*  Plaintiffs contend this was an acknowledgment that the "2Ku defect was severe."  SAC ¶ 77.  The February 27, 2018 article discusses a February 24, 2018 internal Delta memo to flight attendants that "highlight[s] 2Ku's reliability issues and detail[s] a Delta action plan" to "assist Gogo in troubleshooting and diagnostics of 2Ku."  SAC ¶¶ 12, 78; Polovoy Decl., Ex. H (Jason Rabinowitz, *Delta deepens involvement in 2Ku MRO in*

*face of reliability issues*, Runway Girl Network (Feb. 27, 2018) ("Rabinowitz")). The June 1, 2018 article (SAC ¶ 11)—which is the only "new" media report not already considered by the Court—reports that although Air Canada "experienced problems associated with deicing fluid seeping under Gogo 2Ku radomes over the winter," Air Canada "remains a big fan of the inflight connectivity system and is forging ahead with installs, albeit under a delayed schedule." Polovoy Decl., Ex. I (Mary Kirby, *Air Canada enthusiastic about Gogo 2Ku despite delayed installs*, Runway Girl Network (June 1, 2018). The author described the 2Ku service on an Air Canada flight in late May 2018 as "exceptional," noting "recent software changes, which remedied a satellite handoff problem which Gogo alluded to in its recent earnings conference call." *Id*.

Plaintiffs allege that FE1, described as a senior software engineering manager from July 2014 to July 2018 (SAC ¶ 69), explained that "Gogo was able to identify the deicing fluid as the cause of the defect 'over a course of multiple months'" because "it took a day or two before the fluid got 'sticky' enough to cause issues with the antenna, and the ability to backtrack the path and location(s) of a plane to pinpoint exactly when, where, and how the issue started, or when the fluid started to accumulate, was a challenge." *Id*. ¶ 71. In other words, the Second Amended Complaint does not specify when Gogo identified deicing fluid as a cause of the problem, but instead confirms that pinpointing the source of the problem "was a challenge" for Gogo and took several months.

According to another former employee, Former Employee 2 ("FE 2"), described as "an Aircraft Maintenance Controller on [Gogo's] Inflight Internet team from 2014 until August of 2018" (SAC ¶ 73), "Gogo found out about 2Ku issues *in the winter* when deicing fluid was sprayed" (*id*. ¶ 74) and that "Delta Air Lines began to complain about the 2Ku system as early as

10

November or December 2017." *Id.* ¶ 76. Plaintiffs also allege that Former Employee 3 ("FE 3"),
an Aviation Maintenance Controller from November 2016 until July 2018, reported that "2Ku's
problems persisted into 2017" and "the problems . . . increased beginning in November 2017,
especially among Delta's northern routes." SAC ¶¶ 80-81. Other than the attribution to a
particular former employee, these are the same vague temporal allegations that the Court found
inadequate in the prior complaint. Similarly, although the Second Amended Complaint purports
to attribute to FE3 the allegations, repeated from the prior complaint, that "everyone at the
company, including the Chief Executive Officer" received "outage lists" that were generated by
Gogo's "Service Now" database whenever a passenger reported a 2Ku system failure to the pilot
and the pilot, in turn, reported it to Gogo by means of an Aircraft Communications Addressing
and Reporting System ("ACARS") message (*id.* ¶ 82), the Second Amended Complaint still does
not plead when, how often, or how those "outage lists" were received or what information they
contained or conveyed to the alleged recipients.

The Second Amended Complaint also includes new allegations purportedly based on
statements from Former Employee 4 ("FE4"), an Aircraft Integration Engineer from April 2014
to July 2019 who was part of Gogo's Aircraft Field Support Team, and Former Employee 5
("FE5"), a Senior Program Manager from April 2015 until September 2017. FE4 and FE5
allegedly attended meetings at which 2Ku problems were discussed, but the Second Amended
Complaint tellingly does not specify when those meetings occurred. *Id.* ¶¶ 86-89. FE4 allegedly
reported that the Aircraft Field Support Team monitored an application "that would detail
performance for the antennas, including connectivity" and would "open 'tickets' in 'Service
Now'" when the 2Ku systems lost connectivity. *Id.* ¶ 86. Although FE4 allegedly told plaintiffs
that "[d]uring the winter months, the frequency of the tickets increased to '10 per week,'" the

Second Amended Complaint gives no indication of the year, months, or dates when that occurred. Critically, as in the Amended Complaint, none of the new allegations in the Second Amended Complaint even purports to allege facts showing that any defendant had knowledge of problems with 2Ku reliability prior to an unclear date in "November or December 2017."[3]

## ARGUMENT

## I. PLAINTIFFS FAIL TO PLEAD SECURITIES FRAUD UNDER SECTION 10(b)

### A. Plaintiffs Fail To Plead That Any Statement Was False When Made

To survive a motion to dismiss, a plaintiff must allege facts to show with sufficient particularity that the defendants' statements were false when made, "not incorrect in retrospect." *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *20 (N.D. Ill. Mar. 31, 2011); *see also Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050-51 (7th Cir. 2012) ("[T]here is no fraud by hindsight. . . . Issuers need not be prescient."); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759-60 (7th Cir. 2007) (same).

