## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ASHLEY PIERRELOUIS, Individually and On Behalf of All Others Similarly Situated, | Case No.: 1:18-cv-04473 Hon. Jorge L. Alonso |
| Plaintiff, | **THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| GOGO INC., MICHAEL J. SMALL, NORMAN SMAGLEY, BARRY ROWAN, and JOHN WADE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Lead Plaintiff Daniel Rogers ("Lead Plaintiff") brings this action individually and on behalf of all others who purchased or otherwise acquired the publicly traded securities of Gogo Inc. ("Gogo" or the "Company") during the period from February 27, 2017 through May 4, 2018, inclusive (the "Class Period"), and were injured thereby (the "Class").

Lead Plaintiff alleges the following based upon personal knowledge as to his own acts and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gogo, analysts' reports and advisories about the Company, interviews with a representative of Stelliam Investment Management, one of Gogo's largest investors, interviews with former employees, and information readily obtainable on the internet.

Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.     **INTRODUCTION**

1.      In the winter of 2016-2017, Gogo had a serious problem. The Company, a provider of in-flight internet services, had "bet the company" by investing heavily in the 2Ku global satellite-based in-flight connectivity system ("2Ku"), a new product that promised to provide commercial airline passengers with faster, more reliable internet service in flight.  The new technology was the center of the plan Defendants presented to investors in 2016 to put the Company on the path to profitability after years of burning cash to fuel growth.

2.      2Ku's performance was the keystone of Defendants' plan. Defendants touted 2Ku as "market leading technology" and claimed its dramatically faster speeds and increased availability would win over new and existing airline customers and inspire more passengers to use inflight wi-fi. Gogo's revenues would rise as the Company installed 2Ku on more planes, and each installed plane would see higher "average revenue per aircraft" ("ARPA") as users or airlines paid for usage.  As Defendant Small summarized, "[t]he key point is more bandwidth is the underlying driver of more usage, users and payers for connectivity. More bandwidth also results in both a better passenger experience and faster ARPA growth."  Defendants further explained that as 2Ku was deployed on more planes, and each plane generated more revenue, the Company would see its margins improve and its average costs decrease.  Before and during the Class Period, Defendants referred to these four drivers of growth—more planes, increased ARPA, reduced average cost, and improving margins—as key to achieving profitability.

3.      Investors supported Gogo's plan, and were positive about 2Ku, but the market understood Gogo had boxed itself in. If 2Ku wasn't a success, Gogo had nowhere left to go. The 2Ku technology had taken longer than expected to bring to market, and by 2016, commercial airlines were making long-term commitments to install satellite technology.  The industry was in the midst of a "land rush" for satellite installation commitments and Gogo was not just

competing for new customers, it was defending its existing business.  In the profitable North American market, competitor Viasat was taking share, targeting Gogo's existing and prospective customers and displacing Gogo's older, but profitable, Air To Ground ("ATG") technology. For example, in 2016, American Airlines, one of Gogo's largest customers, announced that it would remove Gogo's ATG technology from 550 planes—almost 20% of Gogo's commercial installations—and install Viasat's satellite technology.

4.      2Ku was Gogo's chance to compete, but the strategy required the Company to heavily subsidize 2Ku installations and enter into long-term satellite bandwidth contracts to cover its customers' flight paths.  To fund these costs, Gogo increased its financial leverage, including by pledging substantially all of its assets to 12.5% senior secured bonds that limited the Company's ability to borrow economically elsewhere.  Having made substantial long-term commitments operationally and financially, Gogo's large backlog of 2Ku orders were expected to provide relief and a path to prosperity.

5.      The costs, the competition, the debt—these things were challenging, but they were accounted for in Defendants' plan and understood by the market. They were not the problem. The problem in the 2016-2017 winter, the problem that could sink the Company, was that the 2Ku technology wasn't working as advertised.

6.      Former Gogo employees with direct knowledge of the matter confirm that when cold weather hit, 2Ku systems began to fail in alarming numbers. According to one former employee, more than a dozen of the approximately 100 planes with 2Ku installed failed during the 2016-2017 winter. This was a far cry from the 98% availability that Defendants were touting to the market, and enough to spur the Company into immediate action to attempt to privately correct the problem.  Gogo quickly worked with a customer to ground an affected plane, and sent

3

engineers from ThinKom, the company that developed the satellite technology, to inspect the 2Ku system. After removing the radome that protects the externally mounted antennae array, the engineers immediately saw that de-icing fluid was leaking into the radome when the plane was being sprayed, causing the antennas to stick and malfunction. Once the cause was identified, Gogo began to work on finding a solution in February 2017, the beginning of the Class Period.

7.     Former employees confirm that executives at Gogo were aware of the problem. One former employee explained that everyone knew, including Defendant Wade. That employee recalled weekly meetings that he attended and that Wade also attended where the de-icing problem was discussed.[1] Another former employee who left early in the Class Period stated that Defendant Wade and the Chief Technology Officer, Anand Chari, knew what was going on. Yet another former employee in Defendant Wade's group, who left before the winter of 2017-2018, stated that because 2Ku was the Company's flagship system, everyone was made aware of problems.

8.     Despite discovering the de-icing issue in the winter of 2016-2017, Defendants concealed the issue from investors.  Defendants' motive was straightforward. They understood that if Gogo disclosed a substantial defect with the 2Ku system, new and existing customers would delay installing 2Ku or, worse, cancel their contracts.  Even Gogo's existing contracts had a clause that allowed customers to cancel if they could replace Gogo products with a superior product.  And if investors learned of the defect, the price of Gogo's securities would decline to reflect the higher risk of failure, which would further limit Gogo's ability to raise the capital it needed.

---

[1] All former Gogo employees are referred to using the pronoun "he" to further protect their identities.

4

9.     Any delay to the installation schedule—let alone a delay of up to a year—would completely derail the four-part plan Gogo had presented to investors. Not only was the Company relying on the revenue the 2Ku installations would generate, Defendants simply couldn't compete for new customers with a defective product.  This wasn't just speculation. American Airlines, one of Gogo's two biggest customers, had sued Gogo in 2016 under the contractual provision that they could replace Gogo's product with a competitor's superior product.  The two parties ultimately agreed that American Airlines would remove Gogo's ATG systems from 550 of its planes and replace them with a competitor's satellite technology—a loss of nearly 20% of the planes in Gogo's Commercial Aviation division. Gogo, and Gogo's investors, were counting on the new 2Ku installations to replace that lost revenue.

10.     The importance of the 2Ku rollout is underlined by information provided by the founder and Portfolio Manager of Stelliam Investment Management ("Stelliam"), one of Gogo's largest investors during the Class Period.  According to Stelliam, large investors and analysts were laser focused on whether Gogo could attain and grow from the 2Ku installed-base targets Defendants provided at the beginning of the Class Period, especially in light of the American Airlines announcement.  Gogo's continued emphasis on the product quality and rapid progress of installations of 2Ku was the primary reason that investors believed that the Commercial Aviation business would turn around, and that the stock was attractive. While they believed the company would meet its installation targets, Stelliam and other investors also believed that if installations were deferred or cancelled competitors would continue to take market share and Gogo would run into cash flow and debt service issues.

11.     By concealing the defect, however, Defendants could continue to install 2Ku systems throughout the summer, knowing that the de-icing issue would not impact flights until

the winter of 2017-2018. Then, even if Gogo hadn't found a solution, Defendants would have bought the Company an additional nine to ten months of installations and marketing. The added time was crucial. It was widely understood in the in-flight broadband industry that, once an airline decided to install a company's satellite technology on its planes, the airline would keep that technology for years. Defendant Small underlined this dynamic in at an investor conference in June 2017, explaining that a 2Ku antenna is a "hard thing to change: attach a big antenna to the outside of the plane. The airlines don't want to do that very often. They want to know that's going to last a long time." For this reason, one analyst likened competition for new plane contracts to a "land grab." By continuing to install 2Ku on as many planes as possible through 2017, and continuing to sign contracts for new installations, Gogo could ensure that it had a solid customer base before it had to own up to the de-icing problem. Then, when the customer learned of the issue, it would be too late to replace the technology. Stelliam confirmed that Gogo needed to show rapid progress, as there was a "land grab" going on to lock up customers and Gogo had already pledged its assets to its senior secured bondholders, limiting its ability to raise fresh capital or pay off unsecured debt when it matured.

12.     Defendants chose to mislead. Throughout the Class Period, Gogo continued to install the 2Ku system on new planes even as the Company furtively worked on a solution to the de-icing problem. But it was apparent at the start of the Class Period that finding a solution would be time-consuming and that it was unlikely that Gogo would be able to repair the existing installations before the winter of 2017-2018.

13.     According to a former employee, Gogo had developed concepts for the remedy by the summer and fall of 2017, but had not deployed them widely. One employee explained that getting the airlines to ground the planes for repairs was challenging, as the airlines would have to

work the repair time into the schedule, and would have to route the plane to an airport with facilities that could handle the work. Defendant Small highlighted this challenge in the context of installations at an investor conference on June 14, 2017, stating, "The airline has to take the plane down, give it to us for a period of time. They hate when their planes are grounded, so the faster it goes the better." Repairing the 2Ku systems was not fast, however. According to one former employee, it could take several days, and would require removing the radome, the antenna, and the adapter plate, and installing hardware to prevent intrusion.

14.     Despite covertly working on the remedy, and knowing the extent of the necessary repair, Defendants not only hid the defect, they touted the speed and efficiencies of the installations, telling investors to expect average costs to go down and revenues to rise as the Company expanded the fleet of 2Ku equipped planes. Defendants made these representations knowing that the defective 2Ku system would need to be repaired when a fix was found, requiring Gogo to continue burning cash and to coordinate with its customers to ground planes for the repairs that were, in effect, a second installation. This would undoubtedly damage customer relationships.

15.     Instead of disclosing the problem, Defendants touted the success of the 2Ku launch. A February 27, 2017 press release announced that Gogo had been awarded a total of 1,500 aircraft for 2Ku installations, and quoted Defendant Small as saying, "2Ku performance demonstrates industry leading speed, coverage, and service availability, and we now have more than 130 2Ku aircraft installed. We are increasing 2Ku installation guidance to 450 to 550 aircraft in 2017 and 650 to 750 in 2018." The press release also quoted Defendant Smagley as saying, "With accelerated 2Ku installations and improved operating leverage, we now expect to

become free cash flow positive in 2019, a year earlier than our prior guidance." Defendants continued to provide glowing progress reports throughout the Class Period.

16.     Further, during the warm weather months of 2017, Defendants consistently touted 2Ku's performance—misleadingly claiming that it was available 98% of the time, but concealing that 2Ku's availability would plunge in the coming winter temperatures.

17.     Investors believed Defendants, and Gogo's share price rose from around $9 a share just before the Class Period, to a high of over $14 a share in the fall of 2017. Furthermore, by concealing the de-icing issue Gogo was able to raise $100 million in additional cash during the Class Period by issuing senior secured notes on September 25, 2017.

18.     But when winter hit in 2017, the Company had installed defective 2Ku units on hundreds of planes. And as Defendants knew they would, the 2Ku units failed in cold weather. According to the Company's after-the-fact disclosures, they failed at the same rate they had the previous winter—dropping to availability in the mid-80 percent range. The difference was that instead of impacting 100 planes, the problem was impacting hundreds—a significant portion of Gogo's commercial aviation division, and enough for airlines and passengers to take notice.

19.     As the issue became apparent to customers, Delta, which had over 200 2Ku planes, became involved in the trouble shooting process, and issued a memo to cabin crew to alert them to the problem so they could deal with customer complaints. With the de-icing issue beginning to be noticed by the public and Gogo's customers, Defendants finally began to disclose the problem, though they initially downplayed its seriousness.

20.     In a February 22, 2018 call with investors, Defendant Wade admitted some details about the radome and de-icing fluid causing "stickiness" within the antenna, but portrayed the problem as "early-stage growing pains." Further, Defendant Wade downplayed how difficult

and expensive the problem would be to fix, claiming that the Company had "identified the root cause of all these issues, and have fixes for all of them that have either been deployed or in the process of being deployed." Crucially, Defendants continued to stand by their claim that the Company would achieve positive free cash flow in 2019.

21. Consistent with the earnings call, in a follow-up call with Defendants Small and Wade, management reassured Stelliam's portfolio manager that the situation was under control. Defendants told Stelliam that the fix referred to on the earnings call was installing additional equipment to prevent de-icing fluid from entering venting holes in the radome. Management said they had started installing these at some point in 2017 on new deliveries but were not able to retrofit the full installed fleet before the weather turned cold. There was no mention of other sources of infiltration under the radome.

22. Investors were concerned with the problem but, like Stelliam, accepted the Company's assurances that the impact would be limited and manageable. Consequently, Gogo's share price declined from $10.51 per share on February 21, 2018 to close at $9.13 per share on February 22, 2018 (and, in fact, declined further the next day to close at $8.88 per share on February 23, 2018).

23. The Board of Directors, which would have understood the true depth of the problem, was apparently rattled, and on March 5, 2018, Defendant Small stepped down as CEO and was replaced by Oakleigh Thorne, a board member and shareholder with a 30% stake in the Company.[2] Defendant Small was not the only casualty. On April 20, 2018, Gogo announced that Anand Chari, the Chief Technology Officer who played a key role developing 2Ku, would move

---

[2] Pletz, John, *Gogo CEO is out, replaced by board member*, Crain's Chicago Business (March 5, 2018), *available at* https://www.chicagobusiness.com/article/20180305/BLOGS11/180309938/gogo-ceo-michael-Defendant Small-is-out-replaced-by-oakleigh-thorne

into a newly created role of "Strategic Technology Advisor." In fact, Chari entered into a separation agreement with the Company effective May 1, 2018.

24.     With Defendant Small out, the Company's tone changed dramatically. On Friday, May 4, 2018, Gogo belatedly revealed the true extent of the damage. In a call with investors, Thorne went to great pains to distance himself from Defendant Small's management of the Company, and admitted that the de-icing problem was going to be expensive and complex to address, and was going to have a material impact on the Company's revenue and outlook. Thorne explained that, because of the "de-icing fluid impact on 2Ku," "airlines held back on marketing the product" and Gogo had to "ramp[] up spending to fix reliability." Facing reduced revenue and increased costs, Gogo was forced to withdraw its previous estimates for adjusted EBITDA "due to increased costs and lost revenue related to the 2Ku implementation challenges." Gogo also had to scrap the growth and profitability plan Defendants had touted throughout the Class Period. In a press release issued that same day, the Company announced that it was "withdrawing its previously provided 2018 guidance for Adjusted EBITDA, airborne Cash CAPEX, and airborne equipment inventory purchases related to airline-directed installations, as well as Free Cash Flow guidance."

25.     Analysts noted the abrupt about-face. For example, Paul Penny of Northland Capital Markets noticed that the "admission comes post last quarter's conference call where the previous management team vocalized minimal / contained damage."

26.     The fallout was swift and devastating. In response to this news, Gogo's share price plunged and on Monday, May 7, 2018, Moody's downgraded Gogo's credit rating over "weakening credit metrics, operational difficulties and deteriorating liquidity" caused by 2Ku's de-icing issues. Moody's wrote, in pertinent part, that "[t]he performance degradation of

antennas in many recently installed 2Ku radomes caused by the infiltration of de-icing fluid, used to remove ice from fuselages in winter climates, resulted in slower performance of the company's 2Ku technology, as well as significant remediation costs. [Gogo's] adjusted EBITDA margin for the first quarter of 2018 was about 5%, down almost 1.5% from the prior year's quarter. These operational issues are expected to negatively impact EBITDA for the year and result in a very low, or potentially slightly negative, company adjusted EBITDA for the second quarter of 2018 since the bulk of remediation expenses will be incurred during the quarter."

27.     In response to Gogo's revelations and Moody's downgrade, the Company lost nearly half its market value, with its stock price falling from $9.59 per share on May 3, 2018 to $5.06 per share on May 8, 2018. Collectively, Gogo's investors lost hundreds of millions of dollars.

## II.    JURISDICTION AND VENUE

28.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

29.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

30.     Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as the Company conducts business and is headquartered in this District.

31.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

32.    Lead Plaintiff acquired Gogo securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged fraudulent conduct. Lead Plaintiff's certifications filed in support of his motion for appointment as lead plaintiff is incorporated herein by reference (Dkt. No. 23-3).

33.    Defendant Gogo provides inflight broadband connectivity and wireless entertainment services to the aviation industry in the United States and internationally. Gogo is a Delaware corporation with its headquarters located at 111 North Canal Street, Suite 1500, Chicago, Illinois 60606. Gogo securities trade on the NASDAQ under the ticker symbol "GOGO."

34.    Defendant Michael J. Small ("Small") served as the Company's Chief Executive Officer ("CEO") and President from February 16, 2010 until March 4, 2018.

35.    Defendant Norman Smagley ("Smagley") served as the Company's Chief Financial Officer ("CFO") from September 2010 until May 4, 2017.

36.    Defendant Barry Rowan ("Rowan") has been the Company's CFO since May 4, 2017.

37.    Defendant John Wade ("Wade") is the President of Gogo's Commercial Division, and previously served as the Company's Chief Operating Officer ("COO") and Executive Vice President during the Class Period.

38.    Non-party Oakleigh Thorne ("Thorne") has been a director on Gogo's Board since 2006. On March 4, 2018, Mr. Thorne succeeded Defendant Small and became the Company's President and CEO.