As this Court said, "[m]erely alleging that (a) Gogo could and did track service outages, (b) defendants had access to outage reports, and (c) at some time prior to May 4, 2018, during or after the 'winter,' the 2Ku system's 'availability plunged down to the mid 80s', without other details, does not provide sufficiently specific and particularized information about *when* the data revealed that the de-icing problem had caused a precipitous drop in availability, or when it became clear that costly remediation efforts were necessary." 414 F. Supp. 3d at 1174 (internal citations omitted). Because the Second Amended Complaint still lacks those necessary details, it, too, fails to "plead sufficient factual matter to make the alleged fraud plausible." *Id.*

---

[3] As discussed below, the claims against Smagley are frivolous because he left Gogo on May 4, 2017 (SAC ¶ 29), *i.e.*, long before "November or December 2017."

1.      Plaintiffs Still Fail To Plead Facts Showing That Defendants' Pre-
        November 2017 Statements Were False When Made

Nothing in the Second Amended Complaint even attempts to allege facts showing that

the significant 2Ku problems discussed by Thorne, Gogo's CEO, on May 4, 2018 had

materialized or become known to any defendant by the start of the putative Class Period in

February 2017 or at any time before "winter" 2017-18.  Although the Second Amended

Complaint continues to discuss deicing problems "in winter" (*see, e.g.*, SAC ¶¶ 74, 80, 89), it

still fails to specify "*when* the data revealed that the de-icing problem had caused a precipitous

drop in availability, or when it became clear that costly remediation efforts were necessary."

*Pierrelouis*, 414 F. Supp. 3d at 1174 (emphasis in original).  The Second Amended Complaint

therefore continues to lack any factual basis on which to infer that defendants knew that deicing

was causing significant problems with 2Ku performance at any time prior to "November or

December 2017" at the very earliest.  *See* SAC ¶¶ 76, 81.  And, as discussed below, even the

allegations that problems increased and were reported by Delta in November or December 2017

are insufficient to infer that the magnitude of the problems was known to defendants at that time.

Instead of pleading facts to support their claim that Gogo's 2016 10-K issued on

February 27, 2017 was misleading because it "merely suggest[ed] that a 'failure of the 2Ku to

perform' *could* occur at some unknown point in the future, [when] the 2Ku was *already*

suffering from a design failure,"  plaintiffs plead that "[d]iscovery will confirm precisely how

many [sic] time, money, and effort Gogo had already expended by this point, which will

underscore the materially misleading nature of the 2016 10-K."  SAC ¶ 105 (emphasis in

original).  But, as this Court has already instructed, even the "'information asymmetries that may

prevent [plaintiffs] from offering more detail' based only on [their] pre-complaint inquiry, which

[they] conduct[ ] without the benefit of discovery," do not excuse plaintiffs from "plead[ing]

13

sufficient factual matter to make the alleged fraud plausible." *Pierrelouis*, 414 F. Supp. 3d at 1174.[4] Plaintiffs have failed again to plead with the particularity required by the PSLRA any factual basis on which to infer that any of defendants' statements made in Gogo's 2016 10-K filed on February 27, 2017, Gogo's earning calls on February 27, May 4, and August 7, 2017, and the William Blair Growth Conference on June 14, 2017 (SAC ¶¶ 102-125) was false at the time it was made. *See Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *7 (N.D. Ill. Oct. 19, 2009) (rejecting "chronological[ly] confus[ed]" allegation that decision made in October 2015 rendered August 2015 statement false when made).

> 2. Plaintiffs Still Fail To Plead Facts Showing That Defendants' Statements In November And December 2017 Were False When Made

The allegations that Delta Air Lines "began to complain about the 2Ku system as early as November or December 2017," the problems "increased beginning in November 2017," and were "discussed regularly" at frequent meetings (SAC ¶¶ 69, 76, 81, 89) are still too vague to allege falsity with the particularity required by Rule 9(b) and the PSLRA, even if they are now attributed to anonymous former employees and supposedly corroborated by media reports.

The Seventh Circuit and this Court have expressed significant skepticism about the reliability of information from anonymous sources. *See Higginbotham*, 495 F.3d at 757; *Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, 2017 WL 6039926, at *13 n.6 (N.D. Ill. Dec. 6, 2017) (Alonso, J.). "[C]ourts should evaluate confidential-witness allegations taking into account such factors as 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and

---

[4] Because Smagley is not alleged to have made **any** statements after February 27, 2017, and the Second Amended Complaint provides no basis to infer that the February 27, 2017 statements attributed to him were false when made, Smagley should be dismissed from the case for this reason alone.

plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, 2012 WL 1030474, at *7 (N.D. Ill. Mar. 27, 2012) (citation omitted). Upon scrutiny, the allegations attributed in the Second Amended Complaint to confidential former Gogo employees still do not pass muster because they are still impermissibly vague—they do not include the required who, what, where, and when required to satisfy the particularity requirement of Rule 9(b) and the PSLRA. *See Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) (plaintiffs failed to plead with particularity required by Rule 9(b) the "who, what, where, and when" of internal memorandum that allegedly contradicted defendants' statements); *Zerger*, 2009 WL 3380653, at *9 (plaintiffs "fail[ed] to plead the 'when' of Defendants' alleged fraud with enough particularity—or lack of outright confusion—to satisfy either the PSLRA or Fed. R. Civ. P. 9(b)").