39. Defendants Small, Smagley, Rowan, and Wade are sometimes referred to herein as the "Individual Defendants." Defendant Gogo and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. FORMER EMPLOYEES REFERRED TO IN THE COMPLAINT

40. FE-1 worked at Gogo from 2014 until October 1, 2017, most recently in the role of Director of Aircraft Engineering. In that role, he reported to FE-4 until spring of 2017, after which he reported to Defendant Wade until a new VP of Airline Technical Services was named.

41. FE-2 worked at Gogo from 2015 to July 2018, most recently in the role of Project Engineer. In that role, he reported to Joe Kupferd, Senior Director – Airline Technical Services.

42. FE-3 worked at Gogo from February 2017 until August 2018 as Director – Airline Technical Operations. In that role, he reported to Michael Lorenzini, Senior VP of Airline Technical Operations.

43. FE-4 worked at Gogo from 2013 to May 2017, most recently in the role of Senior VP, Airline Technical Operations. In that role, he reported to Anand Chari, the Chief Technology Officer.

44. FE-5 worked at Gogo from 2014 to May 2017, most recently in the role of Director, Aircraft Certification and Compliance. In that role, he originally reported to FE-4, who in turn reported to Chari. Though his job remained the same, he later reported to Defendant Wade, following a reorganization.

## V. FACTUAL ALLEGATIONS

### A. Brief Overview of Gogo's Commercial Airline Division and 2Ku

45. Gogo provides in-flight broadband connectivity to commercial and business aircraft. Aircraft operators use Gogo's services to provide passengers with in-flight internet and entertainment, and to provide internet connectivity to aircraft crewmembers. To provide these

services, Gogo installs hardware, including antennas, modems, and other electronics, on the outside and inside of the aircraft, and supplies proprietary software to operate the hardware and for passenger use.

46.     During the relevant period, Gogo reported its financial results in three reporting segments, two for its commercial aviation business, Commercial Aviation-North America ("CA-NA") and Commercial Aviation-Rest of World ("CA-ROW," and with CA-NA, "CA"), and one for its business aviation business, Business Aviation ("BA").

47.     Commercial airplanes equipped with Gogo products access broadband either from ground-based networks—which Gogo refers to as "air-to-ground" or "ATG" networks—or from satellites.  Gogo primarily relies on its "2Ku" system to provide satellite connections to commercial aircraft in the CA-NA and CA-ROW segments.  2Ku is a satellite-based system that relies on the Ku open architecture satellite network. 2Ku is an upgrade of Gogo's "Ku-band" satellite service and, according to the Company, provides additional bandwidth and improved speeds for internet service on airplanes. Gogo's Ku-band service was capable of delivering in-flight internet connectivity at speeds of up to 50 Mbps through use of satellite operators. According to Gogo, 2Ku is capable of offering connectivity at twice the speed of Ku-band (*i.e.*, up to 100 Mbps), as well as significantly faster than the ATG systems.[3]

48.     According to Defendants, the 2Ku system was more reliable than either the ATG or Ku technology.  For example, during an investor presentation on December 6, 2016, Defendant Small stated that, with 2Ku, Gogo was achieving "99% reliability.  We often watch the competition struggle to get to 90% availability.  And even on our now two-year-old,

---

[3] During the relevant period, the BA segment did not use the 2Ku system.

three-year-old Ku technology, we're struggling to get to 98%. So, this is inherently more reliable and available technology."

49.     Defendant Small summarized the benefits of 2Ku as "15, 98, 98." For example, in a May 4, 2017 investor presentation, he explained, "2Ku is delivering the best performance in the industry, characterized by 3 numbers: 15, 98, 98. This means 15-plus megabits per second speed to connect the passengers[,] 98% coverage of global flight hours and 98% service availability. This is the performance we are delivering today to 2Ku aircraft around the world." Defendants repeated this metric throughout the Class Period.

**B.     2Ku's Success Was Central to Gogo's Business Plan**

50.     Before and during the Class Period, Defendants placed 2Ku at the heart of the business plan they presented to investors. Defendants pitched Gogo as a growth story—a company that needed to spend more money than it made as it developed its technology and built out its customer base. Investors and analysts accepted this narrative, investing with the expectation that the investments would one day pay-off. As an analyst for Cowen & Company put it in a December 21, 2016 report, "Gogo will continue burning cash for the next few years, primarily to fund capital expenditures," such as installing its hardware on aircraft.

51.     While investors supported the Company's plan, Defendants understood that no investor wants a company to burn cash forever. So, in 2016, Defendants presented investors with a detailed plan for the Company's growth and profitability. The plan had four parts, which Defendants referred to throughout the Class Period, including in the 2016 annual report on Form 10-K, filed on February 27, 2017.

52.     The 2016 10-K explained that the "four key drivers fueling Gogo's growth and financial performance" as "increasing the number of Gogo-connected aircraft, increasing average

revenue per aircraft, reducing investment per aircraft and improving margins." Defendants touted 2Ku's reliable availability and increased bandwidth as the key to achieving this plan.

53. For example, in a February 27, 2017 conference call to discuss the 2016 financial results, Defendant Small explained how 2Ku would drive growth of average revenue per aircraft ("ARPA"): "The key point is more bandwidth is the underlying driver of more usage, users and payers for connectivity. More bandwidth also results in both a better passenger experience and faster ARPA growth. This vast need for bandwidth is why we are working so hard to accelerate the deployment of our 2Ku service in 2017." The 2016 10-K similarly stated that the additional bandwidth provided by 2Ku would make it more attractive to passengers, increasing usage and, therefore, usage-based revenue.

54. In that same call, Defendant Small also explained how those same benefits would lead to more airlines contracting with Gogo to install 2Ku on their planes: "Our industry-leading performance has been on display on more than 35,000 commercial 2Ku flights as far north as Alaska and as far south as the tip of South America. Many more regions will experience 2Ku's performance this year. Our network performance is a key driver of aircraft awards. With wins for 2Ku exceeding 1,000 aircraft in 2016 from several of the world's leading airlines including Delta, American, Air Canada, Air France, KLM and British Airways we now have more than enough awarded aircraft to achieve profitability both on a consolidated basis and in CA-ROW."

55. Defendants further explained that, as the Company successfully rolled out 2Ku, it would be able to achieve the remaining drivers—reducing investment per aircraft and improving margins. As Gogo explained in its 2016 10-K, the Company "made substantial investments in our network technologies, aircraft operations and platform in order to serve aircraft operators globally." To recoup these investments and improve margins, Gogo had to achieve two primary

goals. First, Gogo had to bring more aircraft online outside of the United States—*i.e.*, expand its customer base and install its 2Ku hardware on additional planes—and, second, Gogo had to convert domestic customers to 2Ku with the expectation that 2Ku's additional bandwidth would lead to increased ARPA.

56.     According to Stelliam, Gogo's investors and analysts believed Defendants' statements that numerous and ramping installations of their 2Ku product would allow Gogo to leverage the high fixed costs it had incurred to build out the global satellite coverage necessary for the 2Ku launch. To win the business of major multinational airlines and to give Gogo's already installed North American planes an attractive solution to replace ATG as the industry migrated to satellite, Gogo needed to buy expensive satellite capacity up front, to cover where the Company expected the airlines to fly, even if 2Ku was on limited flights at the time. The timing of the 2Ku rollout was crucial, as once one airline decided to proceed with a strong wi-fi product, such as American Airlines had in 2016, other airlines needed to upgrade as well. Furthermore, previous product delays and installation subsidies had left Gogo in a place where the Company needed to show progress to demonstrate that Gogo could address an upcoming convertible bond maturity.

57.     Contemporaneous analyst reports confirm that investors approved of Gogo's plan, and agreed that a successful rollout of 2Ku was vital to the Company's future. Consequently, analysts closely watched both the number of new planes with agreements to install 2Ku—the Company's "backlog"—and the rate at which Gogo was able to install 2Ku on the backlogged planes.

58.     For example, after Defendants provided a positive 2Ku update on November 10, 2016, announcing a backlog of 1,500 planes and a faster installation rate, an analyst at Cowen &

Company commented approvingly that, "2Ku remains the real story, and here growth in backlog continues to accelerate." The analyst also noted that, "[c]oncerns about Gogo's ability to fulfill its backlog should ease as investors consider that days to install has fallen to 3.5 from 8 [. . .] and management remains confident it will have 500 jets in service with 2Ku by the end of 2017."

59.     An analyst for UBS similarly commented in a November 11, 2016 report, "While near-term catalysts appear limited, we believe investors will gain confidence as Gogo's 2Ku backlog is installed and begins to generate revenue and cash flow."

60.     And indeed, on February 27, 2017, Defendant Small confirmed that the plan was working even better than expected, and investors could expect Gogo to stop burning cash and achieve "positive free cash flow" sooner than projected. Positive free cash flow is a finance term that means Gogo would generate enough cash through its business to pay its day-to-day and financial obligations. Defendant Small explained that, "*[w]e now expect levered free cash flow to go positive in 2019, a year earlier than our prior guidance due to an acceleration in 2Ku installs*."[4]

61.     On that call, Defendant Small reiterated how the 2Ku roll-out would allow Gogo to achieve its four drivers, stating, "In summary, we remain well-positioned on our path to profitability as we increase aircraft online, ARPA and margin while simultaneously reducing our investment per aircraft. Accelerated 2Ku installs and improved operating leverage will enable us to reach free cash flow now in 2019."

62.     During the call, analysts enthused about the positive news, but James Breen, an analyst from William Blair & Company, wanted more assurance. He noted Gogo's loss of 550

---

[4] All emphasis added, unless otherwise indicated.

American Airlines planes, and wanted to know the financial impact of that, and how Defendants

had "confidence" in "mov[ing] up that free cash flow positive by a year."

63. In response, Defendant Smagley reiterated that their confidence came from how

the successful roll-out of 2Ku was allowing Gogo to meet the four drivers of growth:

> In terms of what we have confidence in saying 2019 is a free cash
> flow positive year, I will give you the answer, kind of tying into
> the four parameters we talked about the drive our business model
> at the Analyst Day. And if you remember those four were planes,
> success-based co-investment, ARPA and margins. So in terms of
> planes with the contracts we have in place we have effectively
> locked down installations and planes through 2018 going into
> 2019. So that's pretty certain. The success-based co-investment per
> plane also driven by the same factors. That's pretty well locked
> down. Next is ARPA. Michael has talked about ARPA tripling on
> existing aircraft in Rest of World, continuing to grow double digits
> this year. So we have a good sense of where new airlines will come
> on and grow from there. Lastly is margins, and we have our
> bandwidth costs very well locked down. We know what our costs
> are going to be, so you put all those four things together and gives
> us a pretty good level of confidence in being able to say the 2019
> will be the year for turning cash flow positive.

64. Defendants Small and Smagley omitted, however, that 2Ku had not been

performing as expected in cold weather, and the significant de-icing defect threatened to disrupt

the Company's "locked down" installation schedule. Ignorant of these material facts, analysts

issued positive reports.

65. For example, on February 27, 2017, an analyst with Wells Fargo wrote: "Gogo

reported a solid quarter with revenue and EBITDA ahead of our estimates. The stock was strong

despite the soft '17 EBITDA guidance as the market seemed to like the strong revenue and

earlier than expected FCF generation in '19. Gogo has a solid backlog of 2Ku installs and the

company's commentary is positive on the potential for 2Ku to drive ARPA (average revenue per

plane) higher in the coming years."

66.     On February 28, 2017, Lance Vitanza, an analyst with Cowen & Company, wrote: "Gogo is a buildout story; in the short term, its securities will likely remain volatile around earnings and contract wins (both its own and on behalf of its competitors). [. . .] As 2Ku service proliferates, we expect a more-favorable investor reaction."

67.     Investors also responded positively to the news, and Gogo's share price rose from a close of $9.17 on February 24, 2017 (a Friday), to a close of $10.49 at the close of February 27, 2017, on heavy trading volume.  The stock price continued to rise over the next several weeks to above $12 a share.  Further, as Defendants continued to provide positive updates about 2Ku through the summer and into the fall, the stock reached a Class Period high of over $14 a share.

### C.     Defendants Knew 2Ku Failed in Cold Weather in the Winter of 2016-2017

68.     While externally Defendants pushed a positive narrative to investors, internally, the Company was scrambling to find a solution to a major defect in the 2Ku system.  De-icing fluid, sprayed on planes during cold weather, was leaking into the 2Ku system and causing it to fail entirely. Even more troubling, the fix would require a change to part of the 2Ku system mounted on the outside of the plane, a change that might require time-consuming regulatory approval from the FAA.

69.     The 2Ku system employs two externally-mounted satellite antennas that are housed within a "radome"—a shallow, oblong bubble that protects the antennas.  These antennas are called "mechanically-phased-array" antennas, meaning that, rather than physically pointing toward the target satellite (as so-called "gimballed" antennas must), these antennas create a beam in the desired direction by mechanically rotating a series of internal plates with carefully designed resonance characteristics.

70.     The internal plates' ability to rotate freely is critical to the 2Ku's operation. However, as discussed further below, beginning with the winter of 2016-2017, Gogo began to

notice that 2Ku systems were breaking down during cold weather, with as many as 13% of 2Ku planes unable to connect to the internet—rendering 2Ku far less reliable than Defendant Small's claims of 98% reliability. Gogo quickly determined that the cause was de-icing fluid leaking into the radome and preventing the antennas from rotating properly.

### D. Gogo Discovered the De-icing Problem in the Winter of 2016-2017

71. Multiple former employees have confirmed that Gogo discovered the de-icing problem in the winter of 2016-2017, realized the extent of the problem, and was working on a solution by February 2017, the start of the Class Period.

72. FE-1 oversaw the engineering team that designed the 2Ku system for different aircraft types, and worked on finding a remedy to the 2Ku de-icing problem. FE-1 reported to Defendant Wade for a time in the spring of 2017. According to FE-1, connectivity problems began impacting multiple planes in December of 2016 and January 2017. FE-1 confirmed that, by February 2017, one of Gogo's customers had grounded a plane so that engineers from ThinKom, the company that designed the 2Ku system, could inspect the problem. Based on this inspection, engineers determined that the problem was caused by de-icing fluid leaking into the radomes. FE-1 recalled the problem affecting more than a dozen planes that winter, including Boeing 737s and at least one Airbus. FE-1 stated that the 2Ku outages appeared on an outage list that was circulated to everyone in his management chain.

73. FE-1 recalled that Gogo engineers began working on a solution in February 2017. Gogo invested substantial resources in finding a solution. According to FE-1, the Company provided an old airplane fuselage to the team, and Gogo's engineers affixed a 2Ku system to it, installed a camera in the radome, and sprayed the radome with de-icer to determine how the fluid got in. FE-1 said the Company learned that the fluid leaked in through drain holes in the rubber skirt that acted as a seal between the radome and the fuselage, and then was unable to drain out.

21

74.     According to FE-1, Gogo continued to install 2Ku systems on customer planes after learning of the problem.  FE-1 further explained that the Company had developed two potential fixes by October 2017, when he left the Company.  FE-1 stated that 2Ku was the flagship system so everyone was made aware of any issues that came up.

75.     FE-1 explained that the remedy was time consuming—about three days—because it required taking off the radome and antennas, modifying the skirt or adaptor plate, and getting all installed back on. He also explained that it required a lot of coordination with the airlines and airports, which also took significant time.  The airlines had to make time in the plane's schedule and arrange to have it at a maintenance facility. He recalled that, before he left, he had provided a few remedy kits for new installs on planes.

76.     FE-2 oversaw the installation of the prototype and production versions of the 2Ku system, and was involved in installing the supplemental equipment that was created to address the de-icing problem.  FE-2 recalled Gogo discovered that a 2Ku system failed due to de-icing fluid intrusions into the radome as the frigid weather began in the latter part of 2016.  FE-2 also recalled that after flying in an area that required de-icing, one of the Company's customer planes had a 2Ku system go offline. When technicians took the equipment apart and examined it, they discovered the problem—it was junked up with de-icing fluid.

77.     FE-2 also confirmed that, after the Company learned of the problem, Gogo continued to install the 2Ku system with the flawed design on additional planes. While Gogo was installing the original design of 2Ku on its customer planes, the Company had its engineering team working on finding a solution to the problem, according to FE-2. The team that designed the 2Ku system also worked on developing a fix to the problem, he said.  According to FE-2, it

was a fully coordinated, integrated product team comprised of people with subject matter expertise.

78.     FE-2 also confirmed that the remedy for the de-icing fluid problem was rolled out in the spring or summer of 2017, and it would have probably been tested for months prior to that.

79.     FE-2 recalled that the 2Ku de-icing fluid problem was a big concern at Gogo, and many executives knew about it.  According to FE-2, 2Ku was an extremely important product for Gogo, and the problems with it captured the attention of high-level people from several departments.  FE-2 explained that when you're putting stuff on an airplane, even if you're drilling one hole, there are about three dozen people at the company that know about that one hole.

80.     FE-2 believed Gogo's leadership had its reasons for continuing with installations after the problem was discovered.  FE-2 recalled the Company had announced aggressive install schedules and Gogo did not want to miss hitting those numbers in 2016 and 2017.