Nor do the January 22, 2018 and February 27, 2018 media reports now cited in the Second Amended Complaint (SAC ¶¶ 12, 77-78, 177) supply the necessary temporal precision lacking in the confidential witness allegations. Neither article says that Delta reported 2Ku problems to Gogo before defendants' challenged statements on November 2, November 17 and December 6, 2017. In fact, the January 22, 2018 Ars Technica report discusses a single outage on the return flight of the author's round-trip travel on Delta from Washington, D.C. to Detroit on December 11, 2017—several days *after* the last of those statements was made.[5] Nothing in that article suggests that Delta notified Gogo of recurring problems caused by de-icing at the time of that flight or at any time before or after. The February 27, 2018 Runway Girl article quotes a February 24, 2018 internal memo supposedly prepared by a Delta cabin maintenance

---

[5] *See* Polovoy Decl., Ex. G (Gitlin), at 4 (caption to first embedded screenshot states: "Testing Gogo Air's 2Ku service on Delta 1731, DCA to DTW, *December 11th 2017*.").

employee and circulated to Delta flight attendants discussing problems experienced with 2Ku on

"some" Delta flights "in recent months."  Polovoy Decl., Ex. H (Rabinowitz).  Like the Ars

Technica article, the Runway Girl article contains nothing to suggest that these problems were

reported to Gogo before December 6, 2017.  Indeed, this Court already found that the January

and February 2018 articles, which plaintiffs cited in their opposition to defendants' prior motion

to dismiss, did nothing to bolster plaintiffs' inadequate allegations.  *See Pierrelouis*, 414 F. Supp.

3d at 1173 n.3.  Similarly, the June 1, 2018 Runway Girl article cited in the Second Amended

Complaint (SAC ¶ 11) acknowledges that Air Canada experienced deicing issues "in winter"

(Polovoy Decl., Ex. I (Kirby)), but also fails to provide a basis on which to infer that the

magnitude of the problems was known to defendants before November 2, November 17 or

December 6, 2017.

The plausible inference to be drawn from the Second Amended Complaint's allegations

as a whole is that the reports of significant problems occurred in late December 2017, and, as the

new allegations attributed to FE1 confirm, it took time—"over a course of multiple months"—

for Gogo to identify deicing as a cause of the 2Ku outages because "to pinpoint exactly when,

where, and how the issue started, or when the fluid started to accumulate, was a challenge."

SAC ¶¶ 71, 174.  That inference is consistent with defendants' public statements in November

and December 2017.  And it makes perfect sense for the reports of significant issues to have been

received in middle or late December—*i.e.*, *after* the November 2, November 17 and December 6

statements were made—because, as Gogo's new CEO explained in May 2018, the magnitude of

the problems became apparent in ***winter***, when issues arose with de-icing fluid used on aircraft

fuselages entering the 2Ku radomes and causing significant problems (*id*. ¶ 91).

3.    Plaintiffs Still Fail To Plead Facts Showing That Defendants' February 22, 2018 Statements Were False When Made

On February 22, 2018, in its 10-K and in an earnings call, Gogo disclosed the information then known and available to it about significant 2Ku de-icing problems that had begun to surface. Plaintiffs assert conclusorily that these statements were only partially true, but offer no factual basis for saying so. Although plaintiffs fault defendants for not disclosing everything that was later disclosed on May 4, 2018, nothing in the Second Amended Complaint suggests that defendants withheld any information about 2Ku problems and their impact on Gogo's future performance that was available and known to them as of February 22, 2018.

Plaintiffs' allegations about "outage lists" that were supposedly "received by everyone at the company, including the Chief Executive Officer" (SAC ¶¶ 82, 162) fail to support any contrary inference. First, despite the attribution of these allegations to FE3—described as an "Aviation Maintenance Controller"—nothing in the Second Amended complaint suggests that a person in that position would know whether alleged outage lists were actually received by everyone at the company, much less by its senior executives. Nor are the allegations corroborated by any other reliable sources. For that reason alone, the allegations fail to satisfy the PSLRA's particularity requirement. *See DeVry*, 2012 WL 1030474, at *3 (complaint based on statements from confidential witnesses "must 'describe [its] sources with sufficient detail to support the probability that a person in the position occupied by the source would possess the information alleged, or in the alternative provide other evidence to support [its] allegations'").