81.     FE-3 also confirmed that the Company learned about the de-icing problem during the winter of 2016-2017 and was trying to find a solution for the problem by the winter of 2017-2018.  According to FE-3, the problem had been identified when he joined the Company in February 2017, but he did not personally begin working on it for several weeks to a few months. FE-3 further confirmed that fixing the de-icing problem before the winter of 2017-2018 was a high concern for the Company, and everyone at the Company was aware of what was going on, including Defendant Wade.  FE-3 recalled weekly meetings that he attended and that Defendant Wade also attended where the de-icing problem was discussed.  According to FE-3, Defendant Wade was the top leader of the organization and was definitely involved.

82.     FE-4, who reported to CTO Chari, said that he first learned of the 2Ku problems in the winter of 2016-2017.  He recalled that the problem came to him through the customer service department that dealt with airline carriers who had the 2Ku system on their planes.  He believed that the problem had been narrowed down to when the plane was being de-iced prior to when he left the Company in May 2017.  He further believed that engineering was working on a corrective action once the condition had been identified.

83.     FE-5 also confirmed that the 2Ku system was having problems in the winter of 2016-2017.  FE-5 learned about the problems because he and his team served as liaison between Gogo and the FAA for obtaining STCs.  According to FE-5, before he left the Company in May 2017, the department that tracked the functionality of the 2Ku system reached out to discuss the possibility of modifying the 2Ku system to address the de-icing issue and whether they would need a new STC.  FE-5 recalled telling them that they would make that determination after a fix was designed.  According to FE-5, he did not see a revised design before he left in May 2017. FE-5 stated that Defendant Wade and CTO Chari definitely knew what was going on. FE-5 explained the solutions to the problem were coming from both Chari's and Defendant Wade's organizations at Gogo.

84.     The FE's comments are consistent with the comments Defendants made to Stelliam regarding knowing about the issue well before the winter of 2017-2018, as discussed in Section VII.A.2, *infra*.

**E.      Gogo Monitored the Performance of the 2Ku System in Real Time**

85.     With 2Ku so central to the Company's future, investors expected Defendants to monitor the project closely.  Defendants understood this, and throughout the Class Period, they touted their ability to monitor every 2Ku system that was installed, tracking its performance in real time.

86.     For example, on November 17, 2017 in an Investor and Analyst Conference call, Defendant Wade outlined Gogo's monitoring capabilities, stating that, "[t]oday, we have a network operation center that monitors around 8,000 aircraft globally, 24/7. We are able to monitor the aircraft. We're able to monitor the network. We can see exactly what is going on. With the investment we put into the software that runs this network operation center, we have a very detailed view into what's happening in those aircraft as they fly. That's important because we can change the network almost in real time. We understand what's happening on the aircraft. So if something does go wrong, we can give the mechanics a very clear insight into what's happening on that aircraft, ensure the parts are available, ensure that the maintenance activity can happen very, very efficiently."

87.     Two weeks later, during an investor presentation on November 29, 2017, Defendant Rowan again claimed that Gogo had the "ability to monitor the network remotely."

88.     Former employees confirmed that the Company closely tracked every plane in order to take immediate action.

89.     FE-1 explained that the network operations center tracked every in-flight connectivity system, including 2Ku, and knew whether any system was operating efficiently or at all.  According to FE-1, the network operations center generated and distributed an outage list that showed every in-flight system that was experiencing failures.

90.     FE-2 also confirmed Gogo had a system connectivity monitor and knew when the systems went online and when the systems went offline.  He said the Company had a Network Operation Center that monitored uptime based on the sat link. According to FE-2, if a plane's system went offline, the Company would know about it pretty much in real time.

**F.     Fixing the Problem Required Government Approval and Coordination with Airline Customers**

91.     Everything that goes into or changes the outside of a commercial airplane must comply with stringent regulations.

92.     Modifications to the outside of the plane must receive a Supplemental Type Certificate ("STC") from the Federal Aviation Administration ("FAA").   According to the FAA, an STC "is a type certificate (TC) issued when an applicant has received FAA approval to modify an aeronautical product from its original design.  The STC, which incorporates by reference the related TC, approves not only the modification but also how that modification affects the original design."

93.     Gogo was required to obtain STCs specific to each aircraft type that would receive the 2Ku system.  According to Gogo, "We regularly obtain STCs for each aircraft type operated by each airline partner on whose aircraft our equipment will be installed and separate STCs typically are required for different configurations of the same aircraft type, such as when they are configured differently for different airlines."

94.     FE-5 explained that obtaining a STC was a time-consuming, multi-step process that could take multiple months or even years to complete.  According to FE-5, the STC application includes life cycle testing of the 2Ku equipment under different environmental conditions, such as extreme cold and heat, and under different contaminants that would be encountered in the real world before it is installed on a plane.  Then, FE-5 further explained, after the parts are approved, they can be tested on airplanes, and Gogo would need a customer to supply specific airplane types for testing.  If the STC is for a 747, the customer must provide a 747. Once the 2Ku is installed on the plane, it would be tested on the ground.  If those are successful, Gogo must perform flight tests.

95.     At the beginning of the Class Period, Gogo specifically highlighted how the need

for STCs could impact the 2Ku installation schedule and the cost of installing 2Ku.  In the 2016

10-K, Gogo noted that it had obtained STC's for approximately 80% of aircraft types to be

equipped with 2Ku, and informed investors that "[t]his broad portfolio allows us to reuse STCs

to reduce the time and cost required to obtain certification and to accelerate installation

schedules."

96.     When Defendants discovered the de-icing issue, they understood that

modifications may require additional FAA approval, as evidenced by FE-5 fielding questions in

early 2017 from the department that tracked the functionality of the 2Ku system.  Defendants

also understood that obtaining additional STCs would be expensive and time-consuming, as

discussed above.

97.     Defendants also understood that installing 2Ku systems, or modifying existing

installations, would require complex coordination with airline customers, who would need to

ground planes for 2Ku to work on them.  Defendants repeatedly cited the complexity of this

process throughout the Class Period.

98.     For example, on May 4, 2017, Defendant Small stated that the Company would

significantly ramp up installations after Labor Day.  Later in the call, Defendant Wade explained

how the Company's installation schedule was impacted by the availability of customer aircraft:

> Month-to-month, there's going to be variability based on airline,
> aircraft availability. But in even things like Easter Weekend in
> April, actually affects the aircraft availability and route planning.
> So I wouldn't think -- look at any particular months right now as
> indicative of what's going to happen post-Labor Day when the
> airline, aircraft are traditionally available for installation.

99.     As with the initial 2Ku installations, finding and deploying a solution to the 2Ku

de-icing issue would therefore require substantial time, company resources, and coordination

with airline customers. As Defendant Small explained at the June 14, 2017 William Blair Growth Stock Conference when discussing the Company's efforts to reduce installation times, "***The airline has to take the plane down, give it to us for a period of time. They hate when their planes are grounded, so the faster it goes the better***."

100. Importantly, to deploy the fix before the winter of 2017, any resources the Company committed, and any customer plane that was grounded for repair, would be cannibalizing an opportunity that could have gone to installing a new 2Ku system.

**G.    Gogo Concealed the Defect and Continued to Install 2Ku Systems Through the Summer and Fall of 2017**

101. Despite learning of the de-icing defect, and understanding that it would derail the installation schedule, both in the short term as the Company devoted resources to finding and deploying a fix, and in the long-term when customers discovered the defect in the coming winter, Defendants continued to provide investors with glowing updates on the 2Ku rollout.

102. As discussed above, analysts followed any changes in the anticipated installation schedule closely and used them to adjust the models they used to estimate the Company's value, and recommend whether investors buy or sell.

103. For example, on the February 27, 2017 conference call to discuss the 2016 fourth quarter and full year results, Defendant Small reported that, as of the call, Gogo had installed 2Ku on over 130 planes. Defendant Wade reinforced this message after Defendant Small spoke, reiterating the number of installations and provided more details on the pace of future installations. As of that call, Defendant Wade told investors to expect 450 to 550 additional 2Ku installations in 2017 and between 650 and 750 additional installations in 2018. Defendant Wade also noted that, as Gogo increased the number 2Ku installations, the cost per unit would

decrease. In that same call, Defendants Small touted 2Ku's availability rate as "unparalleled" and at "99%".

104.    Neither Defendants Small or Wade—nor any other executive on the call—disclosed to investors, however, that the Company had discovered a serious defect in its existing 2Ku installations, and was secretly working on a solution.  Nor did they disclose that, once a solution was developed, and approved by the FAA, Gogo would have to modify the defective 2Ku units that it was rushing to install.

105.    Similarly, on a May 4, 2017 call with investors, Defendant Small assured investors that "***2Ku is delivering the best performance in the industry, characterized by 3 numbers: 15, 98, 98.  This means 15-plus megabits per second speed to connect the passengers[,] 98% coverage of global flight hours and 98% service availability.  This is the performance we are delivering today to 2Ku aircraft around the world.***"

106.    On the same call, Defendant Wade touted the Company's efficiency and speed installing 2Ku systems, saying, "we continue to set the record here and we have now achieved installations with experienced crews of under 3 days, which as far as we know, is by far the fastest installation of our large radar systems.  So it's going great." Defendant Wade did not mention that every one of those installations would likely have to be fixed when the Company devised a solution to the de-icing problem.

107.    As Gogo installed 2Ku on more planes, Defendants also highlighted how 2Ku was increasing take rates and ARPA, as expected.  On the same call, Defendant Rowan noted lthat ARPA grew 6% in the first quarter of 2017, and stated that, "Our connectivity take rate increased to 8.3%, up from 6.5% a year ago, demonstrating the benefit of the ATG offload from 2Ku and the potential of the multi-payer strategy. We expect ARPA growth to continue

29

throughout 2017, driven by: first, a significant increase in available bandwidth as we upgrade North American aircraft to 2Ku; secondly, the continued expansion of the multi-payer strategy; and thirdly, a stable regional jet count."

108.     In a May 23, 2017 appearance at the J.P. Morgan Tech, Media and Telecom Conference, Defendant Small said, "So we are installing 2Ku at a brisk clip rate now. We're getting darn close to the 200 mark and that'll happen early in June. And we project to have, at least, 500 planes installed by the end of the year."

109.     And again, on June 14, 2017, Defendant Small claimed that the 2Ku system was 98% available, saying, "[w]e now have over 200 plane[s] flying, and *we now have proven performance on the 2Ku.  And that is to deliver 15 or more megabits per second to the user, do it over 98% of the global flight hours -- so all over the globe -- and do it with 98%-plus availability.*  Those are industry-leading stats. We've demoed this extensively with equity analysts and investors, with the media."

110.     Again, on August 7, 2017, in an investor call, Defendant Small touted 2Ku reliability, without admitting that that reliability would plummet in the winter, saying, "*On performance, we deliver what we call 15, 98, 98.  That means 15 megabits per second to the passenger device, service coverage on 98% of flight hours around the world, with service availability 98% of the time.*  No other provider can match this performance."  And Defendant Wade, again, touted Gogo's speedy installations without disclosing that Gogo would need to, in effect, re-install them once a fix was devised, at great cost and disruption to the customer.

111.     In the same call, Defendant Small also "reaffirm[ed] guidance of achieving positive free cash flow in 2019" and once again connected the 2Ku deployment to the Company's four-point plan to achieve growth and profitability, highlighting, "In Q2, take rates in

CA-NA increased more than 20%, and ARPA grew as we started to see the benefits of more bandwidth and the multi-payer strategy. In CA-ROW, revenue more than doubled over the previous year for the second quarter in a row on robust ARPA of $226,000 for the quarter, up 56% from a year ago. Based on the strong airline response to 2Ku, the cost and performance advantages of our airborne connectivity platform and our ubiquitous coverage, we expect to announce additional large commercial airline wins from around the world later this year."

112.    Also on that call, Defendant Rowan told investors that Defendants "***expect[ed] the net cost to Gogo for the airborne equipment and installations to come down in 2018 versus 2017,***" despite knowing that costs would likely rise as the Company repaired every installed 2Ku system.

113.    On November 2, 2017, Defendant Small again touted the reliability of 2Ku and bragged that 2Ku "will accelerate revenue growth and drive long-term profitability.  In fact, we are already seeing evidence of this in the form of increased take rates and improved ARPA on our satellite systems."  Defendant Wade again gave an update on installation times—36 hours as of then.

114.    In a November 17, 2017 Investor and Analyst Conference call Defendant Small falsely claimed that there was "nothing left to do" to capitalize on 2Ku, explaining that, "We now have a global high capacity, highly available network. ***There's nothing left to do to make this happen***. No need to launch new satellites, ***no new antenna design,*** no new modem design. This is out there and happening today. We describe the performance as 15, 98, 98. That's 15 megabits per second to the device, 98% of global flight hours, and 98% availability. This provides a ground-like experience everywhere aircraft fly."

115.     Defendants also used other means to tout 2Ku during the period.  On May 9, 2017, Gogo hosted a group of analysts aboard a private airplane to test the 2Ku technology. Following the flight, Cowen & Company issued a glowing review, writing "We were impressed by what we experienced - with peak downloads speeds of 93 Mbps. In our view, it felt as if we were using the internet in-home."

**H.     The De-Icing Problem Returned in the Winter of 2017-2018**

116.     Despite its secret efforts to address the problems after February 2017, Gogo had not developed an approved modification to address the de-icing issue when the cold weather returned in November 2017.  With 2Ku installed on 473 planes at the end of 2016, Gogo's customers began to report problems to Gogo in November or December 2017.

117.     As complaints from airline partners began to roll in, including from its customers Air Canada and Delta Airlines, Gogo's repair costs and expenses soared. Air Canada reported problems associated with de-icing fluid seeping under Gogo 2Ku radomes over the winter of 2017, and as reported later by Ben Smith, President, Passenger Airlines, "We did have problems with the radome and de-icing, and it delayed us with the first certification. Here in Canada you need both US and Canadian certification, and it delayed us about four months."[5]

118.     Delta Airlines also reported to Gogo that its 2Ku systems were not working during the winter of 2017. The issue with Delta's 2Ku systems escalated to such a point that in February 2018, Delta issued a memorandum to cabin crew highlighting 2Ku's reliability issues and detailing a Delta action plan which sees the carrier becoming more involved in 2Ku maintenance (the "McDermott memo").  The McDermott memo explained that Delta's "TechOps has stepped in to assist Gogo in troubleshooting and diagnostics of 2Ku, stating that

---

[5] Mary Kirby, *Air Canada enthusiastic about Gogo 2Ku despite delayed installs*, RUNWAY GIRL NETWORK (Jun. 1, 2018).

TechOps 'is involving itself in multiple aspects of Gogo's operations. Some of these are on a temporary basis and some will be permanent.'" The memorandum further explained that "TechOps has begun working directly with component manufacturers in order to design improvements into the 2Ku hardware, while Gogo is increasing its stock level in order to better facilitate antenna replacements."[6]

## I.    The Truth Emerges

119.    On February 22, 2018, Gogo announced its fourth quarter and year-end operating and financial results for 2017.  In its filings, and the conference calls that day, Defendants revealed for the first time that 2Ku was experiencing problems with de-icing fluid.  Defendants continued to obscure the full extent of the problem, however, and materially mislead investors about how many planes were impacted, and how difficult the problem would be to remedy.

120.    Gogo issued a pre-market press release announcing its quarterly and year-end earnings on February 22, 2018.  The press release noted that Gogo had met or exceeded its full-year 2017 guidance, including total revenue, adjusted EBITDA, cash CAPEX, and 2Ku installations.  In fact, the press release presented Gogo's fourth quarter and full-year revenue as a "record" for the Company and provided an estimate of $75 million to $100 million adjusted EBITDA for 2018.  The press release did not disclose the 2Ku installation problems.

121.    On the conference call with investors, Defendants downplayed the seriousness of the de-icing issues.  Defendant Wade explained that, "any time you introduce high-tech systems of this scale and speed we've been doing it, there are likely to be early-stage growing pains. 2Ku is not exempt from that phenomenon; on some aircraft we saw degraded reliability."  Defendant Wade was quick to reassure investors, however, representing that Gogo had "identified the root

---

[6] Jason Rabinowitz, *Delta deepens involvement with 2Ku MRO in face of reliability issues*, RUNWAY GIRL NETWORK (Feb. 27, 2018).

cause of all of these issues, and have fixes for all of them that have either been deployed or in the process of being deployed. By midyear 2018, we expect the entire 2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving."

122. One analyst, Landon Hoffman Park from Morgan Stanley, pressed for additional details about the 2Ku installation problems during the question-and-answer portion of the conference call, asking, "Can you give any more details on what exactly was going wrong? And what was the degree of the issue? And what gives you confidence in being able to have that fixed?"

123. Defendant Wade answered that, "It was actually really caused by the de-icing fluid, which was able to penetrate under some of the [radome,] which caused the antennas to temporarily get sticky, if you will. The fix to that was very easy to do, and we've deployed that on a number of aircraft and we're not seeing any further issues around that at this time."

124. Defendants' other statements during the conference call further obscured and/or concealed the truth about the extent and severity of the 2Ku installations. For example, Defendant Small told investors that "*we expect strong growth in consolidated revenue and EBITDA in 2018*," even though Gogo was in the midst of the fallout from the 2Ku installation problems (being that the winter months were coming to a close at this point). Defendant Wade continued to promote Gogo on the basis of its 2Ku installation operations, stating that "*we've shortened installation times for 2Ku to as low as 30 hours, which is less than half the time it typically takes to install a broadband satellite system*," notwithstanding that the installations were defective. Defendant Rowan even went so far as to state that, "*We believe these awarded aircraft and our demonstrated capacity to rapidly install 2Ku aircraft meaningfully de-risk the financial projections for our ROW business*," even though Gogo's installations had been and

would continue to cause additional instability and uncertainty regarding the Company's finances in terms of rising repair expenses and installation costs.