Second, the "outage list" allegations are also insufficiently particular because they are still silent as to what these "outage lists" showed about overall 2Ku service reliability percentages at the time. The Second Amended Complaint does not specify any contemporaneous information in these reports that was inconsistent with the 2Ku performance

statistics that defendants reported. *See In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 987 (E.D. Wis. 2009) (plaintiffs failed to plead that statements were false when made because "confidential witness allegations regarding the preparation and dissemination of daily reports do not actually mention any reports that contained statistics materially inconsistent with the defendants' public statements"). The Second Amended Complaint still merely alleges that defendants "had access to data that *may have shown* that their statements to investors were misleading when made," which this Court held, without more, is insufficient to plead falsity (or scienter). *Pierrelouis*, 414 F. Supp. 3d 1164 at 1174-75. Even FE4's alleged statement that "during the winter months" the frequency of 2Ku outage tickets "increased to '10 per week'" (SAC ¶ 87) fails to specify an actual timeframe when that occurred and fails to provide any metrics from which the Court can determine whether ten outage tickets per week was or was not a significant number at the time. Neither this allegation nor any others in the Second Amended Complaint give any indication that, as of February 22, 2018, defendants understood that the 2Ku de-icing issue was worse than disclosed, or that it would require more extensive and more costly repairs, or how that would impact Gogo's adjusted EBITDA guidance for 2018.

Plaintiffs contend that on January 28, 2018, Gogo's vice president of product management acknowledged publicly that "[t]he 2Ku defect was severe" when he remarked to the author of the Ars Technica article that "'[m]uch like a DirectTV dish has problems in heavy rain, deicing fluid is a concentrated thunderstorm.'" SAC ¶ 77. If true, plaintiffs have pleaded themselves out of a case. "A plaintiff cannot credibly claim to be misled by a company's attempt to hide negative information when that same information is publicly available via alternate channels." *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 834 (N.D. Ill. 2000) (citing *Eckstein v. Balcor Film Inv.*, 58 F.3d 11362, 1169 (7th Cir. 1995)). Either plaintiffs were misled, or the

information was public knowledge. Plaintiffs cannot have it both ways.

Plaintiffs have failed again to plead with the requisite particularity specific facts supporting a plausible inference that each defendant knew on February 22, 2018 of the later-reported issues with the 2Ku system. Plaintiffs thus have failed to plead that the February 22, 2018 statements were false when made.

**B.    Plaintiffs Still Fail To Plead That Any Defendant Acted With The Intent To Defraud**

In addition to finding that plaintiffs' prior complaint failed to plead falsity, this Court found that the prior complaint failed to plead scienter with particularity because it did "not allege when defendants knew or should have known of the magnitude of the de-icing problem." *Pierrelouis*, 414 F. Supp. 3d at 1175. The Court rejected plaintiffs' arguments that defendants' access to information and the importance of 2Ku to Gogo's business were "sufficient to 'create a strong inference' that defendants knew in 2017 and early 2018 that the de-icing problem was serious enough to merit mention in any statement to investors about the 2Ku system." *Id*. The Court additionally held that plaintiffs' allegations did not support a strong inference that defendants "recklessly disregarded a serious problem in omitting to disclose it to investors" because plaintiffs had "not alleged that, before or during the class period, defendants were presented with any specific information that demonstrated the scope and magnitude of the de-icing problem." *Id*. at 1176. The inference of scienter therefore was not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. (quoting *Tellabs*, 551 U.S. at 314). The Second Amended Complaint suffers from the same deficiencies, warranting dismissal of plaintiffs' claims with prejudice. The more compelling inference to be drawn from the allegations of the Second Amended Complaint, especially FE1's alleged statements about how challenging it was to identify the root cause of the 2Ku problems and the time it took to finally

19

do so (SAC ¶ 71), is that defendants provided the best information that was available at the time each of the challenged statements was made.

The Seventh Circuit has rejected the "group pleading doctrine," and therefore "the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). A separate scienter inquiry must be undertaken for each defendant and each statement. *Id.* As shown below, plaintiffs have not pleaded individualized allegations of scienter as to any defendant.

1.  Plaintiffs Still Have Not Pleaded That Smagley Knew Or Recklessly Disregarded Design Problems With Gogo's 2Ku Systems

Other than the alleged misleading statements in Gogo's 2016 10-K (SAC ¶¶ 103-105), the sole alleged false statement attributed to Smagley is his statement during an earnings conference call on February 27, 2017—nine months before winter 2017-18—about an expected decline in cash needs and an increase in EBITDA in 2018 compared to 2017 (*id.* ¶ 106). Because, as shown in Section I.C.1 below, this is a forward-looking statement protected by the PSLRA's safe harbor, the required scienter is actual knowledge—anything less requires dismissal. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs II*") ("A complication introduced by the Private Securities Litigation Reform Act is that 'actual knowledge' of falsity, not merely indifference to the danger that a statement is false, is required for liability for 'forward-looking' statements—predictions or speculations about the future."); 15 U.S.C. § 78u-5(c)(1)(B)(ii).

Although the "scienter" section of the Second Amended Complaint (SAC ¶¶ 160-180) contains no allegations about Smagley, plaintiffs allege elsewhere that because "winter [*2016-17*] was coming to a close at the time . . . , Smagley knew about the [sic] 2Ku's design defect and that the costs associated with fixing it would increase exponentially the following year as

additional 2Ku systems were installed and came online." SAC ¶ 107. This is nothing but a bare allegation carried over untouched from plaintiffs' prior amended complaint. As before, plaintiffs have not alleged a single fact—much less the specific facts required by the PSLRA—to support even a weak inference that Smagley knew on February 27, *2017* that the 2Ku systems suffered from a design defect or that the costs of fixing it would increase in 2018. Plaintiffs' allegations support the opposite inference because, as discussed above, the Second Amended Complaint alleges that the problems with the 2Ku system were first reported to Gogo only in November or December 2017, and that it took many months for Gogo to identify de-icing as the cause. *Id.* ¶¶ 71, 76. The inference that Smagley had actual knowledge in February 2017 that Gogo would be unable to meet its 2018 expectations because of problems that plaintiffs contend were first reported months later is neither cogent nor compelling; it is preposterous.