125.     Defendants' misdirection was successful, and analysts focused on the positive results rather than the de-icing problem.  For example, analysts from William Blair in a report dated February 22, 2018, identified the "dip" in Gogo's market price as a buying opportunity and paid no attention to Defendants' statements about the 2Ku installation problems.  In a report dated February 22, 2018, Analysts from Morgan Stanley classified the 2Ku installation problems described by Defendants as mere "growing pains."  In a report dated February 23, 2018, Analysts from J.P. Morgan noted that Gogo's "transition to 2Ku remains on course."

126.     Defendants' disclosures about Gogo's 2Ku installations served as a partial corrective disclosure.  In response to the information, Gogo's stock price fell steadily throughout the day.  Gogo's stock closed at $10.51 per share on February 21, 2018.  By close of market on February 22, 2018, the price had declined to $9.13 per share (and, in fact, declined further the next day to close at $8.88 per share on February 23, 2018).  The decline in Gogo's stock price following the February 22, 2018 conference call was caused by increased concerns over the Company's 2Ku installation process, among other things.

127.     The Board of Directors, with access to inside information, was apparently more rattled by the de-icing problem, and on March 5, 2018, Defendant Small stepped down as CEO and was replaced by Oakleigh Thorne, a board member and shareholder with a 30% stake in the Company.[7]  Defendant Small was not the only casualty.  On April 20, 2018, Gogo announced that Anand Chari, the Chief Technology Officer, who played a key role developing 2Ku, would

---

[7] Pletz, John, *Gogo CEO is out, replaced by board member*, Crain's Chicago Business (March 5, 2018), *available at* https://www.chicagobusiness.com/article/20180305/BLOGS11/180309938/gogo-ceo-michael-Defendant Small-is-out-replaced-by-oakleigh-thorne

move into a new role as "Strategic Technology Advisor." In reality, Chari entered into a separation agreement with the Company effective May 1, 2018.

128. With Defendant Small out, the Company's tone changed drastically. On May 4, 2018, on a conference call to discuss its first quarter of 2018 earnings, Gogo's new CEO, Oakleigh Thorne, revealed for the first time the full extent of the de-icing issue, and the material, negative impact it was going to have on Gogo's business. For the first time, Thorne explained the extent of the de-icing issue, stating:

> My predecessor, Michael Small, talked about 98/98/15. That's
> 98% system availability, 98% flight route coverage and 15
> megabits per second speeds, and that's still our goal. We're
> achieving the 98% coverage, and we're achieving average 15
> megabits per second speeds globally. But we slipped on the 98%
> system availability with our de-icing problems.
>
> [. . .]
>
> Last summer, 2Ku was our most successful product launch ever
> with greater than 98% service availability. And then came winter
> and availability plunged down to the mid 80s. The major cause
> with de-icing fluid getting into the antenna raceways in which the
> antenna discs spin.
>
> We've done a thorough analysis of root causes and discovered that
> while de- icing was the biggest issue there are also some
> manufacturing issues and software issues at fault. We also
> discovered the de-icing fluid entered the antenna ray down through
> far more pathways than we originally thought.

129. Thorne explained that the de-icing defect had two impacts on the first quarter results, explaining that first, "airlines held back on marketing the product, which hurt revenue" and second, Gogo "ramped up spending to fix reliability as soon as we could, which hurt costs. We'll see even higher spending in Q2 as our remediation plans ramp up further in that quarter."

130. On the same call, Defendant Rowan spoke about the de-icing issues and its financial impact, stating in relevant part, that "[t]he third major impact on our financials this

quarter are the 2Ku operational issues Oak described in detail. These are resulting in increased operational costs and lower service revenue. The bulk of the cost will be incurred in the first half of this year." As a consequence, Defendant Rowan explained, "CA-NA segment profit declined $19 million year-over-year. It was impacted by the increased satellite capacity cost to support the rollout of 2Ku, increased operational cost to improve 2Ku performance and resolve the de-icing issues and lower service revenue."

131. Defendant Rowan also underlined the impact going forward, noting, "also it's important to recognize the revenue impact of this, in that the airlines are not going to be motivated to market aggressively until they see the 2Ku system performing at the level that we all expect, and to that point that they can be more aggressive in the marketing and drive the revenues as we planned."

132. In addition to the statements made during the investor conference call, Gogo also revealed in a press release issued that same day that it was "withdrawing its previously provided 2018 guidance for Adjusted EBITDA, airborne Cash CAPEX, and airborne equipment inventory purchases related to airline-directed installations, as well as Free Cash Flow guidance."

133. On this news, the Company's shares fell $1.73 per share or over 18% over the next two trading days to close at $7.86 per share on May 7, 2018.

134. On May 7, 2018, after the market closed, Moody's downgraded Gogo's credit ratings in reaction to the Company's disclosure, including by downgrading its corporate family rating (CFR) to Caa1 from B3, its probability of default rating (PDR) to Caa1- PD from B3-PD, and changing the outlook to negative. Moody's also downgraded Gogo's speculative grade liquidity (SGL) rating to SGL-3 from SGL-2. The company's B2 senior secured rating was affirmed. The downgrade of Gogo's CFR and change in outlook to negative reflects the

company's weakening credit metrics, operational difficulties and deteriorating liquidity. According to Moody's, the downgrade of Gogo's SGL rating to SGL-3 reflects Moody's expectation that Gogo's liquidity would weaken.

135.     Moody's explained the rationale for the ratings downgrade as being driven by the impact of 2Ku's de-icing problem on the Company's business model.  Moody's explained that, "despite a strong performance from Gogo's business aviation segment" the commercial aviation segments had weak operating performance and "diminished consolidated results."  Moody's specifically cited the de-icing issue:

> *The performance degradation of antennas in many recently installed 2Ku radomes caused by the infiltration of de-icing fluid, used to remove ice from fuselages in winter climates, resulted in slower performance of the company's 2Ku technology, as well as significant remediation costs.  Company adjusted EBITDA margin for the first quarter of 2018 was about 5%, down almost 1.5% from the prior year's quarter.  These operational issues are expected to negatively impact EBITDA for the year and result in a very low, or potentially slightly negative, company adjusted EBITDA for the second quarter of 2018 since the bulk of remediation expenses will be incurred during the quarter.*  While Gogo believes it will have all operational issues related to this execution setback addressed by early summer, visibility is very limited as to the timing of any reversal of current negative revenue and EBITDA trends.  Gogo also announced a series of leadership and organizational changes in April 2018, including the hiring of a new CEO.  The company is midway through implementation of a new business plan focused on service quality improvement, revenue growth and cost structure optimization, with a June completion date targeted.

136.     On this news, the Company's shares fell $2.80 per share or over 35.6% to close at $5.06 per share on May 8, 2018, damaging investors.

137.     Numerous analysts reported on the issues with Gogo's 2Ku system, with many downgrading their price targets.  On May 4, 2018, Wells Fargo reduced their price target to $7 "to reflect the greater than expected pressures on the business from the De-Icing issue," among

other issues. Wells Fargo further explained that, "[t]he new management team is taking steps to reassess every aspect of the business. As a result, the company withdrew its prior '18 guidance and stated that it now expects '18 EBITDA below the bottom-end of the prior range" and specifically noted that, "[a] major driver of the weaker EBITDA is the spend associated with fixing the De-Icing problem with installed 2Ku units."

138.    Simon Flannery of Morgan Stanley warned investors in his May 4, 2018 report to "[e]xpect extremely low 2Q EBITDA" because "[r]esults are currently being negatively impacted by 2Ku performance issues related to de- icing fluid, manufacturing issues and software problems, which pushed service availability to the mid-80% range during the winter vs the company's planned 98%." He also noted that the Company would need to raise more cash, writing, "[w]ith the company conducting a new financial planning process, management noted that the business as it currently stands would require 'some but not a lot of additional capital' compared to the previous view that they were fully funded and would reach full year positive FCF by 2020."

139.    Paul Penny of Northland Capital Markets wrote on May 7, 2018 in his report that "[e]scalating reliability issues with their new 2Ku antennas, which is clearly much more than a simple 'de-icing' equipment issue. This admission comes post last quarter's conference call where the previous management team vocalized minimal / contained damage**.** We believe the issues for GOGO are wide reaching: 1) Massive new customer reputational damage (as we've highlighted the material increase in customer complaints of late) as flying customers not just want, but expect reliable / predictable IFC, 2) Incremental OPEX to repair (hard to quantify but we estimate in the $20-40M range) and 3) Increases the  probability of de-selection risk by

GOGO sole-sourced Delta (draconian scenario – rip and replace like American / conservative scenario - adding a 2nd IFC provider to new aircraft fleets)."

## VI.    FALSE AND MISLEADING STATEMENTS

140.    Defendants made materially false and misleading statements to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things:

(a)    Defendants represented that 2Ku was consistently achieving 98% availability, when in fact, Defendants knew that de-icing fluid would leak into the 2Ku systems during cold weather and prevent 2Ku systems from functioning properly or at all, plunging 2Ku system availability into the mid-80% range in cold weather;

(b)    Defendants represented that Gogo was pushing to install as many 2Ku systems as possible to achieve its business plan, when in fact, Gogo was also rushing to install 2Ku on as many planes as possible before the markets or customers learned of the de-icing problem;

(c)    Defendants represented that Gogo expected to reduce the amount of cash spent on installing 2Ku systems in 2018, when in fact, Defendants understood that Gogo may have to expend significant additional cash to modify the existing 2Ku installations once a fix was developed;

(d)    Defendants represented the number of 2Ku installations as being complete, when in fact, 2Ku installations completed before the Company devised a fix for the de-icing issue would need to be, in effect, reinstalled;

(e)    Defendants provided investors with their purported view of the Company's future performance, when in fact, Defendants understood that that performance would be materially impacted by the reappearance of the unresolved de-icing issue in the winter

of 2017-2018, which could derail the Company's plan to achieve profitability, including by impacting the installation schedule, the cost of the 2Ku launch, and the Company's ability to retain existing customers and sign up new customers for 2Ku installations; and

> (f)    Defendants represented that the 2Ku system design was complete, and that the Company had obtained a certain number of necessary regulatory approvals, when in fact, Defendants understood that 2Ku's design required substantial modifications, which the Company was secretly working on, and that Gogo would need to seek additional regulatory approvals.

### A.    February 27, 2017

141.    On February 27, 2017, Gogo filed a press release with the SEC disclosing full year 2016 and fourth quarter 2016 financial results.  The press release attributed the following statement to Defendant Small, "***2Ku performance demonstrates industry leading speed, coverage, and service availability***, and we now have more than 130 2Ku aircraft installed.  We are increasing 2Ku installation guidance to 450 to 550 aircraft in 2017 and 650 to 750 in 2018."

142.    Defendant Small's statement that "2Ku performance demonstrates industry leading speed, coverage, and service availability" was false and misleading because it omitted to disclose that de-icing fluid would leak into the 2Ku systems during cold weather and prevent 2Ku systems from functioning properly or at all, plunging 2Ku system availability into the mid-80% range, far below the 98% availability that Defendants defined as "industry leading," and preventing 2Ku from delivering the technological performance Defendants had explicitly linked to the Company's plan to achieve profitability.

143.    The press release also attributed the following statement to Defendant Smagley: "With accelerated 2Ku installations and improved operating leverage, ***we now expect to become free cash flow positive in 2019, a year earlier than our prior guidance***."

144.    Defendant Smagley's statement that Gogo expected "to become free cash flow positive in 2019, a year earlier than our prior guidance" was false and misleading, because those expectations and projections were explicitly based on 2Ku installations functioning properly, on Gogo being able achieve its installation schedule in 2017 and 2018, and on Gogo being able to continue to market 2Ku as industry leading technology, and did not take into consideration that Defendants had already discovered a substantial defect in the 2Ku system design and had begun devoting resources to finding a solution for the failure, and that Defendants understood that repairing each defective installation would require significant time and resources and damage customer relationships.

145.    Also on February 27, 2017, Gogo filed an annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position.  The 2016 10-K was signed by Defendants Small and Smagley.  The 2016 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Small and Smagley attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

146.    The 2016 10-K discussed the Company's 2Ku antenna and its installation:

> **We may be unsuccessful or delayed in widely deploying and operating our 2Ku technology.**
>
> [. . .]
>
> As of December 31, 2016, we had approximately 1,400 aircraft awarded, but not yet installed, and ***there can be no assurance that we can meet our installation goals on our current timeline, due to, among other things, the failure of any 2Ku-related technology and equipment to perform as expected, problems arising in the manufacturing process***, our reliance on single-source suppliers to provide certain necessary components and delays in obtaining or failures to obtain the required regulatory approvals for installation

and operation of such equipment and the provision of service to passengers.

[. . .]

**_The failure of 2Ku to perform as expected, or significant delays in our ability to install it, could result in material breaches of such agreements which could in turn result in termination of such agreements and liability to Gogo._**

147.     The above statements from the 2016 10-K were materially false and misleading because they concealed that: (1) 2Ku had already failed to perform as expected and the Company was already working on a repair that would require, in effect, the re-installation of each defective 2Ku system; (2) the de-icing defect already threatened to derail the Company's efforts to install 2Ku, retain existing installation contracts, and win additional installation contracts; and (3) the Company was already investing significant resources in addressing the issue.  The significant costs and the material impact on Gogo's business plan were not disclosed, but instead misleadingly portrayed as a mere risk.

148.     Accordingly, Defendants Gogo, Small, and Smagley materially misled investors by merely suggesting that a "failure of [the] 2Ku to perform as expected" could occur at some unknown point in the future, given that the 2Ku had already failed to perform as expected.

149.     Also, on February 27, 2017, Defendants Small and Smagley hosted a conference call to discuss Gogo's fourth quarter earnings for 2016.  During the call, Defendants Small and Smagley described the purportedly successful release of the 2Ku system, and explained to investors how 2Ku would allow Gogo to achieve its four-point plan for profitability and growth.

150.     During the call, Defendant Small discussed 2Ku's impact on the Company:

As far as the funnel and our business, **_2Ku is performing exceptionally well_**.  The airline industry is seeing that.  Not only are we saying it but flyers are increasingly saying it and fleets and reporter articles.

151.    Defendant Small's statement that "2Ku is performing exceptionally well" was materially false and misleading because it omitted to disclose that de-icing fluid would leak into the 2Ku systems during cold weather and prevent 2Ku systems from functioning properly or at all, plunging 2Ku system availability into the mid-80% range, far below the 98% availability that Defendants defined as success, and preventing 2Ku from delivering the technological performance Defendants had explicitly linked to the Company's plan to achieve profitability.

152.    Defendant Small connected this purportedly excellent performance to Gogo's plan to drive revenue growth, including by increasing the number of installed planes and ARPA: "The key point is more bandwidth is the underlying driver of more usage, users and payers for connectivity.  More bandwidth also results in both a better passenger experience and faster ARPA growth.  This vast need for bandwidth is why we are working so hard to accelerate the deployment of our 2Ku service in 2017."

153.    Defendant Small also explained how, because of 2Ku's purported success, the Company was making a significant, positive revision to expected future results, stating:

> *We now expect levered free cash flow to go positive in 2019, a year earlier than our prior guidance due to an acceleration in 2Ku installs.  2Ku has taken flight and creates a critical inflection point.*  The week before last[,] we took 2Ku's performance to the next level by demonstrating speeds in excess of 100 megabits per second on our test plane with our next-gen modem and our high throughput satellite*.  Our rapid installation of 2Ku means we are moving from a period of significant bandwidth constraint to an era of much greater bandwidth abundance*.  More bandwidth is the key to better experiences for our airline partners and their passengers and more flexibility in pricing our products and services.

154.    Defendant Smagley discussed the Company's projected future costs associated with 2Ku:

> *We expect a significant decline in cash needs in 2018 versus 2017 due to a substantial decline in Gogo's average investment*

44

> *for 2Ku installation and a significant increase in consolidated adjusted EBITDA.*
>
> [. . .]
>
> *In summary, we remain well-positioned on our path to profitability as we increase aircraft online, ARPA and margin while simultaneously reducing our investment per aircraft. Accelerated 2Ku installs and improved operating leverage will enable us to reach free cash flow now in 2019.*

155. Defendant Smagley's statements that Gogo was "reducing our investment per aircraft" and realizing "substantial decline in Gogo's average investment for 2Ku installation" and that 2Ku installs were "accelerated" were materially false and misleading, because the de-icing issue threatened to derail the Company's efforts to install 2Ku and win additional installation contracts, would force the Company to, in effect, re-install every installed 2Ku system, and would require significantly increased investment per aircraft to address. Consequently, Defendant Smagley's statements that Gogo "remain[ed] well-positioned on our path to profitability as we increase aircraft online, ARPA and margin" and that 2Ku installations "will enable us to reach free cash flow now in 2019" were also false and misleading, because those expectations and projections were explicitly based on 2Ku delivering the expected reliability numbers and on Gogo being able to achieve its installation schedule in 2017 and 2018, and did not take into consideration the failure of the 2Ku system and the costs and resources required to remedy those failures.

156. Defendants Smagley and Small knew, or were reckless in not knowing, that Gogo had discovered the de-icing defect prior to this call, and was investigating a solution that would require revisiting the installation on every installed 2Ku system.