2. Plaintiffs Still Have Not Pleaded That Any Other Defendant Knew Or Recklessly Disregarded Design Problems With Gogo's 2Ku Systems

Similarly preposterous are plaintiffs' contentions that any of the other defendants actually knew or recklessly disregarded information that materially contradicted any of their public statements—both present and forward-looking. Plaintiffs allege that defendants Small, Wade and Rowan "knew or had access to information that materially contradicted their public statements" (SAC ¶ 160) because they allegedly received "'outage lists' whenever a 2Ku system failed" (*id.* ¶ 163) and confirmed in public statements they each made on November 17, 2017 that they "monitored the performance of 2Ku systems in real-time" (*id.* ¶ 166; *see also id.* ¶¶ 164-165, 167-169).[6] These allegations are no different from the allegations held inadequate in

---

[6] Contrary to plaintiffs' insinuation, Small did not state on November 17, 2017 that he "studied [the performance requirements] on a routine basis" (SAC ¶ 164). *See* Polovoy Decl., Ex. M (Nov. 17, 2017 Investor and Analyst Day Tr.).

plaintiffs' prior complaint, and they fail for all the reasons identified by the Court in its dismissal of the prior amended complaint. *Pierrelouis*, 414 F. Supp. 3d at 1175-77.[7]  The only new "scienter" allegations in the Second Amended Complaint are allegations that (1) identifying de-icing as the cause of the 2Ku outages was "a challenge" and took "multiple months" (SAC ¶¶ 71, 174); (2) fixing the problem also took time and was not as easy as initially thought and announced (*id.* ¶¶ 175-176); and (3) Gogo's vice president of product management supposedly confirmed that "the severity of the 2Ku defect was known internally at Gogo well in advance of the end of the Class Period" because he said on January 28, 2018 that "deicing fluid is like a concentrated thunderstorm" (*id.* ¶ 177).  None of these allegations give rise to an inference of fraud more compelling than the opposing nonfraudulent inference.  To the contrary, as already noted, these allegations are more consistent with the nonfraudulent inference that defendants disclosed the best information that was available to them at that time.  If the first reports of significant problems were received in late December, it is not at all surprising that the full extent of the problem, all of its root causes, and its impact on the Company's future performance were

---

[7]  Plaintiffs' suggestions that out-of-context snippets from certain analyst reports show that the public felt misled by Gogo's disclosures (SAC ¶¶ 19, 99, 100, 171) also fail to support any inference of scienter. *See In re Eros Int'l Sec. Litig.*, 2017 WL 6405846, at *6, *8 (S.D.N.Y. Sept. 22, 2017) (plaintiffs' citations to "cherry-picked statements" from analyst reports did not support a plausible inference "that the investment community was misled by Defendants' statements"), *aff'd sub nom. Eisner v. Eros Int'l PLC*, 735 F. App'x 15 (2d Cir. 2018).  These allegations are unchanged from the prior complaint, and, just as they failed to support an inference of scienter in the prior complaint, they fail to do so again. When read in context, the May 8, 2018 report of Cowen analyst Lance Vitanza, quoted in paragraphs 19 and 100 of the Second Amended Complaint, simply reports exactly what CEO Thorne explained, *i.e.*, that after further investigation, the problems reported in February 2018 turned out to be "much worse than initially thought."  Polovoy Decl. Ex. R (Lance Vitanza, "Operational Setbacks Leave Gogo Complex in Limbo for Now," Earnings Update, May 8, 2018) at 1.  Similarly, despite Northland Capital Markets analyst Paul Penney's insinuations about Small's credibility (*see* SAC ¶¶ 19, 99), his reports say nothing to back up those insinuations—they do not identify any factual information that was known earlier but not disclosed until May 4, 2018.  *See* Polovoy Decl., Ex. S (Paul Penney, "Gogo Inc. (GOGO) Your Seat Cushion Can Also Be Used as a Flotation Device – PT to $3.50," May 7, 2018); *see also* Polovoy Dec., Ex. T (Paul Penney, "Gogo Inc. (GOGO) Seat Belts Get an Extra Tug with Risk Clouds Emerging Darker & Closer," Feb. 23, 2018).

22

not sufficiently apparent until later.  As Gogo's new CEO said on May 4, 2018, the Company had completed "a thorough analysis of root causes and discovered that while deicing"—which was disclosed on February 22, 2018—"was the biggest issue, there are also some manufacturing issues and software issues at fault" and they "also discovered the deicing fluid entered the antenna [radome] through far more pathways than we originally thought."  Polovoy Decl., Ex. D (Q1 2018 Earnings Call Tr.) at 6.  The fact that the Company continued to investigate, address and assess the problem even after February 22, 2018 does not support the inference that defendants fraudulently concealed any known information on February 22, 2018, or at any time earlier.  "Taking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."  *Pierrelouis*, 414 F. Supp. 3d at 1176 (quoting *Higginbotham*, 495 F.3d at 761).