157. Also during the call, analysts were enthused about the positive news, but James Breen, an analyst from William Blair & Company, wanted more assurance. He noted Gogo's

loss of 550 American Airlines planes, and wanted to know the financial impact of that, and how

Defendants had "confidence" in "mov[ing] up [] free cash flow positive by a year."

158.    In response, Defendant Smagely reiterated that their confidence came from how

the successful rollout of 2Ku was allowing Gogo to meet the four drivers of growth:

> In terms of what we have confidence in saying 2019 is a free cash
> flow positive year, I will give you the answer, kind of tying into
> the four parameters we talked about the drive our business model
> at the Analyst Day.  And if you remember those four were planes,
> success-based co-investment, ARPA and margins.  ***So in terms of
> planes with the contracts we have in place we have effectively
> locked down installations and planes through 2018 going into
> 2019.  So that's pretty certain.  The success-based co-investment
> per plane also driven by the same factors.  That's pretty well
> locked down.  Next is ARPA.  [Defendant Small] has talked
> about ARPA tripling on existing aircraft in Rest of World,
> continuing to grow double digits this year.  So we have a good
> sense of where new airlines will come on and grow from there.
> Lastly is margins, and we have our bandwidth costs very well
> locked down.  We know what our costs are going to be, so you
> put all those four things together and gives us a pretty good level
> of confidence in being able to say the 2019 will be the year for
> turning cash flow positive.***

159.    Defendant Smagley's statements that Gogo had "locked down installations and

planes through 2018 going into 2019," that "success-based co-investment per plane" was also

"locked down," and that "[w]e know what our costs are going to be" were materially false and

misleading because the de-icing issue threatened to derail the Company's installation schedule,

would force the Company to, in effect, re-install every installed 2Ku system, and would require

significantly increased investment per aircraft to address.  Consequently, Defendant Smagley's

statements regarding ARPA that Gogo has "a good sense of where new airlines will come on and

grow from there" and that "so you put all those four things together and gives us a pretty good

level of confidence in being able to say the 2019 will be the year for turning cash flow positive"

were also false and misleading, because those expectations and projections were explicitly based

on 2Ku delivering the expected reliability numbers and on Gogo being able to achieve its installation schedule in 2017 and 2018, and did not take into consideration the failure of the 2Ku system and the costs and resources required to remedy those failures.

**B.     May 4, 2017**

160.    On May 4, 2017, Gogo filed a press release with the SEC that announced the Company's first quarter 2017 financial results.  The press release attributed the following statement to Defendant Small:

> We remain focused on hitting our 2Ku installation targets and driving 2Ku system performance above the 15 Mbps we are already delivering to connected passengers around the globe.  ***We reaffirm all of our 2017 and long-term guidance and remain on track to becoming free cash flow positive in 2019***.

161.    Defendant Small's statement reaffirming that the Company was "on track to becoming free cash flow positive in 2019" was materially false and misleading, because those expectations and projections were explicitly based on installed 2Ku systems delivering the expected performance and on Gogo continuing to achieve its installation targets and to add new contracted airplanes to its backlog, and did not take into consideration that Defendants had discovered a substantial defect in the 2Ku design, the costs and resources required to remedy those failures, and the damage to Gogo's reputation and to customer relationships that the defect could cause when cold weather returned.

162.    Also on May 4, 2017, Defendants Small, Wade and Rowan hosted an investor conference call to discuss Gogo's earnings for the first quarter of 2017.  During the call, Defendant Small discussed 2Ku's impact on the Company:

> Add it all up, and ***2Ku is delivering the best performance in the industry, characterized by 3 numbers: 15, 98, 98.  This means 15-plus megabits per second speed to connect the passengers[,] 98% coverage of global flight hours and 98% service availability. This is the performance we are delivering today to 2Ku aircraft***

> ***around the world.*** We are driving continued improvements across
> all 3 performance metrics. With the new modem in HTS coming
> this year, we will see rapid improvement in speed on our satellite
> network.
>
> ***Wrapping up, we're delivering what airlines care about: 15, 98,
> 98, which means high speeds everywhere they fly, all the time.***
> With that, I'd like to turn it over to [Defendant] Wade.

163.    Defendant Small's above statements that "2Ku is delivering . . . 98% service

availability" and "we're delivering what airlines care about 15, 98, 98 . . . all the time" were

materially false and misleading because they omitted to disclose that 2Ku was not yielding the

"15, 98, 98" performance "all the time" and Defendants knew that de-icing fluid would leak into

the 2Ku systems during cold weather and prevent 2Ku systems from functioning properly or at

all, plunging 2Ku system availability into the mid-80% range, far below the 98% availability that

Defendants defined as "best performance in the industry" and preventing 2Ku from delivering

the technological performance Defendants had explicitly linked to the Company's plan to

achieve profitability.

164.    Also on the call, Defendant Wade provided information regarding STCs obtained

by Gogo for 2Ku, stating:

> Certification in aircraft engineering capabilities are a challenging,
> and often-underestimated aspect to succeed in our industry. ***We
> are obtaining the additional STCs we need.*** We recently received
> 2Ku STC for single-aisle Airbus, A319s, A320s and A321s,
> doubling our STC coverage to around 2/3 of the world's 2Ku
> applicable aircraft. Given this, and other STCs, we expect to hit
> our guidance of 450 to 550 2Ku-installed aircraft by year-end.

165.    Defendant Wade's statement that Gogo was "obtaining the additional STCs we

need" was false and misleading because it omitted the material fact that Gogo expected that any

fix to the 2Ku system would require Gogo to obtain additional STCs, in addition to the STCs it

had already obtained, a time consuming and expensive process that could impact the Company's ability to install 2Ku systems in the future and win and maintain business.

166.    During the question-and-answer portion of the call, analyst Lance William Vitanza from Cowen and Company asked for an "update on the 2Ku install time."  In response, Defendant Wade stated that:

> *[W]e continue to set the record here and we have now achieved installations with experienced crews of under 3 days, which as far as we know, is by far the fastest installation of our large radar systems.  So it's going great*.

167.    Defendant Wade's statements regarding the 2Ku installations, including that it was the "fastest installation of our large satellite systems" and that "it's going great" were materially false and misleading because they omitted to state that every defective 2Ku system that was installed would need to be, in effect, re-installed once Gogo developed a fix for the de-icing issue, creating additional costs and potentially derailing the Company's installation schedule and marketing efforts.

168.    Analyst Robert Gutman of Guggenheim Securities noted that "ARPA in the ROW segment got a big boost last year" and asked "is this level sustainable?"  In response, Defendant Small replied: "*This level is sustainable.  When you have the bandwidth, you can grow ARPA*. And the primary driver is Japan Airlines moved to an airline-paid service for the entire flight. And we saw rapid, rapid increase in its passenger take rates and ARPA is a result of that; it's a fundamental driver here.  *And you'll see similar such programs appearing at multiple airlines going forward, and we now have the capacity available to accommodate those.*"

169.    Similarly, Landon Park from Morgan Stanley asked "looking at CA-NA, just the -- can you take us through what you guys are expecting on the take rate?  Obviously, very solid

number there, and do you think that the 6% ARPA growth that you saw in the quarter, is that, a

sustainable run rate?"  In response, Defendant Small replied:

> The 6% is indicative of where we stand now.  ***As we bring more
> bandwidth, we're going to have room to accelerate ARPA.***  And
> we're just beginning to get the bandwidth benefits of the 2Ku
> planes, so we announced we've now crossed 100 planes installed
> with Delta, and those were all upgrades from ATG, creating more
> capacity on those planes clearly, but also offloading the ATG
> network.  ***So it's what we're doing now and actually, as we keep
> the 2Ku going at some point, we should be able to even improve
> the 6[]% ARPA growth***.

170.  Defendant Small's statements that the ARPA "level is sustainable.  When you

have the bandwidth, you can grow ARPA" and that "we now have the capacity available to

accommodate" airline-paid service for entire flights and that "we're going to have room to

accelerate ARPA" and that "as we keep the 2Ku going at some point, we should be able to even

improve the 6% ARPA growth" were materially false and misleading because they were

prefaced on the false assumption that 2Ku would continue to deliver expected availability, and

did not take into consideration that the unresolved de-icing issue would impact Gogo's ability to

provide the performance customers were expecting and provide the "capacity," "room," and

"bandwidth" the statements implied.

171.  Analyst James Breen of William Blair & Company also asked for information

about the status of the 2Ku systems and their effect on ARPA.  Defendant Small replied, in

relevant part:

> What we're seeing is a phenomenal customer experience.  It's like
> people, I guess, are used to using the Internet on the ground in their
> homes, and in their offices.  We've seen the entire plane, for all
> practical purposes, get on it at one time and use it.  Streaming,
> works great.  ***We summarized the experience because we're trying
> to put rigorous performance metrics around this, and be able to
> communicate them to you is that 15 plus megabits per second,
> 98% coverage of global flight hours, and 98% service***

> *availability.  And not only that, that's what we're delivering today, and it's getting better every day.*

172.  Defendant Small's statements, including that Gogo was providing "rigorous performance metrics" and was delivering "98% service availability" "today," were materially false and misleading because Defendants were providing selective performance metrics that omitted that during cold weather, 2Ku's availability would plunge to availability in the mid-80% range, far below the 98% availability that Defendants defined as success.  Even if that problem was not occurring during warm weather, the defect had not yet been resolved.  Thus, when winter returned, the 2Ku systems would not be able to provide a "phenomenal customer experience" or meet the "15, 98, 98" performance metrics that investors believed would allow the Company to accomplish its four-point plan for achieving profitability.

### C.  May 23, 2017

173.  On May 23, 2017, Defendants Small and Rowan participated in the J.P. Morgan Tech, Media and Telecom Conference.  During the conference, an analyst asked "[l]et's talk about the progression of creating that capacity in the U.S.  You've talked about your 2Ku install path.  Remind us what the, a, the sort of full year expectations are?  And, b, what the seasonality is of that over the next few quarters?"  In response, Defendant Small stated:

> *Yes.  So we are installing 2Ku at a brisk clip rate now.  We're getting darn close to the 200 mark and that'll happen early in June.  And we project to have, at least, 500 planes installed by the end of the year.  That requires a significant acceleration of the installation rate after Labor Day.  At this stage, we have the requisite STCs, we have the supply chain set up and we have commitments from the airlines to make the planes available*.  The single biggest source of those planes post-Labor Day for this year will be from Delta.  And not only do we -- will we end with 500 or so 2Ku planes, most of those planes or about 350 of those planes will have come off the ATG network.  And so everybody using the ATG network will start to see improved services.  We decongest the network.

51

174.    Defendant Small's statements regarding the 2Ku installation schedule were materially false and misleading because they failed to disclose that: (a) the unresolved de-icing issue would return in the winter, and impact 2Ku's performance; (b) the Company did not have all of the STCs necessary to deploy the fix for de-icing system; and (c) the 2Ku installations were known to be defective and Gogo was secretly working on a fix that would require the Company to, in effect, re-install every defective 2Ku system once it was developed.

175.    Also during the conference, Philip Cusick of J.P. Morgan Chase & Co. asked, "[a]nd what about competition?  There's been a lot of headlines about competition both to the good and bad of some of these companies.  Where do you feel like competition is now versus a year or 2 ago, as you go after new deals and as they come after some of your existing deals?"  In response, Defendant Small replied, "*[w]hat has changed is 2Ku.  We now have a global, high-speed, high-capacity, high-availability global solution and we're now a much more powerful force on the global front*."

176.    Defendant Small's statement that "[w]hat has changed is 2Ku" and that Gogo had a "high-availability global solution" and was a "more powerful force" was materially false and misleading because it omitted that the unresolved de-icing issue would reappear in the winter and derail the Company's four-point plan to achieve profitability, damage customer relationships, harm the Company's reputation, and make it more difficult to compete.

**D.    June 6, 2017**

177.    On June 6, 2017, the Company issued a press release announcing that "Gogo Reaches 200 Installations of its 2Ku Technology."  In the release, the following statement was attributed to Defendant Wade:

> *We are still on pace to hit our goal of between 550 and 650 2Ku equipped aircraft by the end of this year[.]  I'm also extremely excited to say that we have managed to get our install times down*

> *to less than 2 days, by far the best in the industry.* Less downtime
> for the aircraft is hugely important for our airline partners.

178.    Defendant Wade's statements regarding the pace, efficiency, and success of its

2Ku installations were materially false and misleading because they concealed that the 2Ku

system had a substantial defect as installed, and the Company was currently working on a fix.

Once that fix was finalized, the Company would need to work with customers to ground the

planes again, and in effect, re-install the systems, causing delays and damaging customer

relationships.

179.    The June 6, 2017 press release further stated:

> Gogo's 2Ku technology is a proprietary dual antenna system
> developed to bring global streaming-class internet to aircraft. *2Ku
> is now flying and outperforming all other global connectivity
> solutions and delivers speeds of 15 Mbps to each passenger
> device, covering 98 percent of all flight hours around the world
> with 98 percent system availability*.

180.    Defendants' statement in the press release was materially false and misleading

because, even if the 2Ku system was delivering the purported performance numbers in warm

weather, Defendants knew that those performance metrics would plunge in the coming winter,

derailing the Company's four-point plan to reach profitability, which Defendants had explicitly

tied to 2Ku's performance.

181.    The June 6, 2017 press release also reported that "Gogo currently has 14 airlines

representing more than 1600 aircraft awards for the 2Ku technology." This statement was false

and misleading because it concealed that when 2Ku systems began to fail in the coming winter, it

would endanger existing customer contracts and hamper Defendants' ability to market the

product to new customers.

**E.      June 14, 2017**

182.      On June 14, 2017, the Company participated in the William Blair Growth Stock Conference.  During the conference, Defendant Small stated:

> So 2Ku, it's our new global satellite solution.  We deployed it last year, a first plane.  We now have over 200 plane[s] flying, and *we now have proven performance on the 2Ku.  And that is to deliver 15 or more megabits per second to the user, do it over 98% of the global flight hours -- so all over the globe -- and do it with 98%-plus availability.*  Those are industry-leading stats.  We've demoed this extensively with equity analysts and investors, with the media. And of course it's been flying on the planes, and to consistently rave reviews.

183.      Defendant Small's statement that Gogo had "proven performance on the 2Ku" by delivering "98% plus availability" was materially false and misleading because Defendants were providing selective performance metrics and omitting to disclose that de-icing fluid would leak into the 2Ku systems during cold weather and prevent 2Ku systems from functioning properly or at all, plunging 2Ku system availability into the mid-80% range. Thus, when winter returned, the 2Ku systems would not be able to meet the 98% availability and deliver the performance that investors understood was part of the Company's four-point plan to achieve profitability.

184.      In that same conference, Defendant Small stated:

> And some of the proof points of the operating capability, *the fact that we've already installed, well less than a year after its first installation, 200 2Kus is pretty impressive.*  And we're only going to pick up the rate after Labor Day this year when more planes become available.  *So by year-end we will have approximately 600 2Kus installed, or having added about 500 this year.  The certifications for 2Ku -- these certifications aren't that easy to get -- but as of today, two-thirds of the world's aircraft we've certified, and we'll be to 80% or more by year end.*

185.      Defendant Small's statements regarding the 2Ku installation schedule were materially false and misleading because they failed to disclose that: (a) the unresolved de-icing issue would return in the winter and derail the Company's plan to achieve profitability, and Gogo

54

was secretly working on a fix for the defect; (b) the Company did not have all of the STCs

necessary to deploy the fix for de-icing system; and (c) the 2Ku installations were known to be

defective, and would require the Company to, in effect, re-install the defective 2Ku systems once

a fix was prepared for the de-icing issue.

186.     Also during the conference, Defendant Small again connected the success of the

2Ku installations to Gogo's profitability, stating:

> And perhaps the most important thing is the last one: achieve
> profitability.  From the moment I heard the idea, and I think the
> moment most everybody hears the idea, the -- connecting aircraft
> is a good idea.  No one disputes it*.  At this stage, I think we've
> clearly reasserted our leadership, and 2Ku and next-gen ATG are
> the right solutions for the future.*  We need to prove to you we can
> make some money doing it.  ***It's the one thing we haven't done.
> And we're -- you're going to see that corner turn in 2018, and
> we're going to achieve free cash flow positive in 2019.***

187.     Defendant Small's statements that investors were "going to see that corner turn in

2018, and we're going to achieve free cash flow positive in 2019" were materially false and

misleading because they omitted to disclose that: (a) the unresolved de-icing issue would return

in the winter and derail the Company's installation schedule and sales efforts; and (b) that the

2Ku installations were known to be defective, and would require the Company to, in effect, re-

install the defective 2Ku systems once it finalized a fix for the de-icing issue.  Consequently,

Defendant Small knew that the Company could not meet its four-point plan for achieving free

cash flow positive in 2019, as the Company would not achieve the projected ARPA growth and

would need to increase spending to resolve the issue.

**F.     August 7, 2017**

188.     On August 7, 2017, filed a press release with the SEC that reported the

Company's second quarter 2017 financial results.  The press release attributed the following

statement to Defendant Small:

> We launched 2Ku service on five new airlines in the quarter and
> are on plan to meet our targeted increase in installations during the
> second half of the year[.] ***While these installs require up-front
> investment, they will all produce positive returns in the future.***

189.     Defendant Small's statement that "[w]hile these installs require up-front

investment, they will all produce positive returns in the future" was materially false and

misleading because it failed to disclose the de-icing defect in the 2Ku system and that the

installations would require to be repaired in the future, and the impact of the defect on Gogo's

installation schedule, marketing efforts, and expected profitability, as discussed above.