This Court explained that "an inference that the defendants acted with fraudulent intent is not sufficiently "cogent" if it is only one of many possible explanations."  *Id*. (citing *Tellabs II*, 513 F.3d at 710-11).  The few new allegations in the Second Amended Complaint do not make the inference of fraud any more cogent than the original allegations in the prior complaint.  None of those allegations, alone or together, is remotely as compelling as the nonfraudulent explanations for why defendants did not disclose the severity and financial impact of the 2Ku issues until May 4, 2018 (which the Court identified in dismissing the first amended complaint).

> 3.  Plaintiffs Still Have Not Alleged Any Stock Sales Or Any Other Motive To Commit Fraud

Plaintiffs' allegations of scienter are undermined by their failure to plead any stock sales by any defendant during the putative Class Period, or any other motive to commit fraud, and by the fact that Gogo's CEO ***purchased*** a significant amount of stock during the putative Class Period (when plaintiffs allege he knew the stock price was artificially inflated).  While the

absence of motive allegations is not dispositive, the Supreme Court has acknowledged that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. The absence of any alleged financial incentive to commit fraud, as well as stock purchases during the alleged class period, can negate an inference of scienter. *See City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) ("Without a motive to commit securities fraud, businessmen are unlikely to commit it."); *Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995) (defendants' acquisitions of company stock undermined inference of scienter).[8]

Here, plaintiffs have not alleged any stock sales or any other motive for any defendant to commit fraud. Moreover, Small—the Company's CEO at the time each of the allegedly fraudulent statements was made—significantly increased his Gogo stock holdings during the putative Class Period, when he purchased 100,000 shares of Gogo common stock at $8.79 per share on November 6, 2017, bringing his total Gogo stock holdings to 398,224. *See* Polovoy Decl., Ex. U (SEC Form 4, Nov. 8, 2017). In light of plaintiffs' allegations that the problems with 2Ku increased in November 2017 (SAC ¶ 81), the timing of Small's significant stock acquisition undermines plaintiffs' allegations that Small knew of significant undisclosed

---

[8] *See also In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 50 (D. Mass. 2016) (same), *aff'd*, 857 F. 3d 34 (1st Cir. 2017); *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) ("[Defendant] *increased* his holdings of Abiomed stock by 9.2% during the Class Period, which negates any inference that he had a motive to artificially inflate Abiomed's stock during that period.") (emphasis in original); *DeVry*, 2012 WL 1030474, at *12 (finding "dubious" plaintiffs' contention that individual defendant's stock purchases do not undercut inference of scienter with respect to defendant who made no stock sales and only increased his stock holdings during the alleged class period); *IBEW Local 697 Pension Fund v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) (defendants' purchases during the class period "undermine any inference of scienter"); *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 749 (S.D. Ind. 2009) (stock repurchase program negates any inference of scienter) (citing cases), *aff'd*, 679 F.3d 952 (7th Cir. 2012); *In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *8 (N.D. Ohio June 27, 2002) (defendant's class period purchases "inconsistent with a finding of . . . scienter").

problems with 2Ku that were inconsistent with his public statements and were artificially inflating Gogo's stock price. Small's stock purchases eviscerate any inference that defendants acted with scienter: If Small thought for a moment that winter 2017-18 would bring significant problems with 2Ku, he obviously would not have purchased Gogo stock a few weeks before winter started, much less increase his holdings by more than 33 percent.[9]

In sum, the allegations of the Second Amended Complaint fail to support a strong inference of scienter that is cogent and at least as compelling as the nonfraudulent inference.[10]

### C. Defendants' Forward-Looking Statements Regarding Expected Cost Declines And Increased Adjusted EBITDA In 2018 Are Not Actionable Under The PSLRA Safe Harbor

Several of the challenged statements are not actionable for a separate and independent reason: they are protected by the PSLRA's statutory safe harbor for forward-looking statements. 15 U.S.C. § 78u-5(c). Specifically, these include:

- Smagley's February 27, 2017 statement that "[w]e expect a significant decline in cash needs in 2018 versus 2017 due to a substantial decline in Gogo's average investment for 2Ku installation and a significant increase in consolidated adjusted EBITDA" (SAC ¶ 106);

- Rowan's statements on August 7, November 2 and 17, and December 6, 2017 concerning Gogo's expectations that Gogo's net costs for "airborne equipment

---

[9] The Second Amended Complaint suggests, in purely speculative fashion, that defendants "intentionally withheld material information about the 2Ku system defect because the Company needed to increase its stock price in order to facilitate a remedy," and "keep up with its high operating costs" "in the face of mounting competition" and the loss of American Airlines' business. SAC ¶¶ 13, 14, 173. The Seventh Circuit and courts in this district regularly refuse to infer scienter from generalized motives common to all executives, such as the desire to increase the company's stock price. *See, e.g., Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939-40 (7th Cir. 2018); *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012); *Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 WL 60186, at *9-10 (N.D. Ill. Jan. 7, 2020) (rejecting desire to increase company's stock price as a motive to commit fraud), *app. filed* (7th Cir. Feb. 4, 2020).