190.     The press release attributed the following statements to Defendant Rowan:

> ***Our planned increase in investments in the second quarter lay
> the foundation for future growth in revenue and profitability[.]
> We expect Adjusted EBITDA to increase substantially in the
> second half of 2017 and into 2018, and we are on track to
> generate positive free cash flow in 2019***.

191.     Defendant Rowan's statements that Gogo's "planned increase in investments in

the second quarter lay the foundation for future growth" and that Gogo was "on track to generate

positive free cash flow in 2019" were materially false and misleading, because those

expectations and projections were explicitly based on 2Ku delivering the expected performance

numbers and did not take into consideration the failure of the 2Ku system, the costs and

resources required to remedy those failures, and the damage to customer relationships caused by

the defect, as discussed above.

192.     Also on August 7, 2017, Defendants Small, Wade and Rowan hosted an investor

conference call to discuss Gogo's second quarter 2017 financial results.  During the call,

Defendant Small discussed 2Ku's performance:

> ***On performance, we deliver what we call 15, 98, 98.  That means
> 15 megabits per second to the passenger device, service coverage
> on 98% of flight hours around the world, with service availability
> 98% of the time.***  No other provider can match this performance.

56

193.     Defendant Small's statements that Gogo delivered "service availability 98% of the time" and that "[n]o other provider can match this performance" were materially false and misleading because they provided investors with the "15, 98, 98" performance metrics without disclosing that de-icing fluid would leak into the 2Ku systems during cold weather and prevent 2Ku systems from functioning properly or at all, plunging 2Ku system availability into the mid-80% range. Thus, when winter returned, the 2Ku systems would not be able to meet the 98% availability and deliver the performance that investors understood was part of the Company's four-point plan to achieve profitability.

194.     On the same call, Defendant Wade discussed Gogo's 2Ku installation time:

> We now have the capability to install our airborne connectivity systems at an unprecedented speed and scale, and have raised the bar for the industry on what is considered achievable. ***One of our most significant operational achievements this year has been to reduce the 2Ku installation time to less than 2 days, something none of our competitors has come close to achieving***. This progress results in significant cost savings for us and even more importantly, enables our airline partners to keep their aircraft in service and generating revenue.

195.     Defendant Wade's glowing portrayal of the 2Ku installation times was materially false and misleading because, by omitting that the installation was defective, it created the false impression that the installation process of the 2Kus were meeting and/or exceeding technical expectations. Further, once Gogo developed a solution to the de-icing problem, the fix would need to be installed, incurring additional costs, time, and drawing down limited resources that could be used to meet future installation goals.

196.     Defendant Rowan also discussed 2Ku's impact on the financials:

> As you know, a key driver of our CapEx spend is the capital we invest to bring new 2Ku aircraft online, particularly the cost and installation of airborne equipment.

We believe it is helpful to look at the business before and after these success-based investments. Segregating the financials in this way helps reveal the underlying economics of the ongoing business by breaking out our co-investment with our airline partners for new installations. *While this airborne equipment represents significant current investment, it is a source of future growth and profitability.*

We expect approximately 70% of the $230 million to $260 million in 2017 CapEx to be for the success-based 2Ku airborne equipment costs, and it will continue to represent a significant portion of our CapEx as we install our 2Ku backlog. The returns associated with this investment represent attractive customer economics, and *we expect the net cost to Gogo for the airborne equipment and installations to come down in 2018 versus 2017.*

. . .

Regarding EBITDA, we have made significant investments in our next-generation technologies and bringing new aircraft online during the first half of the year. Based on expected revenue growth and some abatement in investments in the back half of the year, we expect EBITDA to approximately double from the first half of 2017 to the second half, putting us at the low end of the $60 million to $75 million EBITDA guidance we provided. *We continue to expect EBITDA to be significantly higher in 2018 than 2017 and reaffirm our guidance of achieving positive free cash flow in 2019.*

197. Defendant Rowan's above statements were materially false and misleading because they communicated to the public that the Company expected the net costs for the airborne equipment and installations to decrease in 2018, while omitting to disclose the current and future costs necessary to repair every installed 2Ku system. Defendant Rowan understood that the projections were based on a false statement of current facts, including that: (a) the Company would not have to incur substantial additional spending on installed 2Ku systems; (b) the installed 2Ku systems would perform as expected year-round; and (c) the Company did not foresee any major obstacles to achieving the installation schedule in 2018 and 2019. In fact, Defendant Rowan understood that the 2Ku systems would fail in the winter, and Gogo would

58

need to repair every 2Ku installation to address the de-icing problem, incurring significant additional costs, and disrupting the 2018 installation schedule. Consequently, his statements regarding EBITDA and free cash flow misled investors regarding the Company's internal expectations.

**G.     November 2, 2017**

198.     On November 2, 2017, Defendants Small, Wade and Rowan hosted an investor conference call to discuss Gogo's third quarter 2017 earnings. During the call, Defendant Small discussed 2Ku's impact on the Company:

> Our rapid deployment of 2Ku is transformative. We will have much more to say about this at our upcoming Investor Day on November 17, but at a high level, the increase in bandwidth transforms our offerings in several ways. First, it gives us the ability to vastly improve the customer experience, including, very importantly, across our North American networks. Second, it allows us to accelerate take rate growth through Gogo, airline and third-party programs. And third, it positions us to begin offering new products and services.
>
> ***We are confident this transformation will accelerate revenue growth and drive long-term profitability. In fact, we are already seeing evidence of this in the form of increased take rates and improved ARPA on our satellite systems.***
>
> We recognize that having great technology is not enough. ***We need to get that technology on planes quickly. To that end, we have made significant progress in improving our installation times and reducing installation costs.***

199.     Defendant Small's statements regarding growth, long-term profitability, take rates, and ARPA were materially false and misleading because they omitted to disclose the de-icing defect, and that 2Ku systems would soon begin to fail in the winter, leading to reduced take rates, decreased ARPA, a slow down or stop of the installation schedule, and potential loss of contracted planes. Defendant Small therefore understood that his purported confidence was based on a false statement of current facts, and therefore misleading. Further, Defendant Small's

statements regarding installation times and costs were materially false and misleading because they omitted that every installed system would require repair, incurring additional costs and potentially derailing the installation schedule.

200. Defendant Wade also discussed Gogo's installations of the 2Ku systems:

> During the quarter, we continued to ramp our 2Ku install pace in Commercial Aviation. **In October, we installed 76 aircraft, up from 50 in September, bringing total 2017 installed aircraft to 322.** Our installation time has dropped to about 36 hours. **We are well positioned to hit our install guidance and ramp from here.**

201. This statement was materially false and misleading because, by omitting that the installation was defective, it created the false impression that the installation process of the 2Ku's were meeting and/or exceeding technical expectations. Further, Defendant Wade's statement that Gogo was "well positioned" to "ramp from here" was materially false and misleading because it omitted to disclose that the defective 2Ku system could derail the Company's four-point plan to achieve profitability.

202. On the call, Defendant Rowan provided guidance for Gogo's financials, stating in relevant part:

> **Over all, ARPA was flat compared to Q2, reflecting the expected dilution from newly launched airlines which represented 25% of aircraft online for Q3. We continue to expect strong double-digit growth from our existing fleet, although consolidated CA-ROW ARPA is likely to be lower in Q4 and during 2018 due to new aircraft additions throughout that period.**
>
> . . .
>
> We expect adjusted EBITDA to approximately double from the first half of 2017 to the second half of the year, putting us at the low end of the $60 million to $75 million range, excluding the $4.5 million in charges we incurred this quarter. **We expect adjusted EBITDA to be significantly higher in 2018 than in 2017.**

203.     Defendant Rowan's above statements were materially false and misleading because Rowan's expectations concerning adjusted EBTIDA for 2018 were not reasonable in light of the facts known at that present point in time.  Defendant Rowan understood that his purported expectations were based on a false statement of current facts regarding the performance of the 2Ku system.  In fact, Defendant Rowan understood that the 2Ku systems would fail in the winter, disrupting the 2Ku installation schedule, making it more difficult to retain and attract customers, and requiring the repair of every defective 2Ku installation to address the de-icing problem.  Consequently, his statements regarding EBITDA misled investors regarding the Company's internal expectations.

**H.     November 17, 2017**

204.     On November 17, 2017, Defendants Small, Wade and Rowan hosted Gogo's Investor and Analyst Day.  During the presentation, Defendant Small represented to investors that Gogo's 2Ku systems were providing in-flight connectivity in line with the Company's previously stated "15, 98, 98" performance metrics.  In pertinent part, Defendant Small told investors:

> We now have a global high capacity, highly available network. There's nothing left to do to make this happen.  No need to launch new satellites, no new antenna design, no new modem design. ***This is out there and happening today.  We describe the performance as 15, 98, 98.  That's 15 megabits per second to the device, 98% of global flight hours, and 98% availability.***  This provides a ground-like experience everywhere aircraft fly.

205.     Defendant Small's comment above was materially false and misleading because it provided investors with the "15, 98, 98" performance metrics without disclosing that de-icing fluid would leak into the 2Ku systems during cold weather and prevent 2Ku systems from functioning properly or at all, plunging 2Ku system availability into the mid-80% range. Thus, when winter returned, the 2Ku systems would not be able to meet the 98% availability and

deliver the performance that investors understood was part of the Company's four-point plan to achieve profitability.

206.     Defendant Wade also presented concerning the installation process for the 2Ku systems.  In pertinent part, he stated:

> So today, our fastest install is now just a mere 30 hours.  Aircraft comes in, 30 hours later, it goes out.  We were able to take a lot of our experience on air-to-ground where we reduced that installation time to as low as 10 hours to optimize the 2Ku installation down to 30.
>
> . . .
>
> In September, we achieved 50 2Ku installations.  In October, we achieved 76.  And at the rate we're going the first 3 weeks into November, we will exceed that by the end of November.  So again, a year ago, I stood here and said we were going to develop a plan to install 750 2Kus in a year, and today, I can stand here in front of you and say, "We did it.  It's done.  We're capable of installing at that rate."

207.     This statement was materially false and misleading because, by omitting that the installation was defective, it created the false impression that the installation process of the 2Ku's were meeting and/or exceeding technical expectations.

**I.     December 6, 2017**

208.     On December 6, 2017, Defendants Small and Rowan participated in the UBS Global Media and Communications Conference on behalf of Gogo.  During the conference, Defendants answered questions from analysts about the 2Ku systems and their impact on the Company's EBITDA.  Defendant Small responded as follows:

> John Christopher Hodulik - UBS: Got you.  And obviously, the move to 2Ku, it's a big priority for the [C]ompany and sort of key to your competitiveness.  Can you just talk about the benefits of 2Ku maybe versus the existing solutions that Gogo has on planes?  And what else is out there in the market?

Defendant Small: ***Yes. Gogo -- our 2Ku is the best-performing solution in the marketplace. We describe that as 15/98/98. 15 megabits per second to a device, 98% of the global flight powers covered and 98% availability.*** And those are industry-leading stats. In our view, it's a function of the design of the antenna. It's bigger and rounder, so it gets -- converts megahertz into megabits twice as efficiently. And it has better coverage characteristics everywhere in the globe. And it has fewer moving parts, so it works more reliably. So we have the superior technical solution in the marketplace and that it's a major cost and performance advantage.

209. Defendant Small's comment that "2Ku is the best-performing solution in the marketplace" with "98% availability" was materially false and misleading because it provided investors with the "15, 98, 98" performance metrics without disclosing that Gogo's 2Ku systems suffered from a serious defect that caused them to malfunction when de-icing fluid was applied to the radomes, or that the defect rendered 2Ku less competitive in the marketplace. Defendant Small's statement was also materially false and misleading due to the fact that, at the time of this statement, Gogo was receiving an increased number of 2Ku system complaints from Delta Air Lines as de-icing fluid was being applied to planes with greater frequency during the winter months of 2017 and 2018.

210. Mr. Hodulik also asked Defendants Small and Rowan about "increasing expenses" associated with the 2Ku system installations. Defendants responded as follows:

John Christopher Hodulik - UBS: Got you. So looking at the increase in ARPA, maybe some of the increasing expenses you get along with that as you roll those out, how does the margin picture sort of shape up as -- when we look at the North American segment?

Defendant Small: So well, we've made a few comments that actually have been really consistent since we went public. We see a 50% gross margin in this business. We see that in both Rest of World and North America, we've actually gotten more in the zip code of 60% in North America, and we've said we'd get to there in 2019 in the Rest of the World. So margins are attractive.

Defendant Rowan: Yes. And you really see very strong leverage on increased utilization of the satellite network in the Rest of World. So you're seeing a very significant improvement there along -- towards the targets of market that [Defendant Small] outlined. And for example, just to give you a couple of numbers, it was maybe a little over 60% for the first 3 quarters of this year, but in the most recent quarter, it was less than a negative 30%. So you can see that, that has been improved by a factor of 2, just from a -- the most recent 4-quarter period to the most recent period. So what -- and the reason for that is that as we begin to fly more aircraft over that global network, you get significant bandwidth benefits, and so our cost per effective megabyte has come down by about 80% over a 2-year period. And then very importantly, as we install these -- the significant backlog in Rest of World, it about triples the number of planes flying. And so as we get those planes installed, that enables us to achieve a positive segment margin for that Rest of the World business, right? So we've been investing about $100 million over the most recent 4 quarters, and so that goes basically to breakeven by the installation of those aircraft. So it meaningfully derisks the international business.

211. Defendants' above statements were materially false and misleading because they omitted to disclose that installation and/or repair expenses were increasing as Gogo faced more and more difficulty with regard to the 2Ku systems during the winter months. At this point in time, Gogo had not yet resolved the radome design defect. Accordingly, when discussing installation costs and ARPA in the context of the 2Ku systems, they should have disclosed the significant problems that Gogo was facing at that point in time. These problems directly impacted the margins that Defendants were promoting as positive aspects of Gogo's operations.

212. Mr. Hodulik also asked Defendants Small and Rowan about anticipated EBITDA and expenses for the upcoming year as Gogo increased its 2Ku system installations. Defendant Rowan responded as follows:

John Christopher Hodulik - UBS: Right. And what was -- I think you guys updated at the Analyst Day, but what was your latest in terms of when that -- you would -- I think if you already have seen peak EBITDA losses, then when do you expect to be at EBITDA breakeven on the international?

Defendant Rowan: ***Yes, so we said that we expect 2017 to be the peak in EBITDA loss year***, improving from this point forward, and that we are, as a company, trying to achieve positive free cash flow in 2019 and free cash flow positive for the full year 2020. And Rest of the World is an important contributing factor to that because as we install these planes over the next 2 to 3 years, that is what's going to enable us to achieve that breakeven point in Rest of World, which is about $100 million contribution to EBITDA relative to where we are today.

John Christopher Hodulik - UBS Right.  So you've got a sort of a doubling of sort of 2Ku planes coming onboard, you've got doubling of the sort of ARPA over the next several years.  How much of that, and this is -- might be a little -- you might need an Excel spreadsheet up here, but how much of that, sort of broadly speaking, flows through to EBITDA, given that you've got -- you would seem -- you're already buying, as you said, all this satellite capacity.  You've already put the -- a lot of these price -- these costs are capitalized.  I mean, it would seem that we should see a real nice ramp in -- at the EBITDA line.

. . .

Defendant Rowan: ***Yes, but really it's that inflection point now.*** As we said, ***we expect the EBITDA in the fourth quarter of this year to be meaningfully higher than it has been throughout this year.  And we expect 2018, really, to be the first year that we get the real benefits of classical operating leverage.  So -- and we're going to see that translate into meaningfully higher EBITDA in 2018.***  And the operating leverage is both across the satellite network as well as for the operating expenses.  And about 2/3 of the expenses are on the operating expense side, so you begin to get real leverage on that as you -- as we get increased revenue with the increased plane installations.

213.    Defendant Rowan's above statements were materially false and misleading

because, given the increased expenses Gogo was facing from the faulty 2Ku installations,

Defendant Rowan was in possession of facts that materially contradicted the statement that 2017

would be the "peak" year for "EBITDA loss."  Furthermore, Defendant Rowan's claim that

Gogo had reached an "inflection point" was materially false and misleading because Defendants

had used that term to describe the point at which Gogo's investment in 2Ku would yield profits,

and Defendant Rowan knew that the de-icing issue was poised to derail the Company's four-point plan to achieve profitability.

**J. February 22, 2018**

214. On February 22, 2018, Gogo announced its fourth quarter and year-end operating and financial results for 2017. In its filings, and on the conference call that day, Defendants revealed for the first time that 2Ku was experiencing problems with de-icing fluid. Defendants continued to obscure the full extent of the problem however, and materially mislead investors, about how many planes were impacted and how difficult the problem would be to remedy.

215. Gogo issued a pre-market press release announcing its quarterly and year-end earnings on February 22, 2018. The press release noted that Gogo had met or exceeded its full-year 2017 guidance, including total revenue, adjusted EBITDA, cash CAPEX, and 2Ku installations. In fact, the press release presented Gogo's fourth quarter and full-year revenue as a "record" for the Company and provided an estimate of $75 million to $100 million adjusted EBITDA for 2018. The press release did not make any mention of the 2Ku installation problems, except to note that "[c]ash CAPEX increased to $220.5 million, up 66% from $133.1 million in 2016, primarily due to increased success-based airborne equipment purchases for 2Ku installations."