[10] Because the Second Amended Complaint does not plead scienter as against any of the Individual Defendants, it also fails to plead scienter against Gogo. *See Zimmer*, 673 F. Supp. 2d at 747 n.28 (in determining corporate scienter, a court must look to the scienter of individual corporate officers) (citing *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.,* 365 F.3d 353, 366 (5th Cir. 2004)).

and installations" would "come down in 2018 versus 2017" and adjusted EBITDA would be significantly higher in 2018 than 2017 (*id.* ¶¶ 124, 130, 138, 146); and

- Small's statement on February 22, 2018 that "we expect strong growth in consolidated revenue and EBITDA in 2018" (*id.* ¶ 154).

Pursuant to the PSLRA's safe harbor, a written or oral statement that is forward-looking is not actionable under the federal securities laws if either (a) it is identified as a forward-looking statement and is accompanied by meaningful cautionary language "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (b) plaintiffs fail to plead with particularity that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843-48 (N.D. Ill. 2003) (internal quotation omitted). Both prongs of the safe harbor are satisfied here and provide independent grounds for dismissal of the claims based on the forward-looking statements.

    1.    The Statements Of Expectation Were Identified As Forward-Looking And
          Were Accompanied By Meaningful Cautionary Language

The PSLRA defines "forward-looking statement" to include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share . . . or other financial items"; "a statement of future economic performance"; and "any statement of the assumptions underlying or relating to any [of the foregoing]." 15 U.S.C. § 78u-5(i)(1). Each of the above statements concerning Gogo's expected costs and adjusted EBITDA for 2018 falls within this statutory definition of "forward-looking statement."

Each of these statements also qualifies for the safe harbor because it was accompanied by remarks confirming that the speakers were making forward-looking statements and provided meaningful cautionary disclosures about the relevant risks that might jeopardize defendants' expectations about Gogo's future costs for 2Ku installations and adjusted EBITDA in 2018.

26

Specifically, at each of the conference calls and/or presentations at which these statements were made, investors were warned that forward-looking statements regarding Gogo's future financial performance might be made and that they should consider the risk factors, identified in Gogo's earnings press releases, annual report on SEC Form 10-K and other SEC filings, that could cause actual results to differ materially from those in the forward-looking statements made on the conference call or during the presentation. *See* Polovoy Decl., Ex. J (Edited Transcript Q4 2016 Gogo Inc. Earnings Call, Feb. 27, 2017 ("Q4 2016 Earnings Call Tr.")) at 2; Polovoy Decl., Ex. K (Edited Transcript Q2 2017 Gogo Inc. Earnings Call, Aug. 7, 2017 ("Q2 2017 Earnings Call Tr.")) at 2; Polovoy Decl., Ex. L (Edited Transcript Q3 2017 Gogo Inc. Earnings Call, Nov. 2, 2017 ("Q3 2017 Earnings Call Tr.")) at 2; Polovoy Decl., Ex. M (Transcript Gogo Inc. Investor and Analyst Day, Nov. 17, 2017 ("Nov. 17, 2017 Investor and Analyst Day Tr.")) at 1, 38; Polovoy Decl., Ex. N (Gogo Inc. Investor and Analyst Day Presentation, Nov. 17, 2017) at 2; Polovoy Decl., Ex. O (Edited Transcript Gogo Inc. at UBS Global Media and Communications Conference, Dec. 6, 2017) at 15; Polovoy Decl., Ex. E (Q4 2017 Earnings Call Tr.) at 2. Gogo's earnings releases during this time period also contained the following on-point risk disclosures:

> When used in this discussion, the words . . . "expect," . . . "should," "will," "future" and the negative of these or similar terms and phrases are intended to identify forward-looking statements in this press release. . . . Forward-looking statements reflect our current expectations regarding future events, results or outcomes. These expectations may or may not be realized. Although we believe the expectations reflected in the forward-looking statements are reasonable, we can give you no assurance these expectations will prove to have been correct. Some of these expectations may be based upon assumptions, data or judgments that prove to be incorrect. Actual events, results and outcomes may differ materially from our expectations due to a variety of known and unknown risks, uncertainties and other factors. Although it is not possible to identify all of these risks and factors, they include, among others, the following: . . . any inability to timely and efficiently deploy our 2Ku service . . . ; the effects of service interruptions or delays, technology failures and equipment failures or malfunctions arising from defects or errors in our software or defects in or damage to our equipment; . . . ; increases in our projected capital expenditures due

27

> to, among other things, unexpected costs incurred in connection with the roll-out
> of our technology roadmap or our international expansion . . . .

*See, e.g.*, Polovoy Decl., Ex. P (Press Release, "Gogo Announces Fourth Quarter and Full-Year 2016 Financial Results," Feb. 27, 2017 ("Q4 2016 Earnings Release")) at 3-4; Polovoy Decl., Ex. Q (Press Release, "Gogo Announces Fourth Quarter and Full-Year 2017 Financial Results," Feb. 22, 2018 ("Q4 2017 Earnings Release")) at 3-4.