216. During the call, Defendant Small tasked his COO, Defendant Wade, with discussing the 2Ku installation issues. Defendant Wade stated, in pertinent part, that:

> Our extraordinary pace of 2Ku installs and modem upgrades has not been without its challenges. ***The performance of the systems has been expected; however, any time you introduce high-tech systems of this scale and speed we've been doing it, there are likely to be early-stage growing pains. 2Ku is not exempt from that phenomenon; on some aircraft we saw degraded reliability. We've identified the root cause of all of these issues, and have fixes for all of them that have either been deployed or in the process of being deployed.*** By midyear 2018, we expect the entire

2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving.

217.     Defendant Rowan, in his prepared remarks, discussed the quarterly and year-end results in detail.  Despite extensive financial information about all of Gogo's operations, his only remarks with respect to the 2Ku installation problems were as follows: "Cash CapEx of $220 million was up $87 million from the prior year, reflecting purchases of 2Ku equipment to support 2017 and 2018 installations, but it did come in below the $230 million to $260 million guidance range we provided for the year."

218.     One analyst, Landon Park from Morgan Stanley, pressed Defendant Rowan for additional details about the 2Ku installation problems during the question-and-answer portion of the conference call.  Mr. Park asked, and Defendant Rowan responded, as follows:

> Landon Park – Morgan Stanley: Okay.  And just 2 quick follow-ups.  Are you able to give more specific guidance around what kind of spread that would be?  And then also, just to follow up on John's comments earlier regarding the 2Ku issues, regarding the new modem.  Can you give any more details on what exactly was going wrong?  And what was the degree of the issue? And what gives you confidence in being able to have that fixed?
>
> Defendant Rowan: Let me take the first part of that question, which is on the ARPA spread.  As [Defendant Small] mentioned, we did break that out during the Investor Day, and you saw about a 3 to 1 difference in the airlines that have -- are coming online versus those that have been seasoned.  So you can look at those numbers and see that mix change.  We also highlighted on this call that the ARPA had grown year-over-year for the existing airlines that have been in service for a period of time in Rest of World.  So that really is the dynamic, is just bring those new airlines on with lower ARPA; as those build, and particularly as the airlines get -- the aircraft get installed for an airline to the point that they can then market it comprehensively as a fleet, that's when you start to see the benefit of the growth in ARPA as a larger percentage to those fleets gets installed.
>
> Defendant Wade: ***And on the reliability issues.  It was actually really caused by the de-icing fluid, which was able to penetrate under some of the [radome,] which caused the antennas to***

> *temporarily get sticky, if you will.  The fix to that was very easy to do, and we've deployed that on a number of aircraft and we're not seeing any further issues around that at this time.*

219.    Although the above statements from Defendants Wade and Rowan touched upon the 2Ku installation issues that were negatively impacting Gogo at the time, they did not accurately portray the severity of the issue or disclose the financial toll the problems were exacting on Gogo.  Defendant Small did not even address the issue in his prepared remarks, opting instead to congratulate Gogo for a "record" quarter.  Likewise, Defendant Rowan barely mentioned the effect of the 2Ku issues despite discussing Gogo's other financial results at length.  Finally, although Defendant Wade identified that a problem with the 2Ku installations existed, he misleadingly stated that the fix was easy—rather than being time consuming and expensive— and omitted material information from his disclosure concerning the extent of the problem in terms of operations and finances.  As would later be disclosed by Mr. Thorne on May 4, 2018, 2Ku system "availability plunged down to the mid 80s."

220.    Defendants' other statements during the conference call further obscured and/or concealed the truth about the extent and severity of the 2Ku installation problems.  For example, Defendant Small told investors that "*we expect strong growth in consolidated revenue and EBITDA in 2018,*" even though Gogo was in the midst of the fallout from the 2Ku installation problems.  Defendant Wade continued to promote Gogo on the basis of its 2Ku installation operations, stating that "*we've shortened installation times for 2Ku to as low as 30 hours, which is less than half the time it typically takes to install a broadband satellite system,*" without disclosing that the installations were defective.  Defendant Rowan even went so far as to state that, "*[w]e believe these awarded aircraft and our demonstrated capacity to rapidly install 2Ku aircraft meaningfully de-risk the financial projections for our ROW business,*" even though Gogo's installations had been and would continue to cause additional instability and

uncertainty regarding the Company's finances in terms of rising repair expenses and installation costs.

221.    A number of analyst reports prove that Defendants' statements were materially misleading.  For example, analysts from William Blair in a report dated February 22, 2018, identified the "dip" in Gogo's market price as a buying opportunity and dismissed Defendants' statements about the 2Ku installation problems.  Analysts from Morgan Stanley in a report dated February 22, 2018, classified the 2Ku installation problems described by Defendants as mere "growing pains."  Analysts from J.P. Morgan in a report dated February 23, 2018 overlooked Defendants' comments almost entirely, stating that Gogo's "transition to 2Ku remains on course."

222.    Also on February 22, 2018, Gogo filed an annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's annual financial results and position.  The 2017 10-K was signed by Defendants Small and Rowan.  The 2017 10-K contained signed SOX certifications by Defendants Small and Rowan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

223.    The 2017 10-K discussed the Company's 2Ku and its installation, stating in relevant part:

> **We may be unsuccessful or delayed in widely deploying and operating our 2Ku technology.**
>
> As of December 31, 2017, we had more than 550 2Ku systems installed and more than 1,400 aircraft awarded, but not yet installed.  There can be no assurance that we can meet our installation goals on our current timeline, due to risks that include the failure of 2Ku-related equipment and software to perform as expected during testing or following installation, problems arising

in the manufacturing process, our reliance on single-source and other suppliers to provide certain components and services, and delays in obtaining or failures to obtain the required regulatory approvals for installation and operation of such equipment and the provision of service to passengers. *We have encountered delays and quality problems as we deploy 2Ku, which we are in the process of remediating, and may continue to do so given the aggressive installation schedule that we are undertaking and the demands that the schedule places on employees, suppliers and other resources.*

[. . .]

*If 2Ku fails to perform as expected or we fail to meet the installation timelines and performance metrics for which we have contracted, our business, financial condition and results of operations may be materially adversely affected.*

224. The above statements from the 2017 10-K were materially false and misleading because they concealed the extent of the severity of the issues that Gogo was already having with the 2Ku systems. Contrary to the 2017 10-K's disclosure, Gogo's "delays and quality problems" had already mushroomed into significant expenses and repair costs. As later revealed, these expenses and repair costs resulted in a dramatic decline in adjusted EBITDA and caused Gogo to withdraw its projection for 2018 adjusted EBITDA. Moreover, although the cause for these problems related to an installation design defect, the 2017 10-K falsely attributed it to an "aggressive installation schedule" (which further concealed the truth about the cause of the 2Ku system failures). The lack of information in the 2017 10-K, combined with Defendants' outwardly positive statements about the quarter and prospects for the 2Ku systems in general during the investor conference call (as discussed above), failed to accurately or sufficiently inform investors about the true facts that existed at the time of the 2017 10-K. Had investors known the truth about the 2Ku's installation problems, they would have been able to make an informed decision and avoid the losses they ultimately incurred when the full truth was revealed on May 4, 2018.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

225. Throughout the Class Period, the Individual Defendants (A) had knowledge of information which contradicted the false statements recklessly made to investors during the Class Period and (B) the motive and opportunity to defraud Gogo's shareholders.

### A. Defendants Knew Information that Contradicted Their Public Statements

226. Throughout the Class Period, the Individual Defendants held themselves out to investors and the market as extremely knowledgeable about Gogo's earnings performance and business operations. At all relevant times, Defendant Small was Gogo's President and CEO and Defendant Wade was the COO. Defendant Smagley was CFO until May 2017, and Defendant Rowan was CFO from May 2017 through the end of Class Period. Defendants were the persons with ultimate responsibility for directing and managing the Company's business affairs and communications to investors. In these roles, Defendants were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep Gogo's non-management directors apprised of the state of the Company's business and operations.

#### 1. Former Employees Confirm Executives Were Aware of the Defect During the Class Period

227. Former employees confirm that executives at Gogo were aware of the problem. FE-3 reported that everyone at the Company was aware of what was going on, including Defendant Wade. FE-3 recalled weekly meetings that he attended and that Defendant Wade also attended where the de-icing problem was discussed. According to FE-3, Defendant Wade was the top leader of the organization and was definitely involved. FE-5 stated that Defendant Wade and the Chief Technology Officer, Anand Chari, knew what was going on. FE-1 stated that because 2Ku was the Company's flagship system, everyone was made aware of problems.

### 2. Defendants Confirmed That Gogo Was Working on a Solution Before the Winter of 2017-2018

228.    Following the partial disclosure of the de-icing problem in the February 2018 earnings call, and consistent with that call, in a follow-up call with Defendants Small and Wade, Defendants reassured Stelliam that the situation was under control.  Defendants told Stelliam that the fix referred to on the earnings call was installing additional equipment to prevent de-icing fluid from entering venting holes in the radome.  Defendants said they had started installing these at some point in 2017 on new deliveries but were not able to retrofit the full installed fleet before the weather turned cold.  There was no mention of other sources of infiltration under the radome.

### 3. Gogo Was Devoting Substantial Resources to Fixing the Problem During the Class Period

229.    As detailed above in Section V.D, multiple former employees confirmed that Gogo discovered the problem in the winter of 2016-2017, and was working on a fix by February 2017.

230.    After revealing the problems in February 2018, Defendant Wade also admitted that Gogo had been working on developing a remedy *and had already developed a fix* at that time, stating, "[w]e've identified the root cause of all of these issues, and have fixes for all of them that have either ***been deployed*** or in the process of being deployed.  By midyear 2018, we expect the entire 2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving."  Given the time required to develop a fix and get it approved, the only plausible inference from Defendant Wade's statements was that the Company had been developing the solution prior to the winter of 2017 -2018, which is what Defendants stated to Stelliam in their post earnings follow-up call.

231.    As confirmed by the former employees and Defendants' statements during the Class Period and after the truth emerged, any change to the 2Ku system would require massive

coordination with airlines, as well as a potentially time-consuming and expensive regulatory approval process.

232.    Logically, the strongest inference is that Defendants were aware that the Company's most important product had a serious defect impacting one of the key metrics—reliability—and that several departments within the Company were working on a solution that would require: (a) substantial investment of cash and internal resources; (b) potentially applying for additional STCs for every plane type that had 2Ku installed; and (c) coordination with the Company's customers to find time for planes to be grounded for maintenance—that time itself a limited resource. Furthermore, the coordination with airlines would need to take place at the same time that Gogo was racing to install as many new 2Ku systems as possible, a task that also required deploying Gogo resources and cash as well as the limited-resource of customer plane availability for maintenance.

233.    Therefore, not only is the strongest logical inference that Defendants knew about the de-icing issue and the work needed to address it, it can also be inferred that Defendants knew the 2Ku systems would fail during the winter of 2017-2018 because (a) the deflector shield fix had not been deployed on every 2Ku system and (b) Defendants did not know whether the deflector shield that were deployed would fix the problem.

### 4.    Issues Related to the Rollout of 2Ku Were Part of Gogo's Core Operations

234.    Defendants' repeated misrepresentations about the purportedly successful rollout of the 2Ku system concerned the Company's "core operations." The Individual Defendants, by virtue of their position within the Company, are assumed to have knowledge about any issues impacting the performance of the 2Ku system and/or the Company's planned installation schedule of 2Ku systems during the Class Period.

235.    A core operation concerns a company's primary products or services, and extends to matters of importance that might significantly impact the company's bottom line.  There is no question that 2Ku was the Company's most important initiative during the Class Period.  Gogo's business is to provide internet to passengers during airplane flights, and Gogo spent years developing 2Ku to improve its ability to provide that service.  After suffering reputational harm due to the poor reliability and speeds of Gogo's previous ATG products, Defendants touted the importance of 2Ku's speed and reliability to investors before and during the Class Period as a turning point for the Company.  Because of the importance of those metrics, Gogo closely monitored the performance of every installed 2Ku system, in near real-time, in order to quickly respond to issues that might arise.

236.    Defendants also explicitly placed 2Ku's performance at the center of the four-point plan they presented to investors for achieving growth and profitability, and told investors that the successful roll-out of 2Ku was critical to Gogo to achieving those goals.  2Ku was also the most important product in both CA segments.  The CA segments accounted for approximately 64% of Gogo's revenue at the start of the Class Period, but they remained unprofitable for the Company.  The rollout of the 2Ku in the CA segments was central to the Company's *growth* in revenue, which investors understood was vital to the Company's profitability and survival.  Furthermore, Gogo needed 2Ku to be an attractive technology solution in order to compete for new planes and, as discussed above, to persuade existing customers to upgrade Gogo's ATG systems to 2Ku rather than the technology of a competitor.  Importantly, Defendants had explicitly tied the future of the Company to the 2Ku rollout by increasing the Company's leverage to subsidize 2Ku installations and buy satellite bandwidth to win new 2Ku customers.  Defendants went so far as to pledge substantially all of Gogo's assets

to 12.5% senior secured bonds that limited the Company's ability to borrow economically elsewhere.

237.    Consequently, the timing of 2Ku's deployment was critical to the Company's business, as evidenced by Defendants' repeated statements concerning the importance of new airline contracts and the installation schedule and the substantial resources that Defendants dedicated to 2Ku's launch.  Indeed, the Company raised $100 million in additional debt during the Class Period for the express purpose of continuing to finance the installation of 2Ku systems in 2017.  Defendants were assumed to have knowledge of any issues that would prevent the Company from meeting that installation schedule or that would drastically undermine Gogo's ability to compete for new plane contracts.

### 5.    Defendants Closely Monitored 2Ku's Performance During the Class Period

238.    Throughout the Class Period, Defendants publicly touted their ability to monitor the performance of each installed 2Ku system, in real time, and purported to provide accurate reports on the performance of 2Ku.  For example:

(a)    In a call with investors on November 3, 2016, Defendant Small, in response to an analyst question about financial performance, explained that "it's way too early to begin talking about financial performance but the technical performance is off the charts good." He also emphasized that, "*[a]t this stage of the 2Ku deployment, we're focused on network performance, technical performance, and it's been extraordinary, not only in speed but also in reliability and availability*."  Later in the call, in response to an analyst question regarding his confidence that 2Ku was a "superior global solution," he repeated "that [w]e have installs that are flying allows us to collect the data, but we are seeing superior peak speeds.  We are seeing more consistent streaming across a larger number of customers and, very importantly, we're

seeing a reliability and availability numbers that are dramatically higher than anything else we see in the marketplace."

(b)     On November 9, 2016, at a conference with investors, Defendant Small again emphasized 2Ku's performance, stating, "[w]ell, Gogo had what's next in its 2Ku, and we are deploying that right now.  We have backlog of 1,500 to deploy.  We are doing now one a day, every day which is an amazing rate of installs, and 2Ku is performing fabulously.  It's not only high-speed allowing a streaming class service -- you can get on Netflix if you want -- but it's also doing it with amazing reliability, 99% availability.  No other satellite solution in the world is achieving anything close to that.  And it works anywhere on the face of the globe, better than any other solution too."

(c)     On a December 6, 2016 call with investors, Defendant Small again touted the reliability of 2Ku on "100%" of the planes that had it at that time, stating, "I'm so pleased to report that, in 2016, we now have a capacity solution in North America in 2Ku.  It's performing above the -- our lofty expectations, on a path to 100 megabits per second.  ***We're already achieving 99% availability on the system, which is extraordinarily high in our business. We've already seen 100% of the plane get on and work great.***  We're now over 70 installs on the new technology.  We're doing one a day."

(d)     In a May 4, 2017 investor call, Defendant Small stated, "[a]dd it all up, and 2Ku is delivering the best performance in the industry, characterized by 3 numbers: 15, 98, 98.  ***This means 15-plus megabits per second speed to connect the passengers[,] 98% coverage of global flight hours and 98% service availability.  This is the performance we are delivering today to 2Ku aircraft around the world***."

76

(e)      On a June 14, 2017 investor call, Defendant Small stated, "[w]e now have over 200 plane[s] flying, and we now have proven performance on the 2Ku.  And that is to deliver 15 or more megabits per second to the user, do it over 98% of the global flight hours -- so all over the globe -- and do it with 98%-plus availability."

(f)      On a November 17, 2017 investor call, Defendant Small stated that, "[w]e now have a global high capacity, highly available network.  There's nothing left to do to make this happen.  No need to launch new satellites, no new antenna design, no new modem design.  This is out there and happening today.  We describe the performance as 15, 98, 98.  That's 15 megabits per second to the device, 98% of global flight hours, and 98% availability.  This provides a ground-like experience everywhere aircraft fly."

(g)      On that November 17, 2017 investor call, Defendant Wade also confirmed that Gogo monitored the performance of the 2Ku systems in real-time, stating, "*[t]oday, we have a network operation center that monitors around 8,000 aircraft globally, 24/7.  We are able to monitor the aircraft.  We're able to monitor the network.  We can see exactly what is going on.  With the investment we put into the software that runs this network operation center, we have a very detailed view into what's happening in those aircraft as they fly.  That's important because we can change the network almost in real time.  We understand what's happening on the aircraft.  So if something does go wrong, we can give the mechanics a very clear insight into what's happening on that aircraft, ensure the parts are available, ensure that the maintenance activity can happen very, very efficiently*."

(h)      Two weeks later, during an investor presentation on November 29, 2017, Defendant Rowan emphasized that Gogo had the "ability to monitor the network remotely."

239.    Furthermore, in investor appearances in January and February of 2017, during the time that Gogo discovered and began looking for a solution to the de-icing problem, Defendant Small did *not* provide current statistics on 2Ku's reliability.  This is in contrast to Defendant Small's comments in the Fall of 2016 and Spring, Summer, and Fall of 2017, in which he explicitly stated 2Ku's performance as currently being 98 or 99% availability.  Instead, he only spoke vaguely about performance.  For example:

(a)    In an investor call on January 5, 2017, Defendant Small slightly hedged the performance of 2Ku for the first time, stating, "[w]e are feeling stronger and stronger about our position based on the introduction of 2Ku.  ***It's now flying on the 94 aircraft, pretty well-established*.  *It's high performance***."

(b)    Similarly, in a February 27, 2017 call with investors, Defendant Small did not provide current metrics on 2Ku's performance.  Instead, he spoke generally about 2Ku's "performance," and future plans, including, "***[w]e are now engineering our solutions to achieve speeds in excess of 100 megabits per second and with 99% availability.***  This is true for both our next-generation air-to-ground and our global satellite solutions.  We expect these figures to continue to improve."

240.    In the very next investor call, however, on May 4, 2017, Defendant Small returned to providing investors with current performance numbers, stating, "[a]dd it all up, and 2Ku is delivering the best performance in the industry, characterized by 3 numbers: 15, 98, 98.  This means 15-plus megabits per second speed to connect the passengers[,] 98% coverage of global flight hours and 98% service availability.  This is the performance we are delivering today to 2Ku aircraft around the world."

241.     Defendant Small continued to provide current performance metrics in investor calls through the rest of Class Period, until forced to disclose the de-icing issue in 2018.  Given Defendants' demonstrated focus on performance, and their supplying of explicitly current performance details in other investor phone calls, the strong inference is that Defendants were aware of performance issues with 2Ku in January and February of 2017, and either (1) Defendants had not yet decided whether they were going to disclose the problem, and were speaking cautiously, or (2) Defendants had decided to conceal the problem, but Defendant Small wanted to avoid an explicit false statement.

242.     Former Gogo employees confirmed that the Company monitored the performance of every installed 2Ku system and circulated outage lists.

### 6.     The Full Truth Was Only Revealed After the Long-Standing CEO Was Removed

243.     On February 22, 2018, even as the 2Ku system problems were at a near all-time high, Defendants concealed the severity of the issues they faced by portraying the rampant failures as "early-stage growing pains" that resulted in temporary "degraded reliability." Defendants' attempts to cover-up or conceal the growing 2Ku problems further support the conclusion that they acted with scienter when making the public statements identified above.

244.     On March 4, 2018, Defendant Small, who was the Company's largest shareholder along with his affiliated entities, was removed from control of Gogo after serving as CEO since 2010.  As the Company framed it, Oakleigh Thorne took over the Company after a "mutual decision" between the Board of Directors and CEO Defendant Small that Defendant Small would step down immediately.

245.     The most logical inference from the fact that it took new management to disclose the truth regarding the Company is that Defendant Small, had knowledge of, or was reckless in

not knowing, the full-extent and impact of the 2Ku defects, and the Board of Directors wanted to bring in new management to ensure that the Company was being fully forthcoming with investors.

**B.    The Individual Defendants Had Motive to Conceal the Defect**

246.    Defendants' motive for hiding the defect was straightforward.  Concealing the defect would buy them ten months of installations, which were important to Defendants for the reasons below.

247.    First, Defendants understood that once airlines installed the 2Ku system, they were unlikely to de-install it, even if they experienced problems.  Installing and de-installing inflight wi-fi systems is time consuming and expensive.  Defendant Small underlined this dynamic at the William Blair Growth Stock Conference on June 14, 2017, explaining that a 2Ku antenna is a "hard thing to change: attach a big antenna to the outside of the plane.  The airlines don't want to do that very often.  They want to know that's going to last a long time."  For this reason, it was well-known in the commercial in-flight wi-fi industry that, once an airline installs a particular company's system, it is unlikely to replace that system absent some compelling reason.  Defendants were therefore motivated to install 2Ku on as many planes as possible before the next winter, in case the problem dissuaded airlines from installing 2Ku systems once it was discovered.

248.    Second, it was clear to the Company and investors at the start of the Class Period that Gogo needed to install 2Ku systems on planes to protect its existing revenue-producing installations.  In 2016, the Company had disclosed that, beginning in 2017, one of its two biggest customers, American Airlines, would start to take Gogo's hardware off of 550 planes, and replace them with antennas from a competitor.  At the time, that represented more than one-sixth of Gogo's entire fleet of commercial aircraft.  Each so-called "de-installed" plane would be an

immediate and permanent reduction in Gogo's revenue. Unless Gogo was able to replace the lost American Airlines planes with new customer planes, the Company faced serious cash-flow issues, potentially even existential if it was unable to service its debt. Further, the Company was entering into expensive contracts to buy satellite capacity to provide internet based on its expected 2Ku installations, and the Company would have to pay for that bandwidth whether it used it or not. Without installed 2Ku systems generating revenue, the satellite contracts would represent an enormous fixed cost that would not be generating any revenue, further exacerbating cash-flow problems.

249.    Third, Gogo could not afford to lose the contracts it had to install 2Ku on the planes of its other biggest customer, Delta Airlines. As of December 31, 2016, just before the start of the Class Period, revenue from planes operated by Delta accounted for approximately 27% of Gogo's revenue and planes operated by American Airlines accounted for 23%. If Delta were to hold off on installing 2Ku, or worse, switch planes to a competitor as American Airlines had, it would be disastrous. Perhaps recognizing this, Gogo focused on installing 2Ku on Delta, and installed over 200 of the contracted planes before the end of 2017.

250.    Fourth, Gogo was actively selling the 2Ku system to potential new customers, and entering into long-term contracts to install the system on planes. In February 2017, the Company had contracts to install 2Ku on approximately 1,500 planes, but often spoke of the Company's potential in terms of the 20,000 commercial aircraft comprising the global aircraft market. Potential customers might be hesitant to sign on to install defective hardware on their planes.

251.    Fifth, Defendants had committed substantially all of Gogo's cash and assets to launching 2Ku and were therefore highly motivated to conceal a defect that would undermine that launch.

252.    Finally, Defendants understood that investors and analysts were aware of the many problems Gogo faced if 2Ku was unsuccessful, and knew that disclosing a serious defect in the roll-out, with an unknown date for solving the problem, would almost certainly lead investors to revalue the Company, driving down the stock price. A drop in stock price could further exacerbate the issues facing the Company, raising the cost of capital, and further imperiling the viability of the business.

253.    Given the above, Defendants were motivated to conceal, and later downplay, the seriousness of the de-icing issue to buy time to either find a remedy or increase the number of planes that would have 2Ku installed before customers paused or cancelled installations.

## VIII.    CORPORATE SCIENTER ALLEGATIONS

254.    Throughout the Class Period, Defendants Small, Smagley, Rowan, and Wade served as CEO, CFOs, and COO. The CEO and CFO Individual Defendants signed each of the Class Period SEC filings on behalf of Gogo. The Individual Defendants, therefore, acted with apparent authority to speak on behalf of the Company and their statements were made with the imprimatur of the Company that selected them to speak on its behalf. Moreover, the Individual Defendants were highly involved in the preparation, review, finalization, and issuance of the Company's financial statements, and investors relied on their honesty and integrity.

255.    Based on the foregoing, the Individual Defendants' actions, knowledge and scienter are imputable to Gogo at all times during the Class Period. The Individual Defendants acted as an agent of Gogo, both with respect to the SEC filings that they signed and also with respect to the SEC filings and earnings releases that they assisted in preparing and/or that they oversaw or participated in the accounting for. Therefore, the Individual Defendants' knowledge and states of mind are imputable to Gogo for all of the challenged statements in this Complaint, whether or not they personally signed those statements.

256.    As alleged herein, corporate scienter can be inferred separately and apart from the scienter of the Individual Defendants.

## IX.    LOSS CAUSATION

### A.    Defendants' False and Misleading Statements Artificially Inflated the Price of Gogo Securities

257.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Gogo securities and operated as a fraud or deceit on Class Period purchasers of Gogo securities by misrepresenting the Company's true state of affairs and prospects, and omitting to disclose issues impacting the performance of 2Ku, the Company's planned installation schedule, and the Company's anticipated future costs and revenues in connection therewith.

258.    Defendants' false and misleading statements had their intended effect and directly and proximately caused Gogo securities to trade at artificially inflated levels, with common stock reaching a Class Period high of $14.76 per share.

259.    As a result of Defendants' fraudulent conduct as alleged herein, the price at which Gogo securities traded was artificially inflated throughout the Class Period.  When Lead Plaintiff and other members of the Class purchased their Gogo securities, the true value of those securities was greatly lower than the prices actually paid.  As a result of purchasing Gogo securities during the Class Period at artificially inflated prices, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

260.    In addition, Defendants assured investors that installed 2Ku systems were performing as or better than anticipated, that the Company expected related investments to

decrease and margins to improve, and that the Company anticipated meeting its schedule for installing 2Ku systems. Defendants' assurances were nothing more than a further attempt to mislead the market's expectations for the Company. To that end, Defendants' false and misleading statements maintained and increased the artificial inflation in the price of Gogo securities.

261. As a result of Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to the Defendants, Lead Plaintiff and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Gogo securities at artificially inflated prices during the Class Period. Had Lead Plaintiff and other members of the Class known the truth, they would not have made such purchases.

### B. When the Market Learned the Truth, the Price of Gogo Common Stock Fell Dramatically

262. When the misrepresentations and omissions that Defendants had concealed from the market were revealed through the series of partial disclosures beginning on February 22, 2018, and continuing through the close of the market on May 8, 2018, the price of Gogo common stock fell dramatically, causing substantial losses to investors.

#### 1. The February 22, 2018 Disclosure

263. On February 22, 2018, Gogo announced its fourth quarter and year-end operating and financial results for 2017. In its filings and on the conference call that day, Defendants revealed for the first time that 2Ku was experiencing problems with de-icing fluid. During the conference call, Defendant Wade stated, in pertinent part, that 2Ku was experiencing "early-stage growing pains" and "on some aircraft we saw degraded reliability." However, Defendant Wade misleading assured investors that Gogo had "identified the root cause of all these issues

and have fixes for all of them that have either been deployed or are in the process of being deployed." Defendants did not disclose the full extent of the problem and stood by their previous guidance to investors. Defendants' disclosures about Gogo's 2Ku installations served as a partial corrective disclosure. In response to Gogo's partial corrective disclosure, Gogo's stock price fell steadily throughout the day. Gogo's stock closed at $10.51 per share on February 21, 2018. By close of market on February 22, 2018, the price had declined to $9.13 per share (and, in fact, declined further the next day to close at $8.88 per share on February 23, 2018).

### 2. The May 4, 2018 Disclosure

264. On May 4, 2018, investors finally discovered the true extent and severity of the 2Ku installation problems. While discussing the Company's first quarter financial earnings for 2018, Defendants disclosed that the installation design defect for the 2Ku systems was much worse than previously disclosed. One analyst, in particular, wrote that "Gogo had previously disclosed that de-icing fluid leaking into antenna radomes had caused service failure on some of its newly installed 2Ku aircraft. On its new CEO's first earnings call, the [C]ompany revealed the problem was much worse than initially thought, with service availability plunging to the mid-80% vs. the [C]ompany's targeted 98-100% level." In response to Defendants' May 4, 2018 disclosures, the Company's shares fell $1.73 per share to close at $7.86 per share on May 7, 2018 (from $9.59 per share on May 3, 2018).

265. On May 8, 2018, Moody's downgraded Gogo. Moody's decision to downgrade Gogo was based, in large part, on the financial and operational difficulties the Company encountered with its 2Ku systems. The Company's shares fell an additional $2.80 per share, on exceptionally high trading, to close at $5.06 per share on May 8, 2018. The decline in the price of Gogo's stock as a result of the Moody's downgrade was causally related to the fraud alleged herein.

266.    From an intra-Class Period high of $14.76 per share on September 11, 2017, Gogo's stock declined to $5.06 per share following the close of the Class Period.  In total, Gogo's market capitalization declined by more than $750 million.

## X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

267.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Lead Plaintiff and other members of the Class purchased Gogo securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

268.    At all relevant times, the market for Gogo's common stock was an efficient market for the following reasons, among others:

(a)    Gogo's common stock met the requirements for listing and was listed and actively traded on the NASDAQ Exchange, a highly efficient and automated market;

(b)    as a regulated issuer, Gogo filed periodic public reports with the SEC and the NASDAQ;

(c)    Gogo communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Gogo was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

(e)     Unexpected material news about Gogo was reflected in and incorporated into the Company's stock price during the Class Period.

269.     As a result of the foregoing, the market for Gogo's common stock promptly digested current information regarding Gogo from all publicly available sources and reflected such information in Gogo's stock price.  Under these circumstances, all purchasers of Gogo's common stock during the Class Period suffered similar injury through their purchase of Gogo's common stock at artificially inflated prices, and a presumption of reliance applies.

270.     Lead Plaintiff is also entitled to a presumption of reliance under the United States Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, as Defendants' misstatements throughout the Class Period were primarily ones of omission, in that they failed to inform investors about the existence and expected impact of the de-icing issue.

## XI.     CLASS ACTION ALLEGATIONS

271.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Gogo securities during the Class Period (the "Class").  The following are excluded from the Class: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Gogo during the Class Period; (iv) any firm, trust, corporation,

or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

272. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Gogo has approximately 83.77 million shares of stock outstanding, owned by thousands of investors.

273. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

      (a) whether the Exchange Act was violated by Defendants;

      (b) whether Defendants omitted and/or misrepresented material facts;

      (c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

      (d) whether Defendants knew or deliberately disregarded that their statements were false and misleading;

      (e) whether the price of Gogo common stock was artificially inflated; and

      (f) the extent of damage sustained by Class members and the appropriate measure of damages.

274. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

275.     Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

276.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XII.     SAFE HARBOR

277.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

278.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

279.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Gogo who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by the Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants

expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XIII.   CAUSES OF ACTION

### COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

280.    Lead Plaintiff incorporates ¶¶ 1-279 by reference.

281.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

282.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Gogo common stock during the Class Period.

283.    Lead Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Gogo common stock and other securities.  Lead Plaintiff and the other members of the Class would not have purchased Gogo common stock and other securities at the prices they paid, or at all, if they had

been aware that the market prices had been artificially and falsely inflated by Defendants'
misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

284.    Lead Plaintiff incorporates ¶¶ 1-279 by reference.

285.    The Individual Defendants acted as controlling persons of Gogo within the
meaning of §20(a) of the Exchange Act.  By virtue of their positions with the Company,
ownership of Gogo stock, and participation in and/or awareness of the Company's operations
and finances, the Individual Defendants had the power and authority to cause Gogo to engage in
the wrongful conduct complained of herein.

286.    The Individual Defendants were provided with or had unlimited access to copies
of the Company's reports, press releases, public filings and other statements alleged herein to be
misleading prior to and/or shortly after these statements were issued, and had the ability to
prevent the issuance of the statements or cause the statements to be corrected.

287.    The Individual Defendants had direct and supervisory involvement in the day-to-
day operations of the Company and regularly spoke on behalf of the Company.  They exercised
control over the operations of Gogo and had the power to control the public statements about
Gogo giving rise to the securities violations as alleged herein, and exercised the same.

288.    Gogo violated §10(b) and Rule 10b-5 by its acts and omissions as alleged in this
Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are
liable pursuant to §20(a) of the Exchange Act for Gogo's violations of §10(b).  As a direct and
proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class

suffered damages in connection with their purchases of the Company's stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiff's counsel as Class counsel;

B.    Awarding Lead Plaintiff and the members of the Class damages in an amount to be proven at trial, including interest;

C.    Awarding Lead Plaintiff's reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: July 22, 2020

Respectfully Submitted,

**LUBIN AUSTERMUEHLE**

*/s/ Peter S. Lubin*
Peter S. Lubin
360 West Butterfield Road, Suite 325
Elmhurst, IL 60126
(630) 333-0002
Email: Peter@L-A.law

*Liaison Counsel for Lead Plaintiff*

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton (admitted *pro hac vice*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

-and-

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 432-1495
Email: rprongay@glancylaw.com
Email: csadler@glancylaw.com

*Counsel for Lead Plaintiff*
*and Co-Lead Counsel for the Class*

**LABATON SUCHAROW LLP**
James W. Johnson
Serena P. Hallowell (admitted *pro hac vice*)
David J. Schwartz (*pro hac vice* forthcoming)
Thomas W. Watson (admitted *pro hac vice*)

140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email: jjohnson@labaton.com
Email: shallowell@labaton.com
Email: dschwartz@labaton.com
Email: twatson@labaton.com

*Additional Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Peter S. Lubin, the undersigned attorney, hereby certify that on July 22, 2020, I caused

to be served a copy of the foregoing document via the Court's CM/ECF system, on all counsel of

record.

*/s/ Peter S. Lubin*
Peter S. Lubin