As plaintiffs acknowledge, Gogo's 2016 10-K included a risk factor titled "[w]e may be unsuccessful or delayed in widely deploying and operating our 2Ku technology," which warned that "there can be no assurance that we can meet our installation goals on our current timeline, due to, among other things, the failure of any 2Ku-related technology and equipment to perform as expected" and "[i]f 2Ku fails to perform as expected or its commercial availability is significantly delayed as compared to the timelines for which we have contracted, our business, business prospects and results of operations may be materially adversely affected."  SAC ¶ 103 (quoting 2016 10-K at 25).  Gogo's 2017 10-K, filed on February 22, 2018, updated this risk factor as follows:

> We have encountered delays and quality problems as we deploy 2Ku, which we
> are in the process of remediating, and may continue to do so given the aggressive
> installation schedule that we are undertaking and the demands that the schedule
> places on employees, suppliers and other resources. . . . If 2Ku fails to perform as
> expected or we fail to meet the installation timelines and performance metrics for
> which we have contracted, our business, financial condition and results of
> operations may be materially adversely affected.

*Id.* ¶ 158 (quoting 2017 10-K at 25-26).  Gogo's 2016 and 2017 10-Ks also warned in the MD&A section that key factors that may affect Gogo's future performance include "costs associated with the implementation of, and our ability to implement on a timely basis our technology roadmap, upgrades and installation of our . . . 2Ku . . . technologies (including failures or delays on the part of antenna and other equipment developers and providers) . . . ."

Polovoy Decl., Ex. C (2016 10-K) at 59; Polovoy Decl., Ex. B (2017 10-K) at 56.

In determining whether the safe harbor applies here, the Court may consider cautionary statements that accompanied the statements at issue, cautionary statements that were incorporated by reference, and cautionary statements that were publicly available at the time each of the forward-looking statements was made. *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1166-67 (N.D. Ill. 2004); *Stavros*, 266 F. Supp. 2d at 844. The Seventh Circuit has explained that the cautionary statements "need not identify what actually goes wrong and causes the projections to be inaccurate; prevision is not required . . . . [I]t is enough to point to the principal contingencies that could cause actual results to depart from the projection." *Asher*, 377 F.3d at 732, 734. Gogo's warnings about potential and actual 2Ku performance failures meet this requirement. Accordingly, defendants' forward-looking statements are protected by the PSLRA's safe harbor, and plaintiffs' claims based on those statements should be dismissed.

> 2. Plaintiffs Fail To Plead That Defendants Actually Knew Their Statements Were False Or Misleading

The forward-looking statements are not actionable under the safe harbor for the additional and alternate reason that plaintiffs have not pleaded with particularity facts to support a strong inference that defendants actually knew that their forward-looking statements about expected costs and adjusted EBITDA in 2018 were false or misleading when they made them. *See Stavros*, 266 F. Supp. 2d at 847; 15 U.S.C. § 78u-5(c)(1)(B); 15 U.S.C. § 78u-4(b)(2); *see also In re Harley-Davidson*, 660 F. Supp. 2d at 994 ("a forward-looking statement unaccompanied by meaningful cautionary language may still qualify for safe harbor if the plaintiff cannot prove the defendants had 'actual knowledge . . . that the statement was false or misleading.'"). Thus, even if the Court were to assume that the risks related to 2Ku had already

materialized at the time the forward-looking statements were made, and the cautionary statements therefore were not "meaningful," the challenged forward-looking statements are still protected by the safe harbor.  The reason is that, as explained in Section I.B.1 above, plaintiffs have not adequately alleged that defendants made their forward-looking statements with actual knowledge that they were false or misleading, *i.e.*, they were *actually aware* of the eventual scope of the problems and their impact on future costs and adjusted EBITDA at the time they made those statements.  *See* 15 U.S.C. § 78u-5(c)(1)(B); *Stavros*, 266 F. Supp. 2d at 847.[11]

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Second Amended Complaint with prejudice.

Dated: February 21, 2020

Respectfully submitted,

NEAL, GERBER & EISENBERG LLP

/s/  *Andrew G. May*
Jonathan S. Quinn
Andrew G. May
Two North LaSalle Street, Suite 1700
Chicago, Illinois 60602
Telephone: (312) 269-8000
jquinn@nge.com
amay@nge.com

SHEARMAN & STERLING LLP
Jerome S. Fortinsky (admitted *pro hac vice*)
Brian H. Polovoy (admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
jfortinsky@shearman.com
bpolovoy@shearman.com

*Attorneys for Defendants*

---

[11] Because plaintiffs fail to plead a violation of Section 10(b), their Section 20(a) "control person" claim fails as a matter of law.  *Pugh*, 521 F.3d at 693.  Furthermore, Smagley was no longer Gogo's CFO for most of the putative Class Period (SAC ¶ 29), and accordingly cannot be held liable as a control person under Section 20(a) for any statements made after he left Gogo (i.e., after May 4, 2017